IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA        )
                                )
        v.              )  CRIMINAL NO. 04-36 ERIE
                                )
MAURICE FRANCIS FOLEY           )


SENTENCING
_____


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Thursday, July 28, 2005.


APPEARANCES:
_____
            CHRISTIAN A. TRABOLD, Assistant United States
            Attorney, appearing on behalf of the Government.

DAVID A. SCHROEDER, Esquire, appearing on behalf
of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

```
1              I N D E X
               _ _ _ _ _

2

3      WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS
       _____          _____  _____  _____  _____

4   FOR THE GOVERNMENT:

5   Eric Reese            13     46     49      --

6

7   FOR THE DEFENDANT:

8   James Peterson       58     61     --      --

9

10

11              - - -
```

12

13

14     EXHIBITS:                    IDENTIFIED     ADMITTED
       _____                    _____     _____

15   FOR THE GOVERNMENT:

16   Government Exhibit 1              13            50

17   Government Exhibit 2              39            50

18

19

20

21

22

23

24

25               - - -

3

1               P R O C E E D I N G S
                – – – – – – – – – – –

2

3         (Whereupon, the proceedings began at 10:00 a.m., on

4   Thursday, July 28, 2005, in Courtroom C.)

5

6          THE COURT:  This is the time set for sentencing in

7    the case of United States versus Maurice Francis Foley, at

8    Criminal Docket No. 04-36 Erie.  The first item of business is

9    to take up several objections to the presentence investigative

10   report that have been filed by counsel for the defendant.  Are

11   you ready to address those, Mr. Schroeder?

12          MR. SCHROEDER:  Yes, your Honor.

13          THE COURT:  Why don't you come up to the podium.

14          MR. SCHROEDER:  Your Honor, with respect to

15   objection number one, the presentence investigative report

16   adding two points for obstruction of justice.  This obstruction

17   of justice is premised upon letters which were written by the

18   defendant, at the time of his plea we acknowledged that he

19   wrote these letters.  Our contention is that these letters do

20   not rise to the level of obstruction of justice.  It is one

21   co-defendant communicating with another co-defendant, talking

22   about in large part asserting the right to remain silent in

23   many of these instances.  And that we do not believe as a

24   matter of law these letters that were written rise to the level

25   of obstruction of justice.

1     THE COURT:  You made another argument, though, with

2  respect to the alleged inappropriateness of enhancement for

3  obstruction, that was I'm not permitted to do that fact finding

4  after United_States_v._Booker?

5     MR. SCHROEDER:  I believe that's an open question,

6  your Honor.  I understand the case law that was presented by

7  the United States Attorney --

8     THE COURT:  For purposes of this hearing, that's

9  your position, is that correct?

10     MR. SCHROEDER:  That is correct.

11     THE COURT:  All right.  Is there anything else that

12  you want to tell me about your objection to a two-point upward

13  adjustment for obstruction of justice?

14     MR. SCHROEDER:  Nothing further with respect to that

15  point, your Honor.

16     THE COURT:  All right.  You also object to a

17  four-point enhancement by the probation officer as a leader or

18  organizer under 3B1.1, is that right?

19     MR. SCHROEDER:  That is correct, your Honor.

20        THE COURT:  Tell me about the nature of your

21  objection to that?

22        MR. SCHROEDER:  Your Honor, the indictment period

23  covers a time period of approximately six years.  The

24  indictment period is from May of 1998 through August of 2003.

25  During that entire time period, there were large portions of

5

1  this time period in which Mr. Foley was incarcerated and simply

2  could not have been the leader or organizer of this conspiracy

3  during that time period.  And when you compare his involvement

4  to other involved individuals in this matter, his involvement

5  does not rise to a four-point level above other individuals who

6  have been involved in this conspiracy.

7        THE COURT:  If he was not the leader or organizer,

8  who was?

9        MR. SCHROEDER:  I believe that there were a number

10  of people who shared culpability for that, your Honor.

11  Particularly, during the time period that he's incarcerated, he

12  simply cannot be a leader or organizer.  There are a number of

13  people who have shared responsibility.  That having been said,

14  a more appropriate upward departure would be a lower point, I

15  believe a two-point upward departure as opposed to a four

16  point.

17          THE COURT:  Now, with respect to your request for a

18  downward departure, which post-Booker I'll call it a departure
    _____

19  under 4A1.33, and that is he has a criminal history category of

20  VI, and it is your contention that the criminal history

21  category of VI significantly over-represents the seriousness of

22  his criminal activity or the likelihood that he will commit

23  other crimes, is that right?

24          MR. SCHROEDER:  That is correct, your Honor.  There

25  is no doubt that Mr. Foley has a criminal past, a past of


                                    6


1  convictions.

2          THE COURT:  Is it a long criminal past?

3          MR. SCHROEDER:  If you examine the offenses that

4  he's been charged with and under the facts of those offenses,

5  one of them was a theft of a newspaper box.  Another offense

6  was the breaking and entering of a laundromat.  They're petty

7  theft offenses.  There's a drug conviction from Missouri.

8    There's another petty theft offense.  And as I indicated, the

9    possession charge.

10          If you look at all of those offenses, your Honor,

11   there are no victims, no one was ever injured in any of this

12   conduct.  These are property offenses, which the aggregate

13   effect of which is to take him to the highest criminal history

14   category.  As I indicate in my motion or my objections itself,

15   it adds, I believe, a total of 120 months to his sentence.

16   The sentencing range which the court -- 225 months is the

17   maximum range that can be imposed.  That is just

18   disproportionate to the type of conduct he was involved in.

19          THE COURT:  Where do you think he should be?  What

20   do you this think his criminal history category should be -- if

21   there were to be departure based upon his previous pattern of

22   criminal activity, what in your view would be an appropriate

23   landing place?

24          MR. SCHROEDER:  We felt through the course of

25   negotiating the plea in this matter, our feeling was this would

7

1    be an appropriate VI, as opposed to a category VII at most in

file:///A|/FOLEYSNG.TXT

2  this instance.  The aggregate effect of that is to add 10 years

3  to his sentence based on this prior criminal conduct.

4         THE COURT:  And finally, I say finally, I might have

5  missed one of the objections, please feel to correct me, but at

6  pages two and three of your objections, you object to the

7  criminal history calculations made at paragraphs 54, 62 and 64

8  of the presentence report, is that right?

9         MR. SCHROEDER:  That's correct, your Honor.

10         THE COURT:  Is there anything you want to tell me

11  about those beyond what you may have told me in the objections

12  in your papers?

13         MR. SCHROEDER:  Yes, if you examine the length of

14  time which has transferred with respect to these offenses,

15  admittedly part of the time he's been incarcerated, but if you

16  examine the aggregate of those offenses relative to the time

17  they were committed, we believe that the entire effect of it so

18  overstates his prior criminal history and puts him in a

19  category that is just disproportionate to both his criminal

20  history, which ultimately yields a sentencing guideline range

21  which is disproportionate to this individual, his history and

22  the crimes committed, particularly, with respect to other

23  co-defendants in this matter, all of whom share culpability.

24      THE COURT:  All right.  Is there anything else you

25  want to tell me, Mr. Schroeder, relative to your objections?


8


1      MR. SCHROEDER:  We would stand on the objections as

2  filed and the arguments we have made, your Honor.

3      THE COURT:  Thank you.  Mr. Trabold.

4      MR. TRABOLD:  Your Honor, if the court wishes to

5  hear testimony on these issues, we have testimony to present on

6  both the obstruction and the leader/organizer.

7      THE COURT:  Let me hear what you first have to say

8  by way of argument, then I will determine whether it will be

9  useful to take some testimony.

10      MR. TRABOLD:  Sure.  With regard to the Booker
                                                      ‾‾‾‾‾‾

11  issue, the case law is clear and, in fact, the Supreme Court in

12  Booker itself made clear that Booker does not stand for the
    ‾‾‾‾‾‾                  ‾‾‾‾‾‾

13  proposition that a jury has to find beyond a reasonable doubt

14  what I'll call sentencing factors as they were called under

15  Blakely and those line of cases.  In effect, not only in Booker
    ‾‾‾‾‾‾‾‾                                                ‾‾‾‾‾‾

16   did they say that you are empowered to find facts relative to

17   this defendant by a preponderance of the evidence, but all of

18   the circuit cases that have come after Booker have said the
                                  _____

19   exact same thing.  They have in fact specifically enumerated in

20   the cases that judicial fact finding is permitted as long as

21   the court makes that finding to a preponderance of the

22   evidence.  There isn't a single case that holds otherwise.  So

23   Booker itself and the line of cases that follow Booker do not
     _____                       _____

24   support the defendant's position in this case.

25          With regard to the obstruction of justice issue.


                                    9


1   The letters that were attached to the government's motion to

2   admit evidence which were filed prior to what we thought was

3   going to be a trial in this case, I believe it's either 30 or

4   32 letters.  Those letters are part of the record in this case

5   and those letters make it very clear that on a multitude of

6   different occasions, as evidenced by the letters, Mr. Foley

7   obstructed justice.

8          There has to be at least a dozen letters where Mr.

9   Foley wrote a letter to a co-defendant telling them one of a

10  number of things.  Hide evidence, get rid of evidence, don't

11  talk to the police, don't sign anything.  If you do talk to the

12  police, don't tell them anything.  Really, your Honor, you

13  couldn't have a starker example of obstruction of justice than

14  this case represents.  Almost every one of the 30 letters

15  represents an instance where Mr. Foley attempted to obstruct

16  justice by hindering the government's investigation.

17        THE COURT:  For the record, Mr. Trabold, could you

18  indicate because I may take some testimony, I presume you are

19  prepared to offer some testimony as to the content of the

20  letters?

21        MR. TRABOLD:  Yes.  Not of every letter, but I

22  picked out what I think is a representative sample.

23        THE COURT:  The aspects, in your view, that would

24  reflect obstruction?

25        MR. TRABOLD:  Correct.


10


1         THE COURT:  Would you indicate for the record who's

2   with you today at counsel table?

3          MR. TRABOLD:  Trooper Eric Reese is here, your

4    Honor, prepared to testify in that regard.

5          THE COURT:  All right.

6          MR. TRABOLD:  With regard to leader/organizer issue,

7    your Honor, the letters represent significant evidence again

8    that Mr. Foley was the leader and/or the organizer of this

9    conspiracy.  And defense counsel's primary argument to the

10   contrary of that is that Mr. Foley was incarcerated through a

11   portion of this conspiracy.  Well, the letters, number one,

12   show that he's the leader of this conspiracy simply because,

13   again, in almost every letter, there are directions from Mr.

14   Foley on what the other people in the conspiracy should do.

15   Again, hide evidence, get rid of evidence, don't talk to the

16   police.

17          But even beyond that, specific letters to people go

18   to these people and collect debts from them.  And in fact if

19   they're reluctant to pay you, show them this letter so that

20   they know that they should pay me the money.  In fact, in some

21   of the letters that I plan on introducing, Mr. Foley even

22   delineates portions of the letter that are specifically

23   addressed to specific people.

24          Beyond that, the letters make clear, in fact,

25  Michael Foley agreed to this when he pled guilty, that during


11


1  the course of this conspiracy, after Maurice Foley was arrested

2  in this case, Mr. Foley instructed his cousin, Michael Foley,

3  to go to Eric Dunn and get and collect a drug debt.  And if you

4  have to get rough with Eric Dunn and in fact that was in effect

5  done in this case.  So the letters, even by their own language,

6  make it clear that Mr. Foley was the leader of this conspiracy.

7          But perhaps what is even more important is they

8  completely counter the argument that Mr. Foley couldn't have

9  been the leader in this conspiracy from jail because subsequent

10  to his arrest on April 17th of 2003, he was leading this

11  conspiracy from jail by virtue of sending all these letters

12  out.  So the letters make it clear that Mr. Foley retained and

13  in fact exercised complete control over the conspiracy, even

14  when he was in jail, and he did so by writing letters to people

15  and providing instructions to people in prison when they came

16  to visit him.

17          THE COURT:  What is your response to their request

18  for a downward departure on the basis that the criminal history

19  category of VI is over-representative?

20          MR. TRABOLD:  Your Honor, according to Shoupe, the
                  _____

21  only way you can grant that downward departure is if you find

22  that it significantly over-represents his criminal history.

23          Mr. Foley has five adjudications as a juvenile for

24  delinquency.  Those range from relatively minor property

25  offenses to a burglary offense, a conspiracy to commit a


                              12


1   burglary offense.

2           Subsequent, within months after becoming an adult at

3   18 years of age, Mr. Foley then continued on with his criminal

4   activity, and all told has 12 adult convictions.  And on every

5   one, almost every one of those adult convictions, his parole or

6   probation was revoked and his adult burglary conviction, his

7   parole was revoked three times.

8           There simply is no period of Mr. Foley's life when

9   he was not engaging in criminal activity and/or in jail

10  subsequent to the age of 15.  So it's strange credulity to even

11  begin to argue that Mr. Foley's criminal history category

12    significantly over-represents the seriousness of his past.

13    Especially when you consider that Mr. Foley committed the

14    offenses he's here on today while he was absconding from parole

15    for one of his prior offenses.

16          We ask that you just consider all of that in finding

17    that no downward departure for that reason should be granted.

18          THE COURT:  All right.  Let's take some testimony on

19    the issue of obstruction.

20          MR. TRABOLD:  Your Honor, the government calls

21    Trooper Eric Reese.  Do you need any testimony on the

22    leader/organizer issue?

23          THE COURT:  Well, to a large extent, wasn't it your

24    position in the papers that the information relative to

25    obstruction also informs on the issue of leader/organizer?


                                    13


1          MR. TRABOLD:  Yes, it's all tied together.

2          THE COURT:  Would you spell your name for my court

3    reporter, please?

4          THE WITNESS:  Eric, E-r-i-c, Reese, R-e-e-s-e.

5          ERIC REESE, GOVERNMENT WITNESS, SWORN

6          DIRECT EXAMINATION

7    BY MR. TRABOLD:

8    Q.    Sir, where are you employed?

9    A.    Pennsylvania State Police in Erie.

10   Q.    How long have you worked there?

11   A.    Twenty-two years now.

12   Q.    I show you what I marked as Government's Exhibit No. 1

13   and ask if you can identify that?

14   A.    This is a stack of handwritten letters that we obtained

15   relative to Mr. Foley sending out to co-defendants in this

16   case.

17   Q.    Okay.  That would be the stack of letters that were

18   attached to the government's motion to admit evidence?

19   A.    To my knowledge, yes.

20   Q.    And you're the trooper that has come to be in charge of

21   the investigation against Mr. Foley?

22   A.    Yes, I am.

23   Q.    The letters that make up Government's Exhibit No. 1 were

24   either obtained during the course of the execution of search

25   warrants or from co-defendants themselves who received the

1  letters from Mr. Foley?

2  A.   Yes.

3       MR. SCHROEDER:  I would object to the leading nature

4  of the questioning.

5       THE COURT:  Overruled, go ahead.

6  BY MR. TRABOLD:

7  Q.   Now, what I would like to do is go through some of the

8  letters, the document reader is a little fuzzy, so what I'm

9  going to have to do is show you letters, individual letters

10  themselves and ask you to go over them with me, okay?

11  A.   Okay.

12       MR. TRABOLD:  Your Honor, I've already marked as

13  Government's No. 1 the whole stack of letters, do you want me

14  to individually mark each letter?

15       THE COURT:  It's not necessary.

16       MR. TRABOLD:  Defense counsel has been provided the

17  stack of letters both today and previously, your Honor.

18  BY MR. TRABOLD:

19  Q.   Now, with regard to the first letter on the stack that

20  I've just handed you, that's a letter written by Mr. Foley to

21  who?

22  A.   It says Jeff, that would be Jeff Artello.

23  Q.   Has Mr. Artello been interviewed with regard to this

24  letter?

25  A.   Yes, he has.


                              15


1  Q.   Has he indicated to the government during the course of

2  his cooperation that he received the letter from Mr. Foley?

3  A.   Yes, he did.

4       MR. SCHROEDER:  Objection, to hearsay, your Honor.

5       THE COURT:  Overruled.

6  BY MR. TRABOLD:

7  Q.   Just so we can make it clear with regard to any letter

8  that you're going to testify to received by Mr. Artello, were

9  those letters seized during the course of the execution of a

10  search warrant?

11  A.   Yes, they were.

12  Q.   And that search warrant was executed on Mr. Artello's

13  residence?

14  A.   Correct, in Albion.

15  Q.  I want to direct your attention to the bottom portion of

16  the first page of the letter.  It says -- do you see where it

17  starts "do not worry?"

18  A.  Yes.

19  Q.  Can you please read what follows there up to the

20  following paragraph?

21        THE COURT:  Loudly and slowly, please, trooper.

22        THE WITNESS:  It says "do not worry, I am just like

23  you when it comes to pigs, I answer nothing, know nothing.  I

24  consider you my good friend and secrets are safe with me."

25  Do you want me to proceed?


                                16


1  BY MR. TRABOLD:

2  Q.  I want you to turn to the next page.  See the paragraph

3  where it begins "Sheister?"

4  A.  Yes.

5  Q.  Please read that paragraph all the way down to the next

6  paragraph?

7  A.  "Sheister was there when I got arrested.  I'm worried

8  they will try to contact him (they let him go) for questioning.

9  I don't really think he is a snitch, but he thinks he can talk

10  his way out of anything.  I don't want him to say anything, as

11  he thinks he is talking his way through something, he is giving

12  them little pieces of information that will or may turn into

13  trouble.  Please contact him and explain this to him and tell

14  him to keep his mouth shut.  Not one word.  Make sure he

15  understands.  You know what I mean, tell him especially not to

16  sign anything.  Once he signs a paper saying he just is

17  confirming on paper that they are" -- excuse me, "that they had

18  a meeting, but it is not admission of any guilt, they can say

19  that he said anything they want and it will be their word

20  against his.  You know how they work.  Please contact him and

21  explain all this to him."  It provides a phone number.  "I

22  think his address is 914 Hess, Lake Erie Restoration is his

23  business name.  His big mouth can really sink ships.  Thank you

24  very much for all your help, you know I will pay you back."

25  Q.    Now, just so we're clear on the record, who does the


17


1  investigation reveal Sheister is?

2  A.    Eric Dunn.

3  Q.   Has Mr. Dunn indicated that himself, that he's Sheister?

4  A.   Yes, he has.

5  Q.   I want you to look at the bottom of the letter, there

6  appears to be a p.s. portion after the signature?

7  A.   Correct.

8  Q.   As best you can, can you read that into the record?

9  A.   Some of it's blurred -- "like anything you can from the

10  house and store it please, my camper supposedly was broken

11  into.  We definitely need to empty the contents and relocate

12  them to your place.  Bring the whole fucking thing to your

13  place if possible, use my dually, I will provide you with the

14  numbers to open the thing inside.  Somebody stole 45, money I

15  had put away for ponds, I think it is the same person who broke

16  in the camper, I'll tell you who later, I can't piss anyone off

17  now."

18  Q.   Okay.  Can you please turn to the next letter that I

19  provided you.

20  A.   (Witness complies.)

21  Q.   And the date appearing on that letter is what?

22  A.   Yes.

23  Q.   What's the date?

24  A.   5/9 of '03.

25   Q.   The letter is addressed to who?


18


1   A.   It states "Tattoo".

2   Q.   Do you know from your investigation who Tattoo is?

3   A.   Yes, it's Jeff Artello.

4   Q.   Has Mr. Artello indicated that himself?

5   A.   Yes, he did.

6   Q.   This again is a letter from Mr. Foley to Jeff Artello?

7   A.   Yes, it is.

8   Q.   I want you to look at the bottom paragraph of the letter

9   where it begins "I'll put you on my visiting list?"

10   A.   Yes.

11   Q.   Can you read that paragraph, please?

12   A.   "I'll put you on my visiting list as soon as I can.  We

13   can only add on visitors between the 1st and 5th of the month,

14   so you won't be on until about June 10th.  If you are doing

15   good with the money, I think the bill is about 7950 or so,

16   remember the 150 for what I cut off the brown brick for Nancy.

17   But whatever, I'm just glad you're helping a lot.  You know I'm

18   never picky over the small things.  I say it's okay to spend 25

19   percent or so on wildfire parts.  I'd like you to keep a few

20   grand on hand to give to Hatrack for the lawyer if he needs

21   it."

22   Q.   I want you to turn to the next page?

23   A.   Next page or next letter?

24   Q.   Next page.  It says that, the beginning portion of it

25   there where it says "we are arranging more work," do you see

19

1   that there -- right up near the top?

2   A.   Yes.

3   Q.   Can you read about maybe five lines down there through

4   that sentence?

5   A.   "We are arranging more work for you to do with the car

6   dealer guy as the bill gets down and as you need it.  Hatrack

7   should have brought over that heavy thing that is locked.

8   Please keep it safe.  I feel like I can trust you more than

9   most not to break into things and help yourself.  I will give

10   you the combo when needed.  You have most of my shit now and I

11   know you will take good care of it.  Thank you."

12   Q.   Now, with regard to the heavy thing that is locked, what

13  has the investigation revealed that heavy thing was?

14  A.    That was a safe.

15  Q.    And does that information come from multiple sources?

16  A.    Yes.

17  Q.    And where was the safe before it was brought to Mr.

18  Artello's house?

19  A.    That safe would have been, it started at Mr. Bole's

20  residence, it went to another residence and then to Mr.

21  Artello's.

22  Q.    And it contained -- did the government ultimately execute

23  a search warrant on that safe?

24  A.    Yes, we did.

25  Q.    What was inside the safe?


20


1  A.    I believe approximately 30 pounds of marijuana.

2  Q.    I want you to turn to the next letter in the stack.

3  What's the date on that letter?

4  A.    June 10, 2003.

5  Q.    I want you to turn to the second page, and you'll see

6  maybe four or five lines above that dark rectangle where it

7   says "Hatrack said you gave him," do you see it there?

8   A.   Yes, I have it.

9   Q.   Okay.  Start reading from that and read down to the next

10  paragraph?

11  A.   It says "Hatrack said you gave him another two grand, I

12  have the bill that at 5950.  What do you have.  You have to let

13  me know what you gave Hatrack because he isn't any good at

14  keeping track.  Just give a list of what the car parts are.  I

15  know you keep a detailed list.  Let me know if 5950 sounds

16  right to you.  I have Hat working on getting the numbers to

17  that thing.  I have them hidden somewhere in code, I need him

18  to bring me the numbers in here so I can look at them and

19  decipher the code to get the correct numbers.  I'm gonna have

20  him take 2 blocks out of there, one for you and one for someone

21  else."

22  Q.   And Mr. Artello was interviewed with regard to the

23  contents of this letter?

24  A.   Yes, he was.

25  Q.   And what did he indicate with regard to the 5950, what

21

1  was 5950?

2       MR. SCHROEDER:  Note my continuing objection, to the

3  hearsay, your Honor.

4       THE COURT:  Hearsay does not obtain in this

5  proceeding, overruled.

6  BY MR. TRABOLD:

7  Q.   What did Mr. Artello say the 5950 was?

8  A.   It was money he owed Mr. Foley for drugs.

9  Q.   Was his drug debt to Mr. Foley?

10  A.   Yes.

11  Q.   I want to turn to the letter dated June 24, 2003.  I want

12  you to turn to the last page of the letter.  Read from the

13  beginning of the last page about halfway down to where it stops

14  at $208?

15  A.   It says "so how is the car dealer doing?  He's about the

16  same as Sheister.  Sheister is fucking me out of a lot of

17  money.  He owes me $4,300 and Hatrack about $4,000.  He

18  borrowed $6,000 from Hatrack and bought some land.  He was

19  trying to sell it to me for $30,000 before he even paid Hatrack

20  the original loan.  He got Hatrack to keep it secret from me

21  for a year.  Do you believe he used my money, Hatrack's money

22  is my money, to buy land only to sell it back to me at a 500

23  percent markup without even paying back the original loan.

24  What a piece of shit.  I'm gonna beat the shit out of him.  I

25  sent my cousin over to rough him up and after throwing him


22


1  through a few walls, he dug in his pockets and pulled out only

2  $208."

3  Q.   I want you to turn to the next letter dated July 14th.  I

4  want you to read at the beginning there all the way down to the

5  portion I have highlighted on the side.  Again, before we

6  start, this is again a letter from Mr. Foley to Jeff Artello?

7  A.   Yes, it is.

8  Q.   We know that specifically from Mr. Artello?

9  A.   Yes.

10  Q.   Okay.

11  A.   It says "Jeff, what's up.  I seen Hatrack and my cousin

12  today.  He told me he got into that thing the other day.  I

13  can't give you all these price breaks you want all the time.  I

14  need 14 for the good one and 11 for the other 9, since I will

15  probably lose considerably when they get cleaned up.  If pounds

16  of scrap is pulled out of them, I need 11, but if they yield

17  more, I might go down a little.  I might have to pay by the

18  pound for everything as is.  I never get to sift through

19  everything and take only what I want, so I can't do that

20  either, especially now that I can't even see what it is.  If I

21  don't have enough money from this shit and from what people owe

22  me, I won't be able to get more, then everything will have to

23  end.  Then no more money being made.  I always give the lowest

24  prices I can, and you know that.  I need to see or know what

25  money I even have in your bank so I know what to do.  You need


                                    23


1  to send me an itemized list.  The last count I have is 5950 and

2  2200 for those heads, not counting what you just got out of

3  that thing."

4  Q.    Okay, that's good.  Let's turn to the next page.  Can you

5  read where it says beginning, approximately where I have that

6  line drawn, "I appreciate the help?"

7  A.    "I appreciate the help from you, but I can't afford to

8  blow money now.  My main objective is to pay the lawyers to get

9  out and have enough money to take with me to continue working.

10  All of this shit so far cost me about 400K. I'll make it back

11  when I get out, but I need money to make money. We don't need

12  the money from these heads for car parts now that we got into

13  that thing. I don't like selling anything but corn, you know.

14  My cousin told me that pounds are going for 16 now that I'm

15  gone and they're hard to get. He'll take all that shit for 12

16  he said. He's been collecting for me, too. He took a car from

17  Sheister and made him sign the title. He also knows the car

18  dealer and says he's a ripoff, too. Everybody agrees on that."

19  Q.    And then just read the next paragraph?

20  A.    "Maybe you can come up Thursday with Hatrack. I'm not

21  being a jizz, I'm trying to make sure I have working capital

22  when I get out. I'm still paying $700 a month in rent and

23  bills in California. Let me know how the car is coming. We

24  don't even really need to get a dry sump right now, unless you

25  really want to. I just need money to make money or we'll be


24


1  out of jobs."

2  Q.    Turn to the next letter, please. What's the date that

3  appears in the next letter?

4  A.   Monday, July 19th of 2004.

5  Q.   And this is a letter from the defendant to who?

6  A.   States "Buddy," and I believe that would be Mr. Bole.

7  Q.   And was this letter received or given to the government

8  by Paul Bole himself?

9  A.   Yes, it was.

10  Q.   And did Mr. Bole indicate that he received that letter

11  from Mr. Foley?

12  A.   Yes, he did.

13  Q.   I want you to read where it says the -- beginning the

14  second paragraph, and I'll tell you when to stop?

15  A.   "I am very angry with you also.  You have done nothing at

16  all to help me.  I'm finding out who my real friends are now

17  that the shit has hit the fan.  After all the times you told me

18  you love me and I'm your buddy, blah-blah-blah, nothing but

19  lies and bullshit to earn brownie points.  You change your

20  numbers and avoid me like I have some kind of disease.  I can't

21  wait until I'm out and I see you in person and you try your

22  Buddy, I'm your best friend bullshit.  This shit going on is

23  the perfect test to show me who is real and who is lying, ass

24  kissing, two-faced, phony bullshiters.  There is no excuse and

25  there is nothing you can say that will ever justify you fucking

file:///A|/FOLEYSNG.TXT

25

1  me over.  I have no money on my account and I need you to send

2  me $100.  After everything I have done for you, you won't even

3  send me a lousy 100 fucking dollars."

4  Q.   Okay.  I'm going to turn to the next letter now.  This is

5  a letter dated Sunday, September 12th?

6  A.   I don't have that one.

7  Q.   Can you see it on the document reader?

8  A.   Yes, I can.

9  Q.   It's addressed to Buddy?

10  A.   Yes.

11  Q.   Would that be a letter we received from Paul Bole?

12  A.   Yes, it is.

13  Q.   From which Mr. Bole indicates came from the defendant?

14  A.   Correct.

15  Q.   Can you see it okay?

16  A.   I can read that.

17  Q.   It says, see where it starts "that's their main weapon?"

18  A.   Okay.  It says "that's their main weapon, snitches.  They

19  denied me bail.  I'll never snitch and that's the same way it

20   should be with everybody.  They will never convict you without

21   snitches.  Chrissy alone is not enough.  So hang in there and

22   don't plead guilty no matter what.  I certainly hope you'll

23   never snitch.  There's nothing to" -- I believe it's supposed

24   to be "snitch on, we're all innocent.  And then I'll see you

25   later."

26

1   Q.   Okay.  Do you have the next letter addressed to Hatrack?

2   A.   November 23rd?

3   Q.   Yes.

4   A.   Yes.

5   Q.   Now, this November 23rd letter is a letter addressed to

6   Hatrack, again sent by the defendant?

7   A.   Yes.

8   Q.   We know Hatrack from your investigation to be who?

9   A.   John Kirkpatrick.

10   Q.   Has Mr. Kirkpatrick himself acknowledged that that was

11   his nickname within the conspiracy?

12   A.   Yes, he has.

13   Q.   I want you to read this letter from the beginning all the

14  way until it's underlined nobody?

15  A.   "Since my lawyer has not been given any money for a

16  trial, I have no choice but to plead guilty and cut a deal.  If

17  I am to effectively exonerate you of any wrongdoing, I need to

18  know certain facts that only you can tell me.  I'll take all

19  the blame, but I need to get a few things straight.  If we

20  don't talk soon, I am sure we could have conflicting statements

21  that might lead them to believe you were involved, which we

22  both know you weren't.  Please come see me right away.  I see

23  the Steelers just stomped all over the Browns, ha-ha.  Destroy

24  this letter after you are done and repeat what I have said to

25  nobody."


27


1  Q.    Do you have another letter dated there 4/21/03?

2  A.    Yes.

3  Q.    And this is a letter addressed to who?

4  A.    It's addressed to Chrissy or Mother Figure.

5  Q.    And we know from the investigation that Chrissy is who?

6  A.    Christina Weber.

7  Q.    And at the time of this conspiracy, what was Christina

8  relationship to the defendant?

9  A.   She was his girlfriend.

10  Q.   It says in parenthesis there Chrissy or Mother Figure,

11  who do we know Mother Figure to be?

12  A.   It would be Ann Weber, Chrissy's mother.

13  Q.   Ann Weber herself has said she was Mother Figure?

14  A.   Yes, she has.

15  Q.   I want you to go down to the second paragraph where it

16  starts there "call some people to get some money," do you see

17  that?

18  A.   Yes.

19  Q.   Read after that, I'll tell you when to stop?

20  A.   "Call some people to get some money.  Tiffany owes me 34.

21  Call her, please.  This is not a time to be angry at her.  I

22  swear me and her never did anything together.  You can call

23  Rob, too, 456-2500, he owes 14.  Sheister, too, 440-1107.  You

24  also know where he lives.  He is at 45.  Paul will also help.

25  His number is 323-7768.  That should be enough for now.  Send

28

1  me what you can, I really need it.  I will help with the bills

2   as these people come through.  We need to figure out what to do

3   about Sandy and the garage.  I guess keeping up on the rent is

4   the best for now, until we see how long I have to be here.

5   Storage in California also is way behind.  It's $125 a month."

6   There's a note written on this, it says "Luke's on it", that

7   was written after the letter was sent.  "I need to keep that

8   paid because there is a thing like Bills, Williams, there that

9   cannot be found.  Must not."

10  Q.   Okay, that's good.  Do you have a letter dated there

11  Friday, 4/25?

12  A.   Yes.

13  Q.   And that's a letter from the defendant to who?

14  A.   To Chrissy, Christina Weber.

15  Q.   All right.  I want you to go to the paragraph that starts

16  "as for talking about borrowing money?"

17  A.   Correct.

18  Q.   Can you read there and then I'll tell you where to stop?

19  A.   "As for talking about borrowing money.  Paul owes a

20  fuckload, go to his house and tell him he better give you some

21  fucking money.  He is to respect you and treat you just like he

22  would me.  If he wants to be an asshole, I'll show him asshole.

23  I won't even start shooting threats.  If he wants to start

24  breaking our gang up, I'll really break it up.  Tell him you

25  and mother need a few thousand for bills and your lawyer, and


                                29


1  me for in here.  As for Tony, if ever wants his coins back, he

2  can give up some money too.  He's kinda broke but $500 or

3  $1,000 needs given up.  Now tell him to sell his stocks or

4  bonds, okay, whatever.  Call my Cuz, 460-1106.  He's

5  cooperative.  Tell him what happened and we really need

6  something.  $500 or $1,000.  926 West 16th is his address, I

7  think.  If Paul gives you a hard time, bring my Cuz over there

8  to start or to straighten him out.  He won't fuck around.  He

9  don't like him in anyways."

10  Q.    Okay.  Now, the next page, it starts out what?

11  A.    Excuse me.

12  Q.    What's the first line on the second page?

13  A.    It says "go out to Paul's house and show him this."

14  Q.    Is what follows a portion of the letter something that's

15  directly addressed or directly stated to Paul?

16  A.    Yes, he wants Paul to read this part, it's for Paul.

17  Q.   And Paul would be Paul Bole?

18  A.   Correct.

19  Q.   And it's a series of instructions or statements to Paul

20  about what he should do now that the defendant's in jail?

21  A.   Yes.

22  Q.   I want you to turn to the next page; what's the first

23  line of the next page?

24  A.   "Show my Cuz this part if Paul is not cooperating."

25  Q.   Can you read what it says after that, I'll tell you where

30

1  to stop?

2  A.   "Can you please put Paul back in fucking line.  He owes

3  me well over 20 bucks.  They confiscated everything that Chrisy

4  has access to.  Except the dually and shit.  She is used to me

5  taking care of her and she needs some money.  Thanks."

6  Q.   What follows after that?

7  A.   "Mother knows where Arby lives, too.  He only owes me

8  $400, so you can go up there and ask him for some.  Ask him for

9  a receipt for the tractor and snowblower, if the cops took it.

10  He's pretty cool.  Show Arby this."

11  Q.   Then there's instructions, right, from this defendant to

12  Arby?

13  A.   Yes.

14  Q.   And Arby is another person  that you know to be involved

15  in this conspiracy?

16  A.   Yes.

17  Q.   And then there's a portion after that with regard to

18  Sheister?

19  A.   Correct.

20  Q.   And what follows there is a specific instruction there to

21  be shown to Sheister from this defendant?

22  A.   Yes.

23  Q.   I want you to read where it says "yo Sheister?"

24  A.   "Yo Sheister, can you please give Chrissy some money you

25  know you owe.  You know jail doesn't stop our thing.  You know


31


1  I would help Liz if you went down, and I don't even owe you

2  money.  I will never tell just like we always talked about.

3  You know what's up.  Do I need to worry about you talking.  You

4  know what we always talked about.  As long as they can't

5    divide, they can't conquer.  There's no dividing here.  Just

6    stay the thorough brother you have always been, you know I

7    always will be.  Thanks."

8    Q.    Now, the next portion of the letter relates to this

9    defendant's sister, Carrie, owing him money, correct?

10    A.    Correct.

11    Q.    And then there is a portion of the letter that contains

12    direct instruction to Carrie?

13    A.    Yes.

14    Q.    From the defendant?

15    A.    Yes.

16    Q.    I want you to turn to -- there's a letter there dated

17    4/30/03, should be not the next letter, but the letter after

18    that, do you see that?

19    A.    Yes.

20    Q.    And that's addressed to who?

21    A.    To Mother Figure.

22    Q.    Which again is Ann Weber?

23    A.    Yes.

24    Q.    I want you to turn to the second page.  And approximately

25    halfway down there's a portion there that says, talks about

1  stuff in the storage locker, and it says "plus a very bad

2  thing," do you see that there where I have it marked?

3  A.    Yes.

4  Q.    Can you read that portion, that very brief portion?

5  A.    "Plus a very bad thing like the ones you took from

6  William and gave me, but it is much worse, it is automatic.  We

7  cannot let that be found."

8  Q.    And then it continues on, "the rent is only "125 month,

9  my friend Mr. Clarence Oday is the guy who rented it?"

10  A.    Correct.

11  Q.    Now, that portion of the letter is in reference to what?

12  A.    A storage facility in California.

13  Q.    Which the investigation reveals this defendant rented as

14  Clarence Oday; and the very bad thing that cannot be found we

15  know to be what?

16  A.    A firearm.

17  Q.    And that's the reference to it's automatic?

18  A.    Yes.

19  Q.    And the reference to William there, the thing that is

20  taken from William, who's William and what does that mean?

21   A.   William's last name escapes me now, but William used to

22   be Ann Weber's live-in boyfriend.

23   Q.   And did William at some point have guns that were taken

24   from his residence and brought to this defendant's house?

25   A.   Yes, the guns were at Ann Weber's and they live together,

33

1   Ann took them out to Mr. Foley's residence in Crawford County.

2   Q.   I want you to go down a little bit in the letter where it

3   says to get some money, see where that paragraph is?

4   A.   Yes.

5   Q.   Does that portion of the letter include instructions for

6   collecting debts?

7   A.   Yes.

8   Q.   I want you to turn to the next letter, the letter is

9   dated July 24th; it was addressed to who?

10   A.   Mother Figure.

11   Q.   Again, that is Ann Weber?

12   A.   Ann Weber, yes.

13   Q.   I want you to read that second paragraph there beginning

14   "Hatrack and Jeff?"

15  A.  "Hatrack and Jeff visited today, Hatrack told me that

16  Paul told him that after the guy refused to wear a wire and go

17  see Hatrack with some money.  He also said that Actor told Paul

18  that the cops were questioning him and showed him pictures of

19  Coin Man, Tony and Sheister mug shots wearing orange prison

20  jump suits like they were already arrested and talked.  Paul is

21  a big liar, though, I don't trust him for a second.  Watch what

22  you say to people even in person.  They may be wired.  Gary and

23  Butch are cool.  If you see Sheister, Coin Man or Actor, don't

24  say shit that is incriminating, assume they're wired.  Feel

25  them up and make them get naked if you are talking to them,


34


1  turn up the radio or the TV to drown out the voices.  Wires are

2  hard to pick up the conversation if there is excessive

3  background noise.  Watch the odd couple too.  If somebody

4  suddenly shows up with a lots of money it could be a set up."

5  Q.  Keep reading there in the next paragraph?

6  A.  "Why would they want to pay suddenly especially the

7  people I mentioned.  Somebody small like Arby or Rob would be

8  okay.  Rob is a soldier and one of my best friends.  He'd die

9   before telling.  Just be really who you let in and let talk to

10  you in your house.  Especially if it's anything to do with

11  money or me, you know who matters and who don't.  Who is a

12  threat and who isn't.  Act like you don't know nothing to

13  almost everyone.  Even turn on a radio when you're talking to

14  Hat, your house could even be wired.  They can even pick up

15  voices with a shotgun microphones through your window.  Looks

16  like they ain't got shit and are desperate to get it.  Come

17  visit so we can talk, I can play with your buttons."

18  Q.    Next letter, dated August 7th, it's addressed to?

19  A.    Mommy.

20  Q.    Who would be who?

21  A.    Would be Ann Weber.

22  Q.    Just so the record is clear, is Ann Weber this

23  defendant's mother?

24  A.    No, she's not.

25  Q.    She is the mother of this defendant's then girlfriend?

35

1   A.    Correct.

2   Q.    I want you to turn to the last page of this letter.

3   Incidentally, August 7th of 2003, were search warrants executed

4   on properties in this case on that date at Mr. Artello's house,

5   August 7th?

6   A.   I believe it was either August 6th or August 7th, I'd

7   have to check the date to be positive.

8   Q.   If this letter was written in 2003, which appears to be

9   right around the time this letter was written, is that in

10   conjunction with the time properties were being searched?

11   A.   Yes.

12   Q.   I want you to read on the last page a portion that I have

13   highlighted there which starts "oh, yeah?"

14   A.   "Oh, yeah, anything like that black notebook you said you

15   found, you should take it to the funny lady with the sewer rats

16   house for safekeeping.  Anything you think should not be found.

17   Ya know.  I need a little time to think before I can figure out

18   what to do about shit.  When she told me about fat guy, I was

19   surprised, and it was too quick for me to figure out what to

20   do.  After I thought about it, this is what I think is the

21   best."

22   Q.   Turn to the next letter dated 4/20/03, it is addressed to

23   who?

24  A.   To Chrissy.

25  Q.   And, incidentally, 4/20/03 would be three days after this


                                    36


1   defendant was arrested in this case?

2   A.   Yes, it is.

3   Q.   I want you to turn to -- turn to the second page, please,

4   and see there's that line that is underlined?

5   A.   Yes.

6   Q.   Approximately -- five lines down from there where it says

7   "please call fat guy ASAP?"

8   A.   Yes.

9   Q.   Can you please read down from there and I'll tell you

10  when to stop?

11  A.   "Please call fat guy ASAP and tell him to clean his house

12  and garage, and please tell everybody else you can think of to

13  clean up immediately.  Our house too needs cleaned.  But it is

14  probably too late.  Please do the best you can.  Notify Butch

15  also.  You can use the Honda all you need, Paul will give you

16  money as needed.  Tell mother to clean Sheister's two messes.

17  Paul can be trusted because he is a good friend.  Give anything

18  questionable to him.  Just keep track.  Anybody with cell

19  phones that I called from mine needs to change cell numbers

20  ASAP.  Please tell everyone for their own good.  Call Hatrack

21  and tell him to stay where is he.  Paul has his number.  Please

22  do all of these things and anything more you can think of for

23  everyone's good.  Please remind everybody they need not worry

24  about my lips, they are sealed and will never open until the

25  day I die.  They have my word."

37

1  Q.    Okay.  Now, incidentally, the Paul reference in that

2  letter is Paul who?

3  A.    It would be Paul Bole.

4  Q.    Were incriminating items involved in this conspiracy

5  actually taken to Paul Bole's house?

6  A.    Yes, they were.

7  Q.    Did Mr. Bole, when the police came to his house, provide

8  some of those items to the police?

9  A.    Yes, he did.

10  Q.    And was one of those items 16 pounds of marijuana?

11  A.    Yes, it was.

12    Q.    I want to show you a letter that is dated Monday,

13    February 7th; it's addressed to who?

14    A.    It says "dude".

15    Q.    And we know that to be who?

16    A.    That would have been Eric Dunn.

17    Q.    Eric Dunn.  And I want you to read it starting at the

18    beginning?

19    A.    "I don't know why you would plead guilty and snitch on

20    yourself.  I called you back at 7 p.m. and Liz was acting all

21    weird.  Like I did something to you, I'm the one going to trial

22    and I'm the one who is gonna have everybody testify against me.

23    They offered me a plea for 25 years.  They can suck a dick.  I

24    looked up your shit on the federal guidelines chart I have.

25    You're only looking at 46 months dude.  The feds only make you


38


1    do 85 percent, so you'll have to do 41 months.  You can

2    participate in a nine month program and they will take another

3    year off.  So you're looking at 29 months.  That isn't shit.

4    They're trying to get all of yous to testify against me so they

5    can hit me with 1,000 to 3,000 kilos.  That carries a minimum

6   mandatory 20 years, plus five years for the gun that wasn't

7   even mine.  They are gonna or they already have offered you a

8   5K, which is to testify against me and you get your time cut in

9   half.  So you cut 46 months in half and you'll get 23 months.

10  You'll save yourself six months to get me an extra 15 years.

11  I'm gonna really see what kind of friends I have."

12  Q.    Okay.  Last letter, this one is dated Thursday, February

13  10th, and it's addressed to who?

14  A.    To "Eric".

15  Q.    All right.  I want you to read from the beginning, I'll

16  tell you where to stop?

17  A.    "Hey I just talked to you a couple of hours ago, like I

18  was saying, you can get out in as little as 29 months.  That's

19  nothing dude.  Go get in shape, get off the booze and shit for

20  a while, etc., I'm either gonna get 20 plus years or I'm gonna

21  beat the search on appeal later this year and get out with

22  nothing.  They will have to return everything.  Even $215,000

23  plus interest they stole.  If I do beat this shit, I'll look

24  out for the people who didn't sell me out.  You fucked me on a

25  few things, but I'm kinda impressed that you're not snitching.

39

1    You don't know shit to snitch. But only time will tell. But

2    if you have to do a couple years, I'll look out, even though

3    nobody looked out for me, I'll make sure you don't lose your

4    house and shit."

5    Q.    Okay, that's good. Just so the record is clear, is that

6    a letter to Eric Dunn?

7    A.    Yes, it is.

8    Q.    I want to show you what I marked as Government Exhibit

9    No. 2, if you can identify what that is?

10   A.    This is a ledger that was recovered from the residence on

11   Hill Road. It was found in the safe at that property.

12   Q.    And the residence on Hill Road, was this defendant living

13   at that residence at the time this search was executed?

14   A.    Yes, he was.

15   Q.    And based on your experience as a trooper, well, first of

16   all, what's contained in the ledger?

17   A.    The ledger contains roughly 20 pages, I think basically

18   have the nickname on top of the page and then numbers. The

19   numbers actually represent amounts of money owed to Mr. Foley.

20   And the amounts are consistent with drug debts.

21   Q.    And the nickname at the top of each page, is it accurate

22   to say that many of those people, if not almost all of them,

23   have been identified?

24   A.   Yes.

25   Q.   They have reviewed the ledger page that refers to them?


                                    40


1   A.   Yes, they have.

2   Q.   Have those people indicated that those ledger pages

3   reference drug debts?

4   A.   Yes, they have.

5   Q.   Did you find any other person charged in this conspiracy

6   to be in possession of ledgers like that?

7   A.   No, we did not.

8   Q.   Is that the only ledger you found to be on Mr. Foley's

9   property?

10   A.   No, I believe there was a total of three ledgers

11   recovered.  I believe one was in one of the vehicles.  The

12   other one was either at the house or at the property on

13   McChesney Road, I can't say for a fact at this time which one.

14   Q.   The amounts owed are in the several hundred thousand

15   dollars?

16  A.  Yes.

17  Q.  Not just in that ledger but in all the ledgers?

18  A.  Yes.

19  Q.  Did you find Mr. Foley to be in the possession of

20  multiple safes on his property?

21  A.  Yes, he was.

22  Q.  And in those safes were located what types of things?

23  A.  Ledger books, drugs, a firearm in one safe, I believe.

24  Alias identifications.  Coin collection.  Miscellaneous

25  documents.  A lot of valuables.


41


1  Q.  Now, is it accurate to say that various co-conspirators

2  in this case were interviewed?

3  A.  Yes.

4  Q.  Many of them on multiple occasions?

5  A.  Yes.

6  Q.  Does that include both people that were charged in the

7  conspiracy and people that were not charged?

8  A.  Correct.

9  Q.  Did any of the folks that were interviewed talk about Mr.

10  Foley's ability to control the conspiracy while he was in jail?

11  A.   Yes, a number of them.

12  Q.   And what did they say in that regard?

13  A.   That Mr. Foley still ran the business, I guess you would

14  call it, while in jail.  He would contact individuals and tell

15  them what to do or he would pay and they would follow whatever

16  he instructed them to do.

17  Q.   Similar to what was done in the letters you just read?

18  A.   Yes.

19  Q.   Was Paul Butler interviewed during the course of this

20  case?

21  A.   Yes, he was.

22  Q.   Did Paul Butler reveal some information relative to this

23  defendant's garage while Paul Butler was in California?

24  A.   Yes.

25  Q.   Mr. Butler went to visit this defendant in California?


42


1  A.   Either to visit him or pick up some drugs from him, one

2  or the other, yes.

3  Q.   Mr. Butler was there during the course of transporting

4   marijuana?

5   A.   Yes.

6   Q.   Is this during the course of this conspiracy?

7   A.   Yes, it was.

8   Q.   At some point in time did this defendant take Mr. Butler

9   out to his garage?

10   A.   He took him to a residence he was living at, there was a

11   garage attached to that residence, yes.

12   Q.   What happened when they went out to the garage?

13   A.   Mr. Butler thought it was unusual because Mr. Foley took

14   him into the garage area and showed him a sizable amount of

15   U.S. currency.  And then walked away leaving Mr. Butler alone

16   in the garage with the money.

17   Q.   What did Mr. Butler take that to be?

18   A.   He took that to be a test to see if he was trustworthy.

19   And he went back in the house and he even confronted Mr. Foley,

20   he claims it was a stupid test because he was basically lost at

21   the location he was at, he wouldn't have anywhere to go if he

22   did take anything.

23   Q.   It was essentially a test to see if Mr. Butler would take

24   any of the money?

25  A.    That's the way Mr. Butler took it, yes.


43


1  Q.    Was Mr. Butler asked approximately how much money he

2  believed was in the garage?

3  A.    Yes, we asked him to give an estimate.

4  Q.    What did he say?

5  A.    He estimated a million dollars.

6  Q.    In cash?

7  A.    In cash.

8  Q.    Was Jeffrey Artello interviewed during the course of this

9  conspiracy?

10  A.    Yes, he was.

11  Q.    During the course of the investigation?

12  A.    Yes.

13  Q.    Did Mr. Artello reveal anything with regard to this

14  defendant storing marijuana at his residence?

15  A.    Yes, he stated at one time Mr. Foley returned from

16  California with approximately 300 pounds of marijuana that he

17  needed to leave at his residence, in his barn for a short

18  period of time.  And I believe he stated it was only there for

19  one night and Mr. Foley returned the next day to recover the

20  marijuana.

21  Q.   Did Mr. Artello reveal further information relative to

22  this defendant's activity around a rental car?

23  A.   He stated that Mr. Foley brought out a car that he was

24  going to take to California to either pick up drugs or to pay a

25  debt on drugs.  He helped Mr. Foley remove the cowling in the

44

1  front end of the car and hide U.S. currency in that cowling in

2  the event that he would be stopped on the way out so the police

3  wouldn't find it.

4  Q.   Did Mr. Artello provide an approximate estimate of how

5  much money he believed was hidden in the rental car?

6  A.   Yes, he stated approximately $300,000.

7  Q.   Now, does the investigation reveal a range at which Mr.

8  Foley would sell pounds of marijuana?

9  A.   Yes.  Even in one letter, I believe I read it, the range

10  usually was around $1,100 to $1,400 per pound.

11  Q.   That's per pound?

12  A.   Per pound, yes.

13  Q.    And do we know from the investigation approximately how

14  much money Mr. Foley bought his marijuana for before he then

15  sold it for between $1,100 to $1,400?

16  A.    All the paperwork information we found indicates that he

17  paid $400 per pound when he bought it in California.

18  Q.    I want you to take a look at some calculations here.  Can

19  you see that on the screen?

20  A.    Yes.

21  Q.    Is it accurate to say that one kilogram equals 2.2

22  pounds?

23  A.    Correct.

24  Q.    And therefore 700 kilograms equals 1,540 pounds?

25  A.    Correct.


45


1  Q.    Further is it accurate to say that 1,540 pounds times

2  $1,200 would equal $1,848,000?

3  A.    Yes, it would.

4  Q.    And if you subtract out the $616,000 figure, would be

5  1,540 pounds times the $400?

6  A.    Correct.

7    Q.    So if you subtract out those amounts, the total profit on

8    the figures you provided, assuming that the amount would be

9    $1,200 per pound, would be $1,232,000?

10    A.    Yes.

11            MR. SCHROEDER:  Your Honor, I'm going to object to

12    this.

13            THE COURT:  I can't hear you, Mr. Schroeder?

14            MR. SCHROEDER:  I'm going to object to the relevance

15    of this, this isn't the issue before the court.

16            MR. TRABOLD:  Well, your Honor, the total profit

17    derived from Mr. Foley is obviously relevant to your total

18    sentencing decision, as well as whether Mr. Foley was the

19    leader or organizer of this conspiracy.

20            THE COURT:  I agree with that, that's overruled.

21    BY MR. TRABOLD:

22    Q.    That $1.23 million figure, that's a conservative estimate

23    because it's based on only 700 kilograms?

24    A.    Correct.

25    Q.    Which is the bottom end of the range stipulated to?

46

1  A.   Correct.

2        THE COURT:  Mr. Trabold, how much further do you

3  have on direct with the trooper?

4        MR. TRABOLD:  That's all I have, your Honor.

5        THE COURT:  All right.  Do you have some cross?

6        MR. SCHROEDER:  Just briefly, your Honor.

7        THE COURT:  All right.

8                CROSS-EXAMINATION

9  BY MR. SCHROEDER:

10  Q.   Trooper Reese, do you accept the assertions that you've

11  made from these letters as factual, the things you've testified

12  to, do you accept them as factually accurate?

13  A.   The information in the letters?

14  Q.   Yes, sir.

15  A.   Yes, I do.

16  Q.   So you would accept as factually accurate, then, the

17  weapons that were recovered were not Mr. Foley's, that they

18  came from someone else who stole them?

19  A.   Some of the weapons that were recovered were from

20  William -- I forget his last name, but Ann Weber bought some of

21  the weapons --

22  Q.   And you would accept as factually accurate the fact that

23   other people were involved on an ongoing basis with respect to

24   this thing?

25   A.   With the drug activity?


47


1   Q.   Yes.

2   A.   Yeah, that's obvious.

3   Q.   Mr. Foley didn't stand alone with respect to ongoing

4   activity if you accept this as factually accurate, all of the

5   defendant continued to be involved?

6   A.   Yes.

7   Q.   And you would accept as factually accurate in some

8   letters where he talks about cleaning places out, that he had

9   been the victim of certain theft offenses which occurred after

10   his incarceration, are you aware of that?

11   A.   I'm aware of, I believe that the reference in the letter

12   was for him to have things cleaned out so that we wouldn't

13   find, law enforcement, referencing his theft that he

14   encountered in California.

15   Q.   That's your interpretation of them, correct?

16   A.   Yes.

17  Q.    But if an individual has been victimized of theft

18  offenses, he's asking somebody to clean a place out so it could

19  prevent other theft offenses from occurring as well?

20  A.    It could have been.

21  Q.    With respect to this million dollars, you met with Mr.

22  Foley and myself a few weeks ago, correct?

23  A.    Yes.

24  Q.    Did he not offer to take a polygraph with respect to this

25  alleged million dollars?


48


1  A.    Yes, he did.

2  Q.    You never offered to give him a polygraph with respect to

3  that?

4  A.    Excuse me.

5  Q.    You never offered him a polygraph with respect to that?

6  A.    No.

7  Q.    Did he offer to take it?

8  A.    Yes, he did.

9  Q.    In the course of your duties as a Pennsylvania State

10  Police Officer, you regularly offer people and utilize a

11    polygraph to ascertain an individual's truthfulness, correct?

12    A.    If it's necessary I would, yes.

13    Q.    Many times it's offered and utilized just to see if an

14    individual is willing to do it, because the thought process is

15    that if an individual won't do it, then he's not being

16    truthful, correct?

17    A.    There's times where individuals will throw that out to

18    give themselves credibility, also.  I can't rational why he

19    would offer another officer's reason for asking for one.

20    Q.    But nonetheless he did offer to take a polygraph with

21    respect to the existence of this million dollars that has come

22    up in this case?

23    A.    Yes, he did.

24    Q.    He was never given a polygraph to confirm whether -- in

25    fact he denied the existence of the million dollars, correct?


                              49


1    A.    Yes, he has.

2    Q.    You've never given a polygraph to ascertain whether in

3    fact his denial was truthful?

4    A.    He never had been given one, no.

5        MR. SCHROEDER:  Thank you, nothing further.

6        MR. TRABOLD:  Just briefly, your Honor.

7                    REDIRECT EXAMINATION

8   BY MR. TRABOLD:

9   Q.   Counsel's reference to us interviewing Mr. Foley several

10  weeks ago; would you characterize the bulk of what Mr. Foley

11  told us during the course of that interview as truthful or

12  untruthful?

13  A.   Untruthful.

14  Q.   Did Mr. Foley lie about things that were already known to

15  the government?

16  A.   Yes, he either lied or would not provide any information

17  when asked.

18  Q.   And is it accurate to say that the information provided

19  by Mr. Foley during the course of that interview session was

20  deemed to be almost entirely if not entirely useless?

21  A.   Yes, it was.

22       MR. TRABOLD:  Nothing further, your Honor.

23       THE COURT:  Trooper, you're excused.

24       MR. TRABOLD:  Move for the admission of Government's

25  1 and 2.

50

1        THE COURT:  One and two are admitted.  Mr.

2   Schroeder, are you going to have any live testimony today?

3        MR. SCHROEDER:  With respect to this issue or the

4   actual sentence itself?

5        THE COURT:  With respect to the actual sentencing

6   itself?

7        MR. SCHROEDER:  Yes, your Honor.

8        THE COURT:  Who would that involve?

9        MR. SCHROEDER:  Father Peterson will testify.

10       THE COURT:  All right, what we're going to do is

11   this.  I'm going to give my court reporter about a three minute

12   break.  Then I'm going to come back and rule on all of the

13   objections.  Then we'll proceed to the sentencing aspect, you

14   can put Father Peterson on.  I'll then hear from you and your

15   client.  I'll hear from the government, and then I'll proceed

16   to impose sentence.

17       (Recess from 11:12 a.m.; until 11:17 a.m.)

18       THE COURT:  This is an order.

19                ORDER

20        Presently pending before the court are a number of

21   objections which have been filed by the defendant to the

22   presentence investigative report.  After argument the court

23   enters the following order.

24        First, the defendant objects to a two-point upward

25   adjustment for obstruction of justice pursuant to United States


51


1   Sentencing Guideline 3C1.1.  Two arguments are advanced.

2        First, that pursuant to United_States_v._Booker,
                                     ——————— ——————— —— ———————

3   125 S.Ct. 738, judicial fact finding of this nature is

4   precluded and enhancements must be submitted to a jury.

5   Alternatively, the defendant argues that the conduct here does

6   not rise to the level of "threatening, intimidating or

7   otherwise unlawfully influencing a co-defendant, witness or

8   juror, directly or indirectly or attempting to do so."

9        First, Booker does not, in my view, preclude
                ———————

10   judicial fact finding by a preponderance of the evidence under

11   these circumstances.  Judicial fact finding in the sentencing

12   context was constitutionally infirm in the pre-Booker
                                                    ———————

13  sentencing scheme precisely because the Sentencing Guidelines

14  were mandatory as opposed to discretionary or advisory.  Since

15  the guidelines have now been expressly rendered advisory by

16  virtue of Booker, there is no impediment to judicial fact
        _____

17  finding, such as that requested here.  As stated in United
                                              _____

18  States_v._Ameline, 409 F.3d 1073 (9th Cir. 2005):
    _____ __ _____

19      "It is crucial for our current purpose to appreciate

20  the distinction drawn by the Supreme Court and by us.  Standing

21  alone, judicial consideration of facts and circumstances beyond

22  those found by a jury or admitted by the defendant does not

23  violate the Sixth Amendment right to jury trial.  A

24  constitutional infirmity arises only when extra-verdict

25  findings are made in a mandatory guidelines system.  This

                            52

1  conclusion has been reached by a majority of the appeals courts

2  that have decided Sixth Amendment sentencing issues post-Booker
                                                        _____

3  .  Citing United_States_v._Antonakopoulos, 399 F.3d 68, 75 (1st
             _____ _____ __ _____

4  Cir. 2005); United_States_v._Williams, 399 F.3d 450  (2nd Cir.

5  2005); United_States_v._Mares, 402 F.3d 511 (5th Cir. 2005);

6  United_States_v._Pirani, 406 F.3d 543 (8th Cir. 2005)." See

7  also U.S._v._Mares, 402 F.3d 511 (5th Cir. 2005); U.S._v.

8  Mooney, 401 F.3d 940 (8th Cir. 2005).  Consequently, for the

9  reasons previously stated, I find that Booker is no impediment

10  to me deciding the merits of the enhancement issue.

11         Turning now to the merits, I first observe that

12  Section 3C1.1 mandates that:

13         If (A) the defendant willfully obstructed or

14  impeded, or attempted to obstruct or impede, the administration

15  of justice during the course of the investigation, prosecution

16  or sentencing of the instant offense of conviction; and (B) the

17  obstructive conduct relates to (i) the defendant's offense of

18  conviction and any related conduct; or (ii) a closely related

19  offense, increase the offense level by two levels.

20         I note that the application notes further flush out

21  the concept.  For instance, the type of conduct to which

22  obstruction would apply would include:

23          (a)  threatening, intimidating or otherwise

24  unlawfully influencing a co-defendant, witness or juror,

25  directly or indirectly, or attempting to do so;


53


1          (b)  committing, suborning, or attempting to suborn

2  perjury;

3          (d)  destroying or concealing or directing or

4  procuring another person to destroy or conceal evidence that is

5  material to an official investigation or judicial proceeding.

6          Here, there is, in my opinion, overwhelming evidence

7  of obstructive conduct within the meaning of the Sentencing

8  Guidelines.  The testimony elicited earlier in the sentencing

9  hearing, as well as the letters upon which the testimony were

10  based, indicates that in numerous letters the defendant advised

11  co-conspirators to conceal evidence, and to refuse to cooperate

12  with police.  The letters also reflect attempts on the part of

13  the defendant to attempt to meet with co-conspirators for the

14  purpose of coordinating their stories.  The content of the

15  letters also reflect direct or implicit threats against other

16  individuals or co-conspirators.  In short, the letters

17  collectively reveal an attempt to orchestrate a coverup from

18  prison.  The enhancement is appropriate.

19       The defendant also objects to a four-point

20  enhancement as a leader/organizer under 3B1.1(a).  The

21  defendant objects on two bases.  First, once again, that he is

22  entitled to a jury trial under Booker.  For the reasons

_____

23  previously discussed in connection with my discussion of Booker

_____

24  as it relates to obstruction of justice, I find that position

25  to be unfounded.

54

1       Secondly, the defendant argues that in any event on

2  the merits, his activities do not justify an enhancement as a

3  leader/organizer.  The commentary to Section 3B1.1(a) lists the

4  following factors that I am to consider in distinguishing a

5  leadership and organizational role from one of mere management

6  or supervision.  They would include the following:

7       (1)  the nature of participation in the commission

8  of the offense;

9       (2)  the recruitment of accomplices;

10          (3)  the claimed right to a larger share of the

11   fruits of the crime;

12          (4)  the degree of participation in planning or

13   organizing the offense;

14          (5)  the nature and scope of the illegal activity;

15   and

16          (6)  the degree of control and authority exercised

17   over others.

18          Here, having carefully listened to the contents of

19   the letters, the letters themselves in my view bespeak his

20   leadership or organizer role within the meaning of 3B1.1.  The

21   record reflects, for instance, that the majority of the profits

22   for the criminal activity went to Foley.  He was actively

23   involved in recruiting individuals to join the conspiracy.

24   Notwithstanding his presence in prison, the evidence is

25   overwhelming that he continued to direct a conspiracy in a


                              55


1    leadership role from prison.  The objection to the enhancement

2    as a leader/organizer consequently is overruled.

3           Defendant contends that he is entitled to a

4   reduction of his criminal history category pursuant to Section

5   4A1.3 of the Sentencing Guidelines.  Section 4A1.3 provides in

6   relevant part:

7         There may be cases where the court concludes that a

8   defendant's criminal history category significantly

9   over-represents the seriousness of a defendant's criminal

10  history or the likelihood that the defendant will commit

11  further crimes.  An example of that might include the case of a

12  defendant with two minor misdemeanor convictions close to ten

13  years prior to the instant offense and no other evidence of

14  prior criminal behavior in the intervening period.  The court

15  may conclude that the defendant's criminal history was

16  significantly less serious than that of most defendants in the

17  same criminal history category, (category II), and therefore

18  consider a downward departure from the guidelines.

19         United_States_v._Shoupe, 988 F.2d 440 (3rd Cir.

20  1993), teaches that downward departures are the exception and

21  are justified only where the criminal history category

22  "significantly over-represents" the seriousness of the

23  defendant's criminal history or the likelihood that he will

24  commit other crimes.  For the record, of course, the criminal

25  history category attributed to the defendant in this case is a

56

1  criminal history category of VI.

2       Foley's criminal history reveals that he has been

3  continuously involved with the criminal justice system since

4  age 15.  He was, for instance, adjudicated delinquent on five

5  separate occasions for offenses that included theft by unlawful

6  taking, possession of drug paraphernalia, burglary and

7  conspiracy to commit burglary.  While 18 he was convicted for

8  seven thefts and an additional criminal mischief.  At 19 he was

9  convicted of burglarizing a laundromat and a retail theft.

10  Using an alias two years later, he was convicted of a larceny

11  offense in New York state.  The addendum to the probation

12  department's presentence report also addresses a conviction in

13  Missouri for marijuana possession.  The record reflects that

14  Foley has had approximately 17 total involvements with the

15  criminal justice system.  The record also reflects that

16  throughout the tenure of his involvement with the criminal

17  justice system, he has frequently been revoked on both

18  probation and parole.  In short, this defendant has been

19    unrepentant recidivist in the criminal justice system for most

20    of his life and no departure is appropriate pursuant to 4A1.3.

21         Finally, the defendant at paragraphs two and three

22    of his filed objections objects to the criminal history

23    calculations, objects under a title criminal history

24    calculations to the calculations made by the probation officer

25    at paragraphs 54, 62 and 64 of the probation report.  Having

57

1    carefully reviewed those paragraphs, I find that the probation

2    officer was accurate in his calculations and those objections

3    are overruled as well.

4         That having been said, I make the following

5    findings.  The total offense level applicable is 33; with a

6    criminal history category of VI.  The statutory provision as to

7    custody, as to Count One, not less than 5 to 40 years

8    imprisonment.  As to Count Three, five years consecutive to any

9    other sentence.  The guideline provisions 235 to 293 months

10    imprisonment, plus five years consecutive.  The statutory

11    provision as to probation ineligible.  The guideline provision

12    is ineligible.  With respect to the statutory provision as to

13  supervised release, with respect to Count One, not less than

14  four years.  With respect to Count Three, not more than five

15  years.  The guideline provision as to Count One, four to five

16  years.  With respect to Count Three, three to five years.

17  As to a fine under the statutory provisions, as to Count One,

18  $2 million.  As to Count Three, $250,000.  With respect to the

19  guideline provisions, $17,500 to $2 million.  Restitution is

20  inapplicable under both the statutory, as well as the guideline

21  provisions.  A special assessment of $100 at each of Counts One

22  and Three applies both under the statutory, as well as the

23  guideline provisions.  Do you have some testimony now?

24        MR. SCHROEDER:  Yes, your Honor.

25        THE COURT:  All right.


58


1         MR. SCHROEDER:  Your Honor, Father Peterson.

2         THE COURT:  Stop right there.  Raise your right

3  hand, please.

4         JAMES PETERSON, DEFENSE WITNESS, SWORN

5               DIRECT EXAMINATION

6  BY MR. SCHROEDER:

7   Q.   Would you state your Name, please?

8   A.   Reverend James Peterson.

9   Q.   With whom are you employed or affiliated, Reverend?

10  A.   Special ministries of the Erie Diocese and Maria House

11  Projects.

12  Q.   In connection with that, Father, do you run a facility in

13  Warren County, I believe it is?

14  A.   Yes.

15  Q.   And what is the name of that facility?

16  A.   We call it the Diocesan Lodge.  It's part of the Maria

17  House Projects.  We have six houses for alcoholics, addicts and

18  ex-convicts.

19  Q.   In connection with the maintenance of that facility, you

20  treat individuals who are involved in the criminal justice

21  system?

22  A.   Yes, we do.

23  Q.   They live at in your facility, you deal with them on an

24  ongoing and daily basis?

25  A.   Yes, I do.

59

1   Q.   I've been practicing law in this county for 20 years and

2   as long as I can remember, you've been involved in that

3   situation, have you not?

4   A.   That's right, yes.

5   Q.   And over the years you have met hundreds, if not

6   thousands of individuals involved in the criminal justice

7   system?

8   A.   Yes, I have.

9   Q.   And you've been asked from time to time to come to court

10  and speak on people's behalf?

11  A.   Quite rarely.

12  Q.   In times you have done that, I would assume you've come

13  in and you testified truthfully and from the heart with respect

14  to individuals and what you believe and who you believe they

15  are?

16  A.   Yes, I do.

17  Q.   Are you acquainted with the defendant, Maurice Foley?

18  A.   Yes, I am.

19  Q.   How long have you known him?

20  A.   About 20 years.

21  Q.   How did you first meet him?

22  A.   I think I first met him in prison.  But I got to know him

23  well when he came to the Diocesan Lodge, he was there for

24  several months.

25  Q.   Can you tell the court what your conclusion is about his


                                    60


1   character and the type of person he is based upon your 20 years

2   of knowledge of him?

3   A.   Well, my knowledge of him came mainly when he was at the

4   Diocesan Lodge.  And I knew very clearly that he was not in any

5   way intimidating anybody.  He had a great deal of generosity

6   and a great deal of kindness.  And there when people come many

7   times there are very troubled people, he was very helpful in

8   regard to their dealing with whatever their problems were.  I

9   don't mean as a counselor, he was a friend.  But his basic

10   kindness and generosity are the thing that struck me there.  So

11   that I had much hope for his future.

12  Q.   Did you continue to be acquainted with him and see him

13  over the course of those 20 years?

14  A.   Yes, most of the others were in prison.  I'm chaplain at

15  Albion and also at the Erie County Prison.  And I dealt with

16   him there.  It's hard to say of how often, it would be monthly

17   probably.

18   Q.   Has your opinion of his character changed over the years?

19   A.    Not his basic character.  He's gotten involved in things

20   that seem to carry him away.  But his basic character is one of

21   kindness and not wanting to hurt people.  I've just heard all

22   the letters which makes it hard to deal with that.  But I know

23   basically there is a kindness in wanting to help.

24   Q.   Do you believe, based on your knowledge of him, that he

25   is a dangerous person and he would hurt people?


61


1  A.   I think in some situations he could.  I'm not sure if

2  it's fair to think about that.  But when we think of a

3  guideline of 25 years and so on, it makes me wonder even about

4  the federal justice system.  A kind of basic goodness there

5  with all this other pressure.  What 25 years will do, if it's

6  only to keep him away from the public that he can't hurt, it

7  seems to me a tremendous deficiency in the justice system as

8  there probably is.

9  Q.   Do you believe that his character is such that after a

10  period of time he could be rehabilitated and there could be

11  salvation for him?

12  A.   I think so.

13  Q.   You believe that he could become in time a productive law

14  abiding member of our society?

15  A.   Yes, I think so.

16       MR. SCHROEDER:  Thank you, nothing further.

17       MR. TRABOLD:  Just briefly, your Honor.

18            CROSS-EXAMINATION

19  BY MR. TRABOLD:

20  Q.   Father, how long ago was it when Mr. Foley was at your

21  lodge?

22  A.   1993.

23  Q.   You'd agree with me that at least based on your hearing

24  of letters that were introduced today, those are not indicative

25  of somebody whose basic nature is one of kindness and

62

1  generosity?

2  A.   I don't think they show his basic nature.  They show what

3  he got involved in.

4  Q.    Well, you'd also agree with me, though, that the actions

5  that we undertake are the truest way of demonstrating our basic

6  nature, correct, rather than words we use?

7  A.    Well, the actions are more important than the words, yes.

8          MR. TRABOLD:  Nothing further, your Honor.

9          THE COURT:  Father, thank you, very much.  All

10  right, anything further by way of testimony?

11          MR. SCHROEDER:  No further testimony, your Honor.

12          THE COURT:  Do you have anything you want to say on

13  behalf of your client?

14          MR. SCHROEDER:  Yes, your Honor.  Your Honor, it

15  goes without saying that Mr. Foley has made numerous mistakes,

16  both before and after his arrest in connection with this.  It

17  goes without saying that none of my remarks are intended to

18  depreciate the seriousness of what is involved here.

19          One of the aspects of Booker and the progeny of
                        _____

20  cases from Booker, your Honor, is they do vest with the court
                  _____

21  discretion that might not have existed otherwise.  And you have

22  had the opportunity to have before you all of the defendants

23  that have been involved in this conspiracy.  Some of whom

24  you've already sentenced.  And you have made the determination

25  that Mr. Foley was a ring leader, if not the ring leader with

63

1  respect to this.

2       But you have heard from Father Peterson, an

3  individual who has been involved in counseling for a number of

4  years, who has testified as to what Mr. Foley's potential in

5  the future is.

6       And there is no question throughout the course of my

7  representation of him, that Mr. Foley always recognized his

8  responsibility in this case.  Has always recognized that he was

9  going to be punished and punished substantially.

10      Mr. Foley did through the course of this case and

11  still believes that there are viable legal issues to be pursued

12  on his behalf.  And we have pursued those issues.

13      Mr. Foley, before I became involved in this case,

14  through prior counsel, attempted to establish communications

15  with the government through prior counsel.  Mr. Foley believes

16  that he was prejudiced by the actions of prior counsel to the

17  extent that the opportunity for him to fully cooperate and

18  become involved in that traditional aspect of it were lost by

19   the actions of prior counsel and the passage of time in this

20   matter.

21       But, nonetheless, Mr. Foley has accepted his

22   responsibility and admittedly he's given credit in total points

23   for his acceptance of responsibility.  But really the question

24   in this case, your Honor, is accepting everything that you have

25   accepted against him, how much is enough time for what has

64

1    transpired here.  There is no evidence that anyone was actually

2    hurt with respect to this.

3        I've reviewed the presentence investigative report,

4    there is no evidence that there was major activity involving

5    anything other than marijuana.  I'm not depreciating the

6    significance of marijuana.  But that's what we're talking about

7    here is a marijuana conspiracy.

8        There is no evidence that at the time he was

9    actually arrested that he brandished, that he had a firearm on

10   his person.  In fact today there was evidence that some of

11   these firearms came from other sources, that he had nothing to

12   do with.

13          There is no evidence that he possessed any

14   significant amount of money, other than that what the

15   government has already received with respect to this.

16          There is evidence today proffered on the record that

17   he offered to take a polygraph with respect to this money that

18   the government believes exists.  Mr. Foley indicated to them in

19   a meeting that it doesn't exist and he offered to take a

20   polygraph with respect to that.

21          There is no question Mr. Foley is accepting

22   responsibility for what he's done.  And recognizes that he's

23   going to be sentenced to a lengthy term of incarceration.

24          The issue for you to decide, and it's a difficult

25   issue, is how much is enough, given what he has done here.  And


65


1   we're not excusing or condoning what's he's done here.  We're

2   talking about the life of a human being.  We're talking about a

3   person who Father Peterson sees redemption and value in.

4          And the question then becomes how much is enough

5   relative to how much time his co-conspirators got in this

6   matter, relative in proportion to how much time other people

7  get for more serious offenses.

8          What we're asking you to do is, the Supreme Court

9  has ruled these guidelines are advisory, certainly there's a

10  range of sentences that you can impose and we understand there

11  is a five-year mandatory sentence which is added at the end of

12  the discretionary range.

13          We're just simply asking for you to give Mr. Foley

14  the opportunity to have a life.  Because he's 32 years of age

15  right now.  Even if you accept things at a minimal level, we're

16  talking about a significant portion of his life he will be

17  incarcerated.

18          What we're asking you to do is consider the good and

19  not just the bad with respect to Mr. Foley.  Consider the fact

20  that the purpose of a sentence is to, generally speaking, to

21  punish and to deter and certainly your sentence today, however

22  long it is, is going to serve as a deterrent.

23          The question then becomes how much punishment is

24  enough for Mr. Foley in this case.  And in keeping in mind that

25  he is a human being, that he does have redeeming qualities, at

66

file:///A|/FOLEYSNG.TXT

1  some point in time he's going to come out, we're just asking

2  you give him the opportunity to come out in some reasonable

3  time and live the rest of his life in the manner that Father

4  Peterson feels he's capable of doing.  Thank you.

5       THE COURT:  Thank you, Mr. Schroeder.  Does your

6  client have anything that he'd like to say?

7       MR. SCHROEDER:  Yes, your Honor.

8       THE DEFENDANT:  I prepared a lot of this stuff here,

9  but I don't even know really if I can say most of it.  Certain

10  things, like this million dollars, they think I have and stuff.

11  This guy was never in California with a million dollars.  I

12  don't even have a garage, I don't have anywhere near a half

13  million dollars.  I'll take a polygraph test, I never had money

14  like that.  Any money I did have, I was like I shared it with

15  people, you know what I mean.

16       People didn't get nothing out of doing this stuff.

17  People have, one guy has 38 acres, Cadillac, all kinds of

18  stuff, you know what I mean.  I don't think, I don't know that

19  I'm totally right, but I don't think I'm the one that's like a

20  hundred percent blame, you know what I mean.

21       I don't know what else to say.  I want to thank my

22  lawyer, Mr. Schroeder, who did a remarkable job.  I couldn't

23  have wished for a better lawyer.

24          I also want to apologize, especially to my dad and

25  John Kirkpatrick --


67


1          THE COURT:  Sir, you're going too fast, just slow

2  down a little bit.

3          THE DEFENDANT:  I also want to apologize, especially

4  to my dad and John Kirkpatrick, who is like a stepfather to me.

5  Between the two to them, they've always been there for me since

6  I've been a little kid.  Now that they're reaching the age of

7  retirement, they now need my help in return, I'm very sorry I

8  cannot be there for them.

9          I feel really bad, especially John Kirkpatrick,

10  because that guy's never done nothing wrong in his life, I feel

11  like it's my fault, you know what I mean.  He's only got a few

12  years left, it's my fault that he's in all this, you know what

13  I mean.

14          The last thing I want to talk about is about money.

15  I learned over the past several years that money is like the

16  root of all evil.  I've seen people do some very amazing and

17  some very ridiculous things because of money.  Probably even

18  myself.

19          Father Peterson is probably the only person that

20  I've ever met that's not concerned about money at all.  I've

21  known him for like 15 years or something, money never means

22  nothing.  Every dollar that passes through his hands he uses to

23  help people.  My father met him 46 years ago and he told me he

24  was the same way then.  All this money that was confiscated by

25  the government and stuff, you know what I mean.  Wherever it

68

1  goes, to the government, whatever, but I think the money should

2  be donated to somebody like Father Pete.  All he does is help

3  people and make the world a better place the best he can.

4  That's it, thanks.

5          THE COURT:  All right.  Thank you, Mr. Foley.  Mr.

6  Trabold.

7          MR. TRABOLD:  Your Honor, I have a number of

8  comments I'd like to make at the outset.  I want to establish

9  very clearly for the court that at no time, at no time did this

10   defendant ever in a credible way offer to cooperate or offer to

11   provide information that was in any way even remotely credible.

12        I've been a prosecutor for 10 years and I have never

13   come across a defendant who made such half-heartedand

14   untruthful efforts to cooperate.  In no way was this defendant

15   in any way prejudiced by his prior counsel.

16        His efforts to cooperate initially in this case were

17   along the lines of I will provide you information if you grant

18   me total immunity and return everything that was seized from

19   me.  That is not cooperation, it has never been cooperation.

20        In his efforts to cooperate more recently, I can

21   fairly characterize as completely ridiculous.  And a total

22   waste of my time.  So you should not even remotely consider

23   that in any way this defendant has ever in a credible or

24   truthful way offered to cooperate.

25        Essentially, what you're asked to do in this


69


1   sentencing, as well as any other sentencing that happens before

2   you, is to balance the mitigating factors that are present in

3   the defendant's background against whatever aggravating factors

4   there may be in arriving at a sentence.

5         In this case I struggle to find any mitigating

6   factors that you can take into account with regard to this

7   defendant.

8         You have the benefit of a lengthy presentence

9   report.  There's nothing in the presentence report that is in

10  any way mitigating about this defendant's background.  Or in

11  any way should give you any reason to conclude that he has even

12  the slightest interest in rehabilitating himself.

13        Certainly Father Peterson testified today.  I in no

14  way mean to cast even the slightest aspersion against Father

15  Peterson.  But Father Peterson's testimony here today is not a

16  reflection on this defendant's good character, it is a

17  reflection on Father Peterson's good character.  Because you

18  have to have an especially generous heart to be able to look at

19  this defendant and his background and his conduct and find good

20  in it.  That finding by Father Peterson is a reflection on him.

21  It's not a reflection on this defendant.

22        There are so many aggravating factors in this case,

23  your Honor, that counsel makes some reference to Booker and
                    _____

24  that the guidelines are advisory in nature.  I presume along

25   the lines of you're not bound by the guidelines after Booker,

_____

70

1   therefore, you can go below the guideline.

2        The problem with that is counsel should hope, based

3   on the factors that are present in this case, that you limit

4   yourself to the guidelines and don't go beyond the guidelines.

5   Because there are enough factors present in this case that Mr.

6   Foley should not be worried about you going below the

7   prescribed guidelines, he should be worried about you going

8   above the prescribed guidelines.

9        Employment history.  Mr. Foley has no employment

10   history.  The record is devoid of any effort by Mr. Foley to

11   have gainful employment.  I believe the presentence report

12   indicates that a record check indicates that he perhaps at some

13   point in time made $300 or some odd amount of money at

14   Applebee's or some other restaurant.  With regard to his

15   employment, Mr. Foley has contributed exactly nothing to

16   society.

17        His criminal history.  Mr. Foley has five juvenile

18   adjudications beginning at the age of 15.  He has 12 adult

19  convictions.  Perhaps most significantly with regard to his

20  criminal history is he has multiple revocations at almost every

21  conviction where he was put on probation or parole.  In fact,

22  at his burglary conviction alone, he was revoked three times

23  and really never completed satisfactorily the probation or

24  parole supervision.

25       Mr. Foley absconded from his parole supervision on

71

1  his burglary conviction in May of 2000, and was a fugitive from

2  that parole supervision for almost three years prior to his

3  arrest in this case.  And, in fact, he was arrested in April of

4  2003 for absconding from parole in May of 2000.  For almost the

5  final three years of this conspiracy, Mr. Foley was on the run

6  from Pennsylvania State Parole.

7       Mr. Foley has convictions under different names.

8  He has a conviction under the name Joseph Redlaw in the state

9  of New York, and a conviction in the state of Missouri under

10  the name of Maurice Hoover.  There is nothing in even slightest

11  way mitigating about Mr. Foley's criminal history.

12       The offense conduct in this case.  Mr. Foley

13    stipulated that the amount of marijuana range in this case is

14    700 to 1,000 kilograms of marijuana.  That's roughly 1,500

15    pounds to a ton of marijuana.  That from May of 1998 to April,

16    I'm sorry, actually April of 2003, when he was arrested, that

17    made its way on the streets of this community.

18          But Mr. Foley's criminal conduct in this case is not

19    limited solely to Count One, because in his plea agreement he

20    accepted responsibility for the conduct that was charged in

21    every other count.  The conduct at the second count is

22    significant because it relates to Mr. Foley's distributing

23    methamphetamine during the course of this conspiracy.  And Mr.

24    Foley's distribution of methamphetamine resulted in a number of

25    people involved in this conspiracy becoming significantly

72

1    hooked on methamphetamine.

2          This isn't a case, your Honor, where you can say

3    well this just involves marijuana, it's really not all that

4    significant.  This case at multiple other counts involves Mr.

5    Foley's gun possession, and use of a gun in furtherance of this

6    drug conspiracy while he was a convicted felon.  There's

7   scarcely conduct that you can consider more dangerous than

8   that.

9       However, Mr. Foley did not stop there.  Mr. Foley

10  was charged and has accepted responsibility for identity theft

11  in this case.  And the identify theft in this case does not

12  relate just to one person's identity.  But Mr. Foley used

13  multiple identities throughout the course of this conspiracy,

14  and he did so to avoid detection and to further the drug

15  conspiracy.

16      In fact, the victim named in the indictment,

17  Clarence Oday, the investigation in this case reveals that Mr.

18  Oday is legally blind and his sole source of income is Social

19  Security disability benefits.  That is the person whose

20  identity Mr. Foley stole.

21      Mr. Foley didn't stop there.  He engaged in money

22  laundering activity with Ann Weber.  Whereby, he had Ann Weber

23  purchase with drug proceeds from himself a vehicle for the

24  purpose of him hiding his drug assets, as well as hiding his

25  identity, as well as hiding his conduct.

73

1        Your Honor, you can only characterize in this case

2    the drugs that were involved as a flood of drugs that were

3    unleased on this community over a relatively short span of

4    time.  The impact of those drugs can only be characterized as

5    enormous, primarily because of the size of the total amount of

6    drugs involved in this case.

7        And you also had at least one letter that we

8    referenced here today from Mr. Foley himself indicating the

9    nature of the impact he had on the drug trade in this

10   community, in that Mr. Foley says once he was arrested,

11   marijuana became harder to find and it became more expensive.

12       Additionally, your Honor, as it relates to specific

13   individuals.  Mr. Foley's conduct in this case can only be

14   described as having a monumental and negative effect on the

15   people that he came into contact during the course of this

16   conspiracy.  I'm in no way saying the people that were charged

17   as co-defendants aren't responsible for their conduct.

18       However, you need to look at the background of a

19   number of those people to realize those people were brought

20   into this conspiracy by this defendant, many of those people

21   had absolutely no prior record before becoming involved in this

22  case, none whatsoever.  A number of those people have already

23  gotten or are about to get from your Honor I presume the safety

24  valve consideration, which is afforded those people who have no

25  prior record.

74

1        Many of those people were supplied methamphetamine

2  by this defendant.  Many of those people's lives have been

3  destroyed as a result of their connection to this defendant.

4  And certainly their own conduct.

5        Several of those people have lost their career.

6  Several of those people's retirement pensions have been

7  jeopardized as a result of their interaction with this

8  defendant.

9        So it is a complete mischaracterization of the

10  record of this case to say that Mr. Foley has not brought harm

11  upon anybody.  He's brought harm upon the community in general,

12  the flood of drugs that he's introduced.  And people's lives

13  have been destroyed because of their relationship with Mr.

14  Foley.

15        Additionally, your Honor, you have found and we're

16  not going to -- I'm not going to rehash the whole matter, but

17  you found that Mr. Foley in a multiplicity of different ways

18  has attempted to or actually obstructed justice in this case.

19  That's the reason there's a two point increase in that conduct.

20       Because that construct strikes at the very core of

21  our justice system.  Because our justice system is premised on

22  the idea that people when questioned will tell the truth.  When

23  they're brought into court, they will tell the truth.  When

24  they come into contact with law enforcement, they will provide

25  the evidence that they have.


75


1       Mr. Foley on more occasions than I can count

2  attempted to have other people hide evidence for him, told

3  other people to be quiet, don't talk to the police.  In one

4  instance offered to pay somebody or offered to make sure that

5  somebody didn't lose their house if they didn't cooperate with

6  the authorities.

7       Your Honor, you have in this case a unique insight

8  into the mind of this defendant that you don't get in probably

9  almost every case that comes before you.  And you get that

10   insight from the letters that were made a part of the record.

11   In the letters that were made part of the record are not every

12   letter that the government was in possession of, but those

13   thirty-some odd letters, a portion of which were read for you

14   here today, give the unmistakenable impression of this

15   defendant as somebody who has no respect for anybody or

16   anything.  And what's valuable about that for yourself is you

17   didn't need to hear somebody else testify about this defendant.

18   You could read those letters over and over and over again and

19   be told all you need to know about this defendant's character.

20          This is a person who made it in a normal daily

21   course to use other people for his own advantage.  I find it

22   laughable for him to come into court today and say money is the

23   root of all evil, I've seen people do crazy things for money,

24   even myself.  This whole case is about this defendant's greed

25   and desire for money.


76


1          Even by our conservative estimates, your Honor, this

2   defendant, at 700 kilos, at $1,200 a kilo, paying $400 himself

3   selling at $1,200 a pound, paying $400 a pound, made an

4   extraordinary amount of money.  An extraordinary amount of

5   money.  And Mr. Foley says, well, not that money was found.

6   $215,000 was essentially found by the government in this case

7   just lying around.  Mr. Foley had $90,000 in a bucket in a

8   garage on McChesney Road.

9          So this case is about money and it's about exactly

10  what Mr. Foley said.  Money is the root of all evil, it's

11  demonstrated by his conduct in this case.

12         Additionally, the letters make it clear, your Honor,

13  that once Mr. Foley is done with somebody, once they're done

14  being useful to him, he jettisons them.  If you can't help him,

15  that's it, your over.  He even had his cousin go and rough up a

16  debtor.

17         So when you put it all together, obviously, your

18  sentencing is going to have an impact on Mr. Foley's life.  But

19  you're not doing it to him.  Your sentence is not the thing

20  that is going to impact his life ultimately.  His own conduct

21  is the thing that is going to impact his life.

22         Mr. Foley at any period, from the age of 15 on,

23  could have made a choice to do the right thing.  Probably in

24  thousands and if not hundreds of thousands of different

25  instances in his life he was presented with the option of doing

77

1 the wrong thing or the right thing.  By my review of the

2 record, in every one of those times he chose to do the wrong

3 thing.  And now all you're doing is making it clear to him what

4 the penalty is for that lifetime of wrong choices.  And I ask

5 you that you impose a sentence dictated by justice in this

6 case, which would be a sentence at the high end of the range.

7 Thank you.

8        THE COURT:  Thank you.  I'm going to digest what I

9 just heard, come out and sentence in about five minutes.

10        (Recess from 12:02 p.m.; until 12:18 p.m.).

11        THE COURT:  In the wake of the recent decision by

12 the United States Supreme Court in United_States_v._Booker,
                                      _____ _____ __ _____

13 as discussed more fully in connection with earlier arguments

14 today, the sentencing guideline are, of course, advisory only.

15 However, I'm still obligated to consult the Sentencing

16 Guidelines in determining an appropriate sentence.  In addition

17 to the guidelines under Booker, I must also consider other
                              _____

18 factors that are set forth in Section 3553(a), which requires

19  courts to impose a sentence "sufficient, but not greater than

20  necessary," to comply with the purposes set forth in paragraph

21  two.  Section 3553(a)(2), states that such purposes are:

22          (A)  to reflect the seriousness of the offense, to

23  promote respect for the law, and to provide just punishment for

24  the offense;

25          (B)  to afford adequate deterrence to criminal

78

1  conduct;

2          (C)  to protect the public from further crimes of

3  the defendant; and

4          (D)  to provide the defendant with needed

5  educational or vocational training, medical care, or other

6  correctional treatment in the most effective manner.

7          Section 3553(a) further directs the sentencing court

8  to consider:

9          (1)  the nature and circumstances of the offense and

10  the history and characteristics of the defendant; the kinds of

11  sentences available, the need to avoid unwanted sentencing

12  disparities among defendants with similar records who have been

13  found guilty of similar conduct; and the need to provide

14  restitution to any victims of the offense.

15       In fashioning this sentence today, I have carefully

16  considered the advisory guideline range, as well as the other

17  factors which I have just articulated.

18       In my view this is a very serious offense.  It

19  involves a large-scale drug conspiracy.  The record reflects

20  that the defendant is a lifelong criminal and as far as I can

21  tell completely unrepentant.  The protection of the public from

22  further crimes is a significant consideration.  Deterrence in a

23  case such as this is important as well.  In addition, I have

24  given serious consideration to the suggested or advisory

25  guideline range.


79


1        A quick word about Father Peterson.  I also have the

2  utmost respect for him and I can state unequivocally that I'm

3  aware of one who has a kinder or more forgiving heart.  And to

4  the extent that I would  disagree with Father Peterson as to

5  this defendant's rehabilitative potential or a threat to

6  society, it is simply a reflection of the fact that Father

7  Peterson sees the defendant through the eyes of a caring priest

8  and friend, while I must view him, of course, simply as a

9  judge.

10      In short, in my view a significant sentence here is

11  not only appropriate, but necessary, to prevent this one man

12  criminal Tsunami from continuing to roll over this community.

13  Please rise.

14      Pursuant to the Sentencing Reform Act of 1984, it is

15  the judgment of the court that the defendant, Maurice Francis

16  Foley, is hereby committed to the custody of the Bureau of

17  Prisons to be imprisoned for a term of 330 months.  This term

18  consists of 270 months at Count One, and 60 months at Count

19  Three, to be served consecutively.

20      Upon release from imprisonment, the defendant shall

21  be placed on supervised release for a term of four years.  This

22  term consists of terms of four years at Count One, and Three

23  years at Count Three, all such terms to run concurrently.

24      Within 72 hours of release from the custody of the

25  Bureau of Prisons, the defendant shall report in person to the

80

1  probation office in the district to which this defendant is

2  released.

3       While on supervised release the defendant shall not

4  commit another federal, state or local crime; shall comply with

5  the standard conditions of supervision recommended by the

6  Sentencing Commission and adopted by this court, and shall

7  comply with the following additional conditions.

8       The defendant shall not illegally possess a

9  controlled substance.

10       The defendant shall not possess a firearm or

11  destructive device.

12       The defendant shall participate in a program of

13  testing and, if necessary, treatment for substance abuse as

14  directed by the probation officer until such time as the

15  defendant is released from the program by the probation

16  officer.

17       Further, the defendant shall be required to

18  contribute to the costs of services for any such treatment in

19  an amount determined by the probation officer but not to exceed

20  the actual cost.

21       The defendant shall submit to one drug urinalysis

22  within 15 days after being placed on supervision and at least

23  two periodic tests thereafter.

24       It is further ordered that the defendant shall pay

25  to the United States a special assessment of $200, which shall


81


1  be paid to the U.S. District Court Clerk forthwith.

2       The court finds that the defendant does not have the

3  ability to pay a fine, consequently, I will waive a fine in

4  this case.

5       Pursuant to the plea agreement in this case, the

6  defendant shall forfeit his interests in the following

7  properties to the United States.  United States currency in the

8  amount of at least $215,031.35.  Cash equivalence in bank

9  account balances.  Real property, including without limitation,

10  19845 Hill Road, Hayfield Township, Crawford County,

11  Pennsylvania.  Southwest intersection of 735 and 606 assessor's

12  parcel number 28-05-008-70003.  Mule Street, Fairfield

13  Township, Crawford County, Pennsylvania, assessor's parcel

14  number 23-06-014-70004.  Vehicles including without limitation,

15  2003 Chevrolet Silverado, VIN number 1GCJK331X3F134794.

16  Dodge Ram truck, VIN number 1B7KF23W91J175474.  BMW, VIN number

17  WBAAA1311MEC69886.  And a coin collection.  Let me check

18  something just briefly.

19         All right, are the defendant's appellate rights

20  circumscribed in any respect by the terms of the plea

21  agreement?

22         MR. TRABOLD:  Yes, your Honor.

23         THE COURT:  All right.  Except insofar as you may

24  otherwise be restricted from appealing by virtue of the terms

25  and conditions of your plea agreement, do you understand that


                              82


1  if you intend to perfect an appeal, you must do so within 10

2  days?

3         THE DEFENDANT:  Yes.

4         THE COURT:  Was that a yes?

5         THE DEFENDANT:  Yes.

6         THE COURT:  Is there anything further, Mr.

7  Schroeder, on behalf of the defendant?

8         MR. SCHROEDER:  Nothing further, your Honor.

9         THE COURT:  Anything further on behalf of the United

10    States?

11          MR. TRABOLD:  Yes, your Honor.  Just for the record,

12    the government has decided not to forfeit the property on Mule

13    Street simply because it is below the government's threshold

14    amount.

15          THE COURT:  All right, then my sentence as

16    previously read will be amended to delete any reference to the

17    Mule Street residence.  We're adjourned.

18

19          (Whereupon, at 12:28 p.m., the Sentencing

20    proceedings were concluded.)

21

22                    - - -

23

24

25


                              83


1              C E R T I F I C A T E
               _ _ _ _ _ _ _ _ _ _

2

3

4    I, Ronald J. Bench, certify that the foregoing is a

5    correct transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11    _____

12    Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24