IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA    )
          )
   v.       )  CRIMINAL NO. 04-36 ERIE
          )
MAURICE FRANCIS FOLEY    )


SUPPRESSION_HEARING
_____ _____


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, December 1, 2004.


APPEARANCES:
_____
        CHRISTIAN A. TRABOLD, Assistant United States
        Attorney, appearing on behalf of the Government.

DAVID A. SCHROEDER, Esquire, appearing on behalf
of the Defendant.


Ronald J. Bench, RMR - Official Court Reporter


2


1                    I N D E X
                     – – – – –

2

3     WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS
      _____               _____  _____  _____  _____

4   FOR THE GOVERNMENT:

5   Randy Detzel              10     24     51       --

6   Charles William Wehrle         58     88     131      --

7   Gerald Verga              135    145    158      --

8

9                  - - -

10

11    EXHIBITS:               IDENTIFIED    ADMITTED
      _____               _____    _____

12  Government Exhibit 1              15      162

13  Government Exhibit 2              16      162

14  Government Exhibit 3              23      162

15  Government Exhibit 4              60      162

16  Government Exhibit 5              62      162

17  Government Exhibit 6             161      162

18

19  FOR THE DEFENDANT:

20  Defendant's Exhibit A            31      161

21  Defendant's Exhibit B           146      161

22

23

24

25              - - -


                              3


1          P R O C E E D I N G S
           – – – – – – – – – –

2

3          (Whereupon, the proceedings began at 9:02 a.m., on

4  Wednesday, December 1, 2004, in Judge's Chambers.)

5

6          THE COURT:  All right, Mr. Trabold.

7          MR. TRABOLD:  Your Honor, an issue has come up with

8    the first witness, as to the identify of the person that

9    provided the initial information about Foley.  And I just

10   wanted to raise it with the court.  First, that I don't think

11   the witness should have to reveal the actual identity of the

12   person.  My point is that, obviously, the disclosure of the

13   informant's name places the informant at grave risk of possible

14   retaliation.  The only real issue is whether the officer --

15         THE COURT:  The quality of the information.  It

16   comes up all the time.  Is there a disagreement among you on

17   this?

18         MR. SCHROEDER:  I'm certainly asking for the

19   identity.

20         THE COURT:  You're not going to get it.

21         MR. TRABOLD:  That's all I wanted to raise with this

22   witness, judge.

23         MR. SCHROEDER:  On behalf of the defendant, your

24   Honor, at the time of the initial search of the property on the

25   17th of August, there were a number of agents present on the

4

1  property, both parole agents and Pennsylvania State Police.  As

2  well as four civilians, in addition to Mr. Foley.  I have

3  subpoenaed or attempted to subpoena those four witnesses.  Two

4  of those witnesses are defendants in this case.

5        THE COURT:  Refresh my recollection, who are the

6  defendants?

7        MR. SCHROEDER:  Mr. Dunn, Mr. Butler.  Mr. Dunn is

8  represented by Attorney Latouf.  Mr. Butler is represented by

9  Attorney Placidi.  In addition, there is an Angela Carbone, who

10  is present pursuant to a subpoena I served.

11        THE COURT:  Who is not a defendant?

12        MR. SCHROEDER:  Who is not a defendant.  I attempted

13  to subpoena a Christina Weber, whose testimony would be quite

14  relevant and important with respect to the issue of consent.

15  Despite my best efforts, I have not been able to locate Ms.

16  Weber.  I received conflicting information as to where she

17  lives, where she works.

18        THE COURT:  Where do you believe she is?

19        MR. SCHROEDER:  I believe she's in Erie County.

20        THE COURT:  Have you had a process server look for

21  her?

22        MR. SCHROEDER:  I sent Leo Pierce out looking for

23  her -- I've looked for her myself.  I had information she lived

24  on West 8th Street.  That did not come to fruition.  I had

25  information she worked in this club in Fairview, that did not

5

1  come to fruition.  I'm told she might be living in Girard.  I'm

2  told she is present in this county because Angela Carbone

3  indicated to me she stopped at her house within the last

4  several days.  But I have not been able to serve a subpoena on

5  her.  I believe she would have relevant testimony with respect

6  to this.  That having been said, the defendant would request,

7  if not a continuance of this proceeding today --

8        THE COURT:  Denied.

9        MR. SCHROEDER:  Or an opportunity to bifurcate this

10  to attempt to locate her and bring her testimony in at a later

11  point.

12        THE COURT:  Let's do this.  I'm not going to

13  continue the hearing today.  But let me hear the testimony

14  first before I make a decision as to whether -- bifurcated on

15  the issue of what?

16      MR. SCHROEDER:  To bifurcate simply for the purpose

17  of attempting to locate her and bring her testimony in at a

18  later point.

19      THE COURT:  I'll see, but it may or may not become

20  germane.  In any event, the government has the burden on the

21  issue of consent.  Is there anything else from a factual matter

22  that you need to bring up with me, witness wise or anything?

23      MR. SCHROEDER:  Yes.  Mr. Dunn and Mr. Butler are

24  represented by counsel.  Mr. Dunn's counsel has told me today

25  that he's advising his client to plead the Fifth Amendment.

6

1  Assuming Mr. Butler's counsel is, we've had ongoing

2  discussions -- they would like to put that on the record with

3  respect to this.

4      THE COURT:  They can do it out there.  In other

5  words, are you willing -- is the upshot this.  If they put on

6  the record that they're invoking the Fifth and I find it a

7  valid invocation, are you willing to let them go?

8      MR. SCHROEDER:  I would then ask the court for some

9    grant of limited transactional immunity for purposes of this

10   proceeding.

11          MR. TRABOLD:  How can a defense attorney get

12   transactional immunity?

13          THE COURT:  That's a pretty good question.

14          MR. SCHROEDER:  They are defendants in this case.  I

15   would ask the court to grant them, those defendants with

16   respect to this particular case, which would be their concern,

17   immunity for purposes of their testimony solely with respect to

18   the issue of the facts and circumstances of the search.

19          THE COURT:  You want me to grant them immunity?

20          MR. SCHROEDER:  Yes, the defendants in this case.

21          THE COURT:  I had always, I didn't mean to speak

22   over you, I had always thought that that ball, the immunity

23   ball, was thrown into court by the prosecutor?

24          MR. TRABOLD:  That's my understanding.  I don't

25   think that the situation contemplated is valid under the law.

7

1  Because unless something would have to prevent me from being

2  able to use the information.  I think the government has to be

3    a party to the grant of immunity.

4         MR. SCHROEDER:  May I respond.

5         THE COURT:  You can.  It would have been helpful to

6    know about some of these issues before this morning.  But be

7    that as it may.

8         MR. SCHROEDER:  As of two days ago, I believed Mr.

9    Dunn was going to testify.  And as of one day ago, I believed

10   Mr. Butler was going to testify.  So I found this out this

11   morning.

12        THE COURT:  I'm not faulting you for that.

13        MR. SCHROEDER:  Obviously, I have to do everything I

14   can on my client's behalf.  That having been said, the only way

15   I can secure their testimony in any manner whatsoever is if

16   they invoke the Fifth Amendment.  I would ask the court to give

17   them some immunity as to what they testify to in the

18   proceeding, it would have limited utility as against them in

19   this particular case.  I recognize this is a novel situation, I

20   have no choice.

21        THE COURT:  Hold your thought one second.  Mr.

22   Trabold, how many witnesses do you have?

23        MR. TRABOLD:  I have five witnesses.  Two of which

24  will be very brief, I expect anyways.

25        THE COURT:  And what you have is somewhat dependent

8

1  on what they say.  With respect to, I'm going to hear this out

2  with respect to the search of the residence itself.  Is the

3  government relying primarily on consent or on the doctrine of

4  protective sweep -- not the garage, I'm talking about the

5  residence?

6        MR. TRABOLD:  We're relying on --

7        THE COURT:  You don't need consent if it's,

8  obviously, if it's a legitimate protective sweep?

9        MR. TRABOLD:  I think both apply to this matter,

10  there's a valid and lawful consent and also there's a

11  legitimate protective sweep that applies to the residence, as

12  well as the garage.

13        THE COURT:  Let's go off the record.

14        (Off the Record.)

15        THE COURT:  All right, there are two co-defendants

16  in this case who have been subpoenaed by the defendant to

17  testify at the suppression hearing.  Until yesterday defense

18  counsel was under the impression they would testify

19  substantively.  They have now been advised by their respective

20  counsels to invoke the Fifth Amendment.  Mr. Schroeder has

21  asked me to grant them transactional immunity, insulating them

22  from any prosecution, although, they are already under the

23  prosecution cloud, for anything they say here.  As we begin our

24  hearing, what I'm interested in knowing is whether that is a

25  viable option, whether the prosecutor has to be a party to

9

1  that.  And then I'll chat with you later about that.  Okay.

2  The government, I gather, is not consenting?

3       MR. TRABOLD:  Correct.

4       THE COURT:  Why don't we get started, I will confirm

5  on the record out there with Attorneys Latouf and Placidi that

6  their clients are invoking the Fifth, and we'll take it from

7  there.

8       (Whereupon, at 9:10 a.m., the proceedings recessed

9  in Judge's Chambers; and at 9:12 a.m., commenced in Courtroom C

10  as follows:)

11       THE COURT:  First of all, before we get rolling

12  today, we have Mr. Latouf is somewhere in the courtroom, is

13  that right, or he's not.  If he's not, ask him to come in.

14  Mr. Latouf, who are you here representing today?

15      MR. LATOUF:  Eric Dunn, your Honor.

16      THE COURT:  All right, is my understanding correct,

17  if called to testify, it would be Mr. Dunn's intention to

18  invoke the Fifth Amendment privilege against

19  self-incrimination?

20      MR. LATOUF:  Yes, your Honor.

21      THE COURT:  All right.  Mr. Placidi, who are you

22  representing today?

23      MR. PLACIDI:  Mr. Butler, your Honor.

24      THE COURT:  Is my understanding correct, that the

25  same would be true with respect to your client?


                                    10


1       MR. PLACIDI:  That's correct, your Honor.

2       THE COURT:  All right.  Are you ready to go, Mr.

3  Trabold?

4       MR. TRABOLD:  Yes, your Honor.  The United States

5  calls Sergeant Randy Detzel.

6        THE CLERK:  Would you raise your right hand, please.

7        RANDY DETZEL, GOVERNMENT WITNESS, SWORN

8            DIRECT EXAMINATION

9  BY MR. TRABOLD:

10  Q.    Sir, can you identify yourself, please?

11  A.    Yes, I'm Sergeant Randolph Detzel from the Vernon

12  Township Police Department.

13  Q.    How long have you worked there?

14  A.    Nine years.

15  Q.    In what capacity are you currently working there?

16  A.    Patrol sergeant with the K-9 Unit.

17  Q.    And you're employed full-time by the Vernon Township

18  Police Department?

19  A.    Yes, I am.

20  Q.    Am I correct in saying that Vernon Township is in

21  Crawford County?

22  A.    That is correct.

23  Q.    How far is Vernon Township from Saegertown?

24  A.    I'll take a guess, maybe 12 miles.

25  Q.    Are you familiar with a Hill Road?

11

1  A.   Yes, I am.

2  Q.   On April 9th of 2003, did an individual provide you some

3  information about a person they called Mo Foley?

4  A.   Yes, they did.

5  Q.   Before we get into the information, the person that

6  provided you the information, did you know the person?

7  A.   Yes, I did.

8  Q.   And you obviously still do?

9  A.   Yes, I do.

10  Q.   How long have you known the person, approximately?

11  A.   As long as I've been doing this job.

12  Q.   Which is how long?

13  A.   Nine years.

14  Q.   Prior to April 9th of 2003, had this person provided you

15  useful law enforcement type information?

16  A.   Yes, they did.

17  Q.   Information that resulted in successful prosecutions or

18  seizures of contraband?

19  A.   Yes, they did.

20  Q.   Now, on April 9th of 2003, what information did this

21  person provide you about an individual they called Mo Foley?

22   A.   The information provided to me was that the gentleman had

23   been wanted by state parole.  They were an absconder, living in

24   Ohio --

25          THE COURT:  Say that again, he was a what?

12

1          THE WITNESS:  He was an absconder from state parole.

2    And that he had been living in Ohio, coming back to the

3    Saegertown area on weekends.

4    BY MR. TRABOLD:

5    Q.   Did the individual provide you any information about any

6    possible illegal activity?

7    A.   Yes, they felt that the person possibly was involved with

8    the manufacture of --

9          THE COURT:  You said they, do you mean he or she?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  All right, be specific.

12          THE WITNESS:  Yes, your Honor.  Said that the

13   individual was possibly involved with the manufacture, use,

14   sale or distribution of methamphetamine.

15   BY MR. TRABOLD:

16  Q.    And did the person provide you a description of the

17  property where the person was living in Saegertown?

18  A.    No.

19  Q.    Was there an address provided, though?

20  A.    Yes.  Not a physical address, the person provided me with

21  a general area where this person would be, something that would

22  be easily identified once we were on that road.

23  Q.    Was that physical description, once you were on the road,

24  was that ultimately then verified?

25  A.    Yes, it was.


                                    13


1   Q.    And did the description that your informant provided you,

2   was that description accurate?

3   A.    Yes, it was.

4   Q.    Now, what did you do with the information about this

5   person identified as Mo Foley?

6   A.    I contacted the Pennsylvania state parole agency, tried

7   the local officer first in Meadville.  And I also contacted

8   another law enforcement officer with the Office of Attorney

9   General.  Eventually I talked to State Parole Officer Bill

10  Wehrle out of Erie, Pennsylvania.

11  Q.    The passing on of this information about somebody

12  absconding from parole is just standard procedure you would

13  have undertaken in any given case?

14  A.    That's correct.

15  Q.    Ultimately you got in contact with State Parole Agent

16  Bill Wehrle on April 17th of 2003?

17  A.    That is correct.

18  Q.    You had some discussions with Agent Wehrle and ultimately

19  the decision was made to attempt to apprehend this person known

20  as Maurice or Mo Foley?

21  A.    That is correct.

22  Q.    And am I correct in saying that you went onto the

23  property on Hill Road in Saegertown sometime after 10 o'clock

24  at night on April 17th?

25  A.    That is correct.


                            14


1  Q.    Prior to that, prior to 10 o'clock at night on April 17th

2  of 2003, had you met with Agent Wehrle and other law

3  enforcement officers to discuss your plan of action?

4   A.   Yes, we did.

5   Q.   And was the decision made to seek the assistance of the

6   state police?

7   A.   Yes, it was.

8   Q.   Do you know or were you a part of why the state police

9   were brought in to assist yourself and the parole agents?

10   A.   The main reason would be to assist with the

11   jurisdictional issues.

12   Q.   And at some point in time, did you become aware that it

13   was believed that Mo Foley or that individuals were present at

14   the property on Hill Road?

15   A.   Yes.

16   Q.   And the decision was then made to go on to the property

17   sometime around 10 o'clock at night?

18   A.   That is correct.

19   Q.   Did you participate in that?

20   A.   Yes, I did.

21   Q.   What was your role on April 17th of 2003 on the property

22   there at Hill Road?

23   A.   I was stationed on the corner, it would have been on the

24   north -- if I have these directions correct, it would have been

25  near a bus, there was a bus that looked as though it stored

15

1  some automobile parts.  I believe the direction would have been

2  to the west of an outbuilding that was utilized as a garage at

3  the time.  My job was to maintain security of that corner.

4        THE COURT:  Officer, from whom did you learn that

5  there might be other people on the property and when did you

6  learn that?

7        THE WITNESS:  Your Honor, I learned that from State

8  Parole Officer William Wehrle.

9        THE COURT:  What were you told?

10        THE WITNESS:  That there were three vehicles and

11  possibly several individuals.

12        THE COURT:  All right, go ahead.

13  BY MR. TRABOLD:

14  Q.    And when you went on the property, there were multiple

15  vehicles on the property?

16  A.    That is correct.

17  Q.    I want to show you what I marked as Government's Exhibit

18  No. 1 and ask if you can identify what's depicted there?

19   A.   Yes, I can.

20   Q.   What is that?

21   A.   This is a picture of the garage, the outbuilding.  It's

22   also showing the bus I spoke of.

23   Q.   It's two different photographs, one is the front of the

24   garage and one is the back of the garage?

25   A.   That is correct.


16


1   Q.   The bus is in the general vicinity of where you were

2   located?

3   A.   That is correct.

4   Q.   And other than the garage, there's also another building

5   on the property, correct?

6   A.   I'm sorry, could you repeat that.

7   Q.   Other than the garage, there's also another building on

8   the property, correct?

9   A.   There was a residence some distance from the garage.

10   Q.   From where you were located near this bus, near the

11   garage, did you have an ability to see what was going on at the

12   residence?

13  A.   No, I did not.

14  Q.   I'm going to show you what I've identified as Government

15  Exhibit No. 2 and ask you if you can identify what's depicted

16  there?

17  A.   Yes, this would be, in the top picture would be the

18  residence.

19  Q.   At the property on Hill Road?

20  A.   At the property on Hill Road, yes.

21  Q.   Now, other than yourself stationed there near this bus,

22  was there any other law enforcement officers stationed there

23  right where you were?

24  A.   Yes, Corporal Rossman of the Pennsylvania State Police.

25  Q.   And your purpose was simply to be there to make sure you


17


1  had that area covered?

2  A.   That is correct.

3  Q.   What happens then when you're stationed there by this

4  bus?

5  A.   Well, things happened very fast.  The first thing I

6  recall is that there was a black Chevy dually, they call it a

7    pickup, it's one with double wheels in the back, with an

8    extended axle.  This vehicle started to run.  Actually, the

9    lights flashed for a second and it started running.  Next, I

10   heard commands being given, that I recognized, by Sergeant

11   Nichols of the Conneaut Regional Police, yelling to get on the

12   ground, get on the ground.

13   Q.   Let me stop you right there for one second.  Sergeant

14   Nichols was located where in relation to the garage?

15   A.   He was somewhere in the area between the residence and

16   the back of the building.

17   Q.   The building being the garage?

18   A.   Correct.

19   Q.   So you hear this truck -- was the truck located in the

20   front area of the garage?

21   A.   Yes, it was.

22   Q.   The truck starts up and then shortly thereafter, almost

23   immediately thereafter, you hear somebody in the back of the

24   garage yelling "get on the ground, get on the ground?"

25   A.   To my side, it would have been possibly, might have been

18

1   back more to the side, there would have been an area between

2   the two buildings, between the residence and the garage, maybe

3   in that distance in there.  I couldn't tell, it was dark, I

4   just heard the yelling.

5   Q.   You could not, from your vantage point, see what was

6   going on in the back part of the garage or at the residence?

7   A.   That's correct, I could not see that.

8   Q.   Now, simultaneous to that or almost simultaneous to that,

9   is anything happening at the front of the garage?

10  A.   Yes, there was a large white dog that approached my

11  canine, at that time my main concern was to keep the dogs from

12  fighting.  And the next thing I knew there was an older

13  gentleman outside the building, the other officers were inside

14  the building.  And two females came up to get a hold of the

15  dogs so there wasn't a dog fight.

16  Q.   Now, from your vantage point where you were by the bus,

17  could you see the front door of the garage?

18  A.   Yes, I could.

19  Q.   How is it that this person ended up coming out the front

20  door of the garage; by that I mean, did anyone knock on the

21  door and announce or anything like that?

22  A.   There was knocking and announcing at the same time that

23  that vehicle started, is when the knocking and announcing was.

24  Prior actually to the vehicle starting.

25          THE COURT:  Let me interrupt for a second here.


19


1  So you're standing outside with your dog, is that right?

2          THE WITNESS:  Yes, your Honor.

3          THE COURT:  All right.  And nothing has happened,

4  roll the tape back, nothing has happened yet.  Walk me through,

5  what happened first, did people first go into the garage, did

6  people first go to the residence or don't you know -- this

7  isn't the sequence of events in the affidavit.  Do you know if

8  people first went to the residence?

9          THE WITNESS:  I don't know that.

10          THE COURT:  Who did you see go to the garage?

11          THE WITNESS:  It was a state parole officer, I

12  believe Jerry Verga.

13          THE COURT:  Did you see him go up to the door?

14          THE WITNESS:  Yes, I did.

15          THE COURT:  Did you see him go in?

16          THE WITNESS:  No.

17          THE COURT:  What's the next thing you saw or heard?

18          THE WITNESS:  The vehicle starting.

19          THE COURT:  Then what was the next thing you saw or

20   heard?

21          THE WITNESS:  I heard yelling, I recognized Sergeant

22   Nichols yelling for the person to get on the ground.

23          THE COURT:  Go ahead, Mr. Trabold.

24   BY MR. TRABOLD:

25   Q.    Just so we're clear, somebody is at the door knocking on


                                    20


1    the door, the car starts, the dog comes out and then you hear

2    somebody yelling in the back?

3          THE COURT:  Is that right?

4          THE WITNESS:  No, not exactly.  Let me go through

5    this again, it happened in seconds, it was quick.

6    BY MR. TRABOLD:

7    Q.    Take your time.

8    A.    The first thing I recall is the door was being approached

9    as we were standing by the bus.

10   Q.    Just so the record is clear, by the door, you mean the

11  front door of the garage?

12  A.   The garage, the man door.

13  Q.   Being approached by a parole agent?

14  A.   Yes.

15  Q.   A knock and announce on the door occurs?

16  A.   I couldn't say, I was too far back.

17  Q.   Okay.  Then what do you recall?

18  A.   The vehicle starting, saw the lights flashing, the

19  vehicle started.

20      THE COURT:  Where was it parked?

21      THE WITNESS:  It would have been to my left in line

22  with the big door that was on that garage.

23  BY MR. TRABOLD:

24  Q.   Again, so the record is as clear as possible, was anyone

25  in this pickup truck that started or was it remote started?


21


1  A.   It was remote started.

2  Q.   I just wanted to make sure the record was clear.  The

3  pickup truck starts?

4  A.   Yes.

5  Q.   Then what do you recall?

6  A.   As soon as that truck started is when I recall hearing

7  Sergeant Nichols yelling to get on the ground.

8  Q.   And then once you hear somebody yelling to get on the

9  ground, how much time elapses before something begins to occur

10  at the front door of the garage?

11  A.   I would say it was the same time, everything was just

12  right now.

13  Q.   And what is it you see then happen at the front door of

14  the garage?

15  A.   I saw it was an older man at the door, I noticed Corporal

16  Rossman left me --

17        THE COURT:  You've got to keep your voice up, what

18  is his name?

19        THE WITNESS:  Corporal Rossman.

20  BY MR. TRABOLD:

21  Q.   An older man at the front door of the garage, Corporal

22  Rossman then does what?

23  A.   He goes immediately to the garage.

24  Q.   Let me stop you and make sure we got the record as clear

25  as possible.  This older man, was he inside the garage and then

22

1  opened the door?

2  A.    Yes.

3  Q.    Okay.  So this older person opens the door of the garage,

4  then Corporal Rossman goes and does what?

5  A.    He left me at this time, like I said, I have a big dog, a

6  mastiff to deal with, then the two females come up to try to

7  take the dog.

8  Q.    At some point in time shortly thereafter, do law

9  enforcement officers go inside the garage from the front door?

10  A.    Yes.

11  Q.    And would that be roughly at the same time or very

12  shortly after you heard get on the ground, get on the ground in

13  the back?

14  A.    Yes.

15  Q.    Would it be fair to say that this was all occurring so

16  fast, it's really one right after the other within a matter of

17  seconds?

18  A.    That's exactly what happened.

19  Q.    And do you stay outside the garage when law enforcement

20  officers make their first entry into the garage?

21  A.   Yes, I was outside when they first went in.

22  Q.   Once the law enforcement officers go into the garage,

23  what do you then see happen or what do you observe?

24  A.   Okay, after the dog was secured, I eventually went into

25  the garage to maintain security.  There was two females and two

23

1  males, they were in the garage.  And basically what I did was

2  just maintain security.

3  Q.   And did you see any items of obvious contraband in the

4  garage in plain view?

5  A.   I personally did not.

6        MR. SCHROEDER:  I object to leading nature of the

7  questions, your Honor.

8        THE COURT:  Overruled.

9  BY MR. TRABOLD:

10  Q.   And then you're there for a period of time subsequent to

11  providing security with your dog, correct?

12  A.   That is correct.

13        MR. TRABOLD:  One moment, your Honor.

14  BY MR. TRABOLD:

15  Q.   Sir, I'm going to show you what I've identified as

16  Government Exhibit No. 3, ask you if you can identify what's

17  depicted there?

18  A.   This would be the building in the top picture.  This is

19  the building that I have been referring to.  This would be the

20  man door that I saw open with the older person opening the

21  front door.

22  Q.   Am I correct in saying that that vehicle, the black

23  vehicle that's depicted there, that would be the dually or the

24  pickup truck you're talking about?

25  A.   That's is the vehicle, yes.


24


1  Q.   That's the pickup truck that remote started?

2  A.   Yes, sir.

3       MR. TRABOLD:  Nothing further, your Honor.

4       THE COURT:  All right.  Cross-examine.

5            CROSS-EXAMINATION

6  BY MR. SCHROEDER:

7  Q.   Sir, with respect to your testimony on direct

8   examination, you indicated it was you who received some

9   information from a confidential informant sometime prior to the

10  actual arrival on the premises, correct?

11  A.   That is correct.

12  Q.   What is the date that you received that information, sir?

13  A.   Without looking at my report, I think it was about a week

14  prior to the time we were at the residence.

15  Q.   One week prior to the time you were at the residence?

16  A.   I believe so.

17  Q.   You've described this informant as being a reliable

18  source of information, correct?

19  A.   Yes, sir.

20  Q.   You've described this informant as being someone who has

21  provided you reliable information on multiple occasions in the

22  past that you have utilized in investigations, correct?

23  A.   On other occasions.

24  Q.   Other occasions?

25  A.   Other occasions.

25

1   Q.   Not just this occasion, but other occasions?

2  A.    Other occasions.

3  Q.    You found through the course of that utilization of that

4  information from that confidential informant that it was in

5  fact accurate?

6  A.    It was accurate, yes.

7  Q.    And your testimony on direct examination was this

8  confidential informant provided you information with respect to

9  the identity of the defendant, Maurice Foley, correct?

10  A.    No, the information that I had was that this person was

11  Mo, at first they weren't sure of the gentleman's full name.

12  And eventually it was discovered it was Maurice Foley.  First I

13  just had it was Mo Foley.

14  Q.    When did you receive information, specific information to

15  Mo Foley?

16  A.    I would say approximately a week before, maybe, I would

17  say the 10th of April.

18  Q.    What is the identity of this confidential informant?

19          MR. TRABOLD:  Objection, your Honor.

20          THE COURT:  I already ruled on that.

21          MR. SCHROEDER:  For the record I wanted to ask the

22  question.

23          THE COURT:  So the record is complete, tell me the

24  basis upon which you feel you need the identity in order to

25  adequately test the informant's reliability?


26


1       MR. SCHROEDER:  There could be a number of

2  circumstances which could arise, your Honor, after the

3  information is ascertained.  Some or all of the defendant

4  witnesses may have some information regarding the truthfulness

5  or veracity of that individual.

6       THE COURT:  For the record, give me the government's

7  position again?

8       MR. TRABOLD:  Your Honor, the government's position

9  is the identity of the person is not relevant to a

10  determination as to their reliability in this circumstance.

11  Obviously, even more importantly, the disclosure of the

12  informant's identity exposes the informant to a whole lot of

13  dangerous circumstances as a result of providing the

14  information.

15       THE COURT:  Let me ask you, officer, what is your

16  opinion as to whether or not this particular informant could be

17  at some risk if his identity were revealed?

18        THE WITNESS:  I feel that it's a very good

19  possibility of that, your Honor.

20        THE COURT:  All right.  I'm going to sustain the

21  objection, I don't see the relevance.  Go ahead.

22  BY MR. SCHROEDER:

23  Q.   But, in any event, Sergeant Detzel, you indicated that

24  you had personal knowledge of this person, that they provided

25  you reliable information in the past and that they provided you


                              27


1  reliable information which you deemed reliable information in

2  this circumstance approximately a week or so before the 17th of

3  April, correct?

4  A.   That is correct.

5  Q.   You then notified state parole agents with this

6  information, correct?

7  A.   Yes, I did.

8  Q.   When did you do that, sir?

9  A.   I believe the first call was the day that I had

10  information, it was to officers working out of the Meadville

11  branch.

12  Q.   In addition, sir, to the information regarding the name

13  of the alleged parole absconder who was Mo Foley, you testified

14  on direct examination that other information was provided with

15  respect to illegal activities taking place at the premises,

16  correct?

17  A.   Possible illegal activities.

18  Q.   When you testified on direct examination, you said that

19  this confidential informant provided you the name of the

20  individual and information regarding drug activities, correct?

21  A.   Correct.

22  Q.   This is the person who you previously described as being

23  historically reliable?

24  A.   Correct.

25  Q.   What specific information was provided to you at that


                                 28


1  time, about a week before the 17th, with respect to drug

2  activities?

3  A.   That the person could possibly be involved in the

4  manufacture, distribution of controlled substances, being

5  methamphetamine.

6  Q.    And, in fact, ultimately there was methamphetamine found

7  on the premises?

8  A.    I can't answer that, I don't know.

9  Q.    Now, you conveyed this information to the state parole

10  agents as well, correct?

11  A.    Yes, I did.

12  Q.    And, again, about a week before the date that this group

13  of individuals arrives at the premises, correct?

14  A.    Yes, I did.

15  Q.    And what happens historically, then, after you conveyed

16  this information to the parole agents?

17  A.    I didn't hear anything from anyone until the 17th.

18  Q.    What time on the 17th did you hear from someone?

19  A.    I'm not sure of the time, I believe I met with the

20  officers at approximately 5:00 p.m.

21  Q.    I'm sorry, you are a law enforcement officer, correct?

22  A.    That is correct.

23  Q.    You have sought and obtained search warrants in the past,

24  correct?

25  A.    Yes, I have.

1  Q.   And based on the information that you received from your

2  confidential informant, there would have been nothing to

3  preclude you from seeking a search warrant with respect to

4  these premises and the information that you had been provided

5  by your reliable informant, correct?

6  A.   Let me make sure I understand this correctly -- are you

7  asking if this was in my jurisdiction or if it was out of my

8  jurisdiction?

9  Q.   Was this in your jurisdiction?

10  A.   No, it was not.

11  Q.   What jurisdiction was it in?

12  A.   State police jurisdiction.

13  Q.   Nothing would have prevented you from contacting the

14  Pennsylvania State Police, indicating that you had received

15  this information from a previously reliable informant, and

16  relating that information to them for purposes on their search

17  warrant, correct?

18  A.   That's correct.

19  Q.   But that did not happen?

20  A.   No.

21  Q.    The only thing that happened was some information was

22  conveyed to the parole agents and, in fact, on the 17th at

23  5 o'clock there is some sort of contact was made with you?

24  A.    That is correct.

25  Q.    Was this a telephone contact or a meeting?


30


1  A.    There was a telephone call just shortly before we met.

2  At that time is when I received the phone call, we met at

3  approximately 5:00 p.m.

4  Q.    Now, in Crawford County there is an assigned magistrate

5  on duty 24 hours a day, correct?

6  A.    We have a rotation system where after 4:30 there's an

7  on-call district justice.

8  Q.    But if you met at 5 o'clock or thereafter, there would

9  have been a district justice available for you and for the

10  officers from the Pennsylvania State Police to go and seek a

11  search warrant based upon this reliable information that you

12  described that you were in possession of?

13  A.    That is correct.

14  Q.    And that did not happen?

15  A.   No.

16  Q.   And, in fact, you testified that a group of individuals

17  then retired out to the address or the property you offered

18  testimony on, correct?

19  A.   Correct.

20  Q.   Now --

21      MR. SCHROEDER:  May I approach the witness, your

22  Honor?

23      THE COURT:  You can do it without asking.

24      MR. SCHROEDER:  Thank you, your Honor.

25  BY MR. SCHROEDER:


                                31


1  Q.   Sir, I'm handing you which I'm going to mark as Exhibit

2  A, I'm going to ask you -- I'll first indicate for the record

3  that would be Defendant's Exhibit A, it's a handwritten diagram

4  of --

5      MR. TRABOLD:  Your Honor, may see the document.

6      THE COURT:  Show it to him, he hasn't seen it.

7      MR. SCHROEDER:  I'm sorry.

8  BY MR. SCHROEDER:

9   Q.   Again, sir, I'm handing you this, which I will be asked

10   to be marked as Defendant's Exhibit A, would I be correct that

11   that is a diagram of a parcel of real estate and a couple

12   buildings?

13   A.   Yes.

14   Q.   Based upon your personal experience being at this

15   location, does this appear to fairly and accurately depict the

16   location that you went to on the 17th of April, 2003?

17   A.   Yes.

18   Q.   And with respect to the diagram itself, there is a house

19   depicted and there is a garage depicted some distance from the

20   house, correct?

21   A.   Correct.

22   Q.   There is what is indicated as a front door on the garage

23   and a back door on the garage?

24   A.   Correct.

25   Q.   And with respect to the house, did you ever go up to the

32

1   house at the initial arrival at the scene?

2   A.   No, not at the initial time, no.

3  Q.   With respect to anything that took place at the house,

4  then, you would have no firsthand knowledge as to what took

5  place at the house?

6  A.   That is correct.

7  Q.   Initially?

8  A.   That is correct.

9  Q.   Did you ever ultimately go into or to the house that

10  evening?

11  A.   Not that evening, no.

12  Q.   You went back on another occasion?

13  A.   In the morning I went back.

14  Q.   Now, with respect to the distance between the house and

15  the garage, what is, as best you as can estimate, what is that

16  distance, sir?

17  A.   That's hard to say -- don't hold me to this as accurate,

18  I'm going to say maybe 75, 100 feet.

19  Q.   Is there anything to obstruct, trees, other outbuildings,

20  parked vehicles, anything to obstruct the view in the area

21  between the garage and the house?

22  A.   It's all settled, the ground is not even there, this

23  building here is higher elevated than what the house is, I

24  believe.

25   Q.   So if the garage is higher elevated, then the vantage

33

1   point of the garage would actually be better looking towards

2   the house than the house towards the garage?

3   A.   I'm not sure, it's been a year and a half since I've been

4   there, I'm not real sure.

5   Q.   Now, there was a bus that was parked close to the garage,

6   correct?

7   A.   That is correct.

8   Q.   Where was the bus parked, sir?

9   A.   It would have been right here.  If we're looking at the

10   diagram, the bus was up in here, this area (indicating).

11   Q.   Write the words on this diagram bus, and a little

12   schematic of the bus?

13   A.   I'd say the bus was right in here (indicating).

14   Q.   Now, when you arrived on the 17th, where did you first go

15   to, where did you position yourself on this diagram?

16   A.   Well, first of all, is this Hill Road out here, just so

17   I'm correct?

18   Q.   It's designated as Hill Road; does that fairly and

19   accurately depict the location of Hill Road and these

20   properties based on your recollection?

21   A.   I don't know if you want me to mark this, but I can mark

22   where that police car was.

23   Q.   Please do?

24   A.   (Witness complies.)  I'll mark K-9 on here so you know it

25   was me.

34

1   Q.   For the record, K-9 is the Vernon Township patrol vehicle

2   that you were driving on that night?

3   A.   That is correct.

4   Q.   Thank you.

5   A.   I parked right here, and then I went over and there was

6   tree by the bus, I believe, I was on the driver's side of the

7   bus.

8   Q.   So if this is designated as the front door, you initially

9   positioned yourself near the front door of the garage?

10   A.   No, I was off to the right, I was a fair distance from

11   the front door, I was not real close.

12   Q.   But closer to the front than the back?

13  A.  Oh, yes, I couldn't see the back.

14  Q.  Did you see a vantage point where you could see the back?

15  A.  No.

16  Q.  Whatever took place at the back door, you could not see?

17  A.  That is correct.

18  Q.  Could you hear what was taking place there?

19  A.  I could hear the commotion, yes.  I recognized Sergeant

20  Nichols' voice.  I'm very familiar with him, that's why I knew

21  his voice when I heard it.

22  Q.  Sir, as best as you can recall, could you with little

23  circles put the place where you were standing and the place

24  where you recall other officers were standing initially?

25  A.  I'm going to put a couple lines, this is the K-9, I was

35

1  standing here, and Corporal Rossman was to my right.

2       THE COURT:  Put the initials, otherwise, I won't

3  know what circle matches which individual.

4       THE WITNESS:  (Witness indicates.)  That's where we

5  were initially.

6  BY MR. SCHROEDER:

7   Q.   Now, and again we're speaking initially, did anyone go to

8   the back of the garage when you reported initially?

9   A.   I can't be sure of that.  Corporal Rossman set up where

10   everybody was going to go, there were several officers there.

11   That's where I was assigned to be, that's where I was.

12   Q.   How many officers were there?

13   A.   I'm not sure right now.

14   Q.   I believe your testimony on direct examination was that

15   there was a lot of commotion within a very short time period,

16   correct?

17   A.   Almost instantaneous, if you would.

18   Q.   Was there someone apprehended at the back of the garage

19   that you could hear taking place?

20   A.   Someone was apprehended, but I cannot say with absolute

21   certainty it was behind the garage or on the side of the

22   garage, I don't know, it was dark.

23   Q.   Well, they weren't apprehended by you?

24   A.   That is correct.

25   Q.   They weren't apprehended by Corporal Rossman?

36

1  A.    That is correct.

2  Q.    So they had to be apprehended by other officers?

3  A.    That is correct.

4  Q.    So would it be safe for me to conclude that there were

5  other officers positioned somewhere in the location of this

6  garage?

7  A.    That would be, yes.

8  Q.    Are there other entrances or exits to this garage, other

9  than the front doors and back doors?

10  A.    I don't know.

11  Q.    I'm going to show you Government's Exhibit 3, and you've

12  previously identified that exhibit, correct?

13  A.    Yes.

14  Q.    And that is apparently, based upon your testimony, this

15  diagram and the photograph, this apparently is the front of the

16  garage that depicts the bus's location, correct?

17  A.    Correct.

18  Q.    And you would have been standing somewhere near this bus,

19  near the front door, where you had a clear vantage of the front

20  door, correct?

21  A.    I was back here off to, just like I drew it there, this

22  white car wasn't there, I don't know where it came from, this

23  white car -- I can't say it wasn't there, I don't remember this

24  white car.  I remember the bus, I remember the doors, but I was

25  off in this area, just like I drew it, it was over here.

37

1  Q.   On the front of the building there is a large garage

2  door?

3  A.   Correct.

4  Q.   And a man door, and then another door it appears?

5  A.   Correct.

6  Q.   And at this time when these photographs were taken, the

7  two garage doors are closed?

8  A.   That is correct.

9  Q.   Was that the condition when you were there?

10  A.   When we initially went there, both these doors were

11  closed and the man door was closed.

12  Q.   And the white car was not there, so your view from this

13  area was unimpeded by the white car?

14  A.   I can't say that, I don't remember this white car.

15  Everything was happening, and I was looking out for a lot of

16  different things, I don't know if that car was there or not.

17  But I was off here, I know exactly where I was, I was off here

18  in this area.

19  Q.    All right.  Now, this second photograph, that is part of

20  Government Exhibit 3, it shows what appears to be the side of

21  that garage, correct?

22  A.    It appears to be, yes.

23  Q.    Would you agree that there are no doors or windows on

24  that side that are visible from that photograph?

25  A.    Yes, I agree.


                                    38


1  Q.    And the bottom portion of Government's Exhibit 2 is

2  basically that same view of that garage, correct?

3  A.    Yes, it is.

4  Q.    And that clearly shows the entire length and there is no

5  exit or entrance door there or window for that matter.  And

6  with respect to the two photographs on Government Exhibit 1, on

7  the back side of that exhibit, those photographs show the rear

8  of the garage, correct?

9  A.    I'd have to agree this is the same building, but I never

10  was to the back.  So I don't know about this.

11  Q.    Relative to the bus, the diagram you marked here, the

12  position of the bus and the front doors, would it be accurate

13  to say --

14  A.    Yes, I would say.

15  Q.    The photographs show the building?

16  A.    Yes.

17  Q.    Would it be accurate to conclude that this photograph

18  here, the second photograph, shows the other side of the

19  building, not depicting the other ones which show no doors or

20  windows on that side as well?

21  A.    This is the same side we just spoke of.

22  Q.    That's the same side?

23  A.    I believe it is.  If you look at the back of railing from

24  up above, it's back here.  This is the same thing, it would be

25  the same.  Yeah, I agree with you there.


39


1  Q.    Other than the front and the back of this structure,

2  there are no entrance ways or exits, based on these photographs

3  and your recollection?

4    A.    Again, I don't know the building, I can only say what I

5    saw in the front.  I don't know about the rest of the building.

6    Q.    Now, you make reference to a dually truck?

7    A.    Yes.

8    Q.    Which started?

9    A.    Yes.

10   Q.    Where was that truck located?

11   A.    It is in front of that -- because I was watching the back

12   of it from my vantage point, what caught my attention is the

13   lights flickered for a second, came on for a second --

14   Q.    It was parked outside the garage?

15   A.    Outside, and the motor started.

16   Q.    What was your proximity to that vehicle?

17   A.    Couple car lengths maybe.

18   Q.    Did you ever test or look at that vehicle to see whether

19   it was equipped with a remote starter?

20   A.    I never did, no.

21   Q.    Other than hearing it, what indicated to you that it

22   started?

23   A.    The motor, I could hear the engine.

24   Q.    Were there any other vehicles in proximity to that?

25   A.    I don't recall if there were.  But I definitely know it

40

1   was that vehicle.

2   Q.   All right.  Are you aware of anyone else ever looking at

3   that vehicle to see whether it was equipped with a remote

4   starter?

5   A.   I'm not aware of it.

6   Q.   Now, your testimony on direct examination was that

7   everything happened in seconds, is your exact quote; do you

8   hear initially a knock on the front door of the garage?

9   A.   I couldn't hear it, no.

10  Q.   Did you see someone knock on the front door of the

11  garage?

12  A.   There was, I'm almost positive there was state parole

13  agent Jerry Verga was at the front door.

14  Q.   There was testimony about a knock and announce, were the

15  prosecutor's words?

16  A.   He was definitely at the front door and I know that

17  everything just happened very quickly.

18  Q.   Where you were you could see the front door?

19  A.   Right, I saw, I believe it was Jerry Verga, I think

20  that's his name, I don't work with these gentlemen every day,

21  so I believe it was Jerry Verga.

22  Q.    You saw one individual at the front door?

23  A.    I saw Jerry Verga at the front door, yeah.

24  Q.    And you used the words knock and announce after the

25  prosecutor used them, correct?


                                    41


1  A.    They was there at the front door.

2  Q.    Was it Jerry Verga that knocked and announced?

3  A.    As far as I know, yes.

4  Q.    Could you see him do that?

5  A.    I seen him at the front door, again, everybody had

6  different clothes on, I'm not sure, it's been a year a half

7  since I seen these gentlemen.  I don't know for sure, I'm

8  pretty sure it was Jerry Verga.  He was a law enforcement

9  officer, definitely.

10  Q.    You heard someone knocking?

11  A.    Someone at the front door.

12  Q.    And when they announced, what did they announce?

13  A.    I can't recall.

14  Q.   If everything happened within a few seconds, what happens

15  next in this very compressed time period?

16  A.   What I recall was the front door, the very first thing I

17  heard was that truck, the lights came on in the truck, the

18  motor started on the truck, I heard get down, get down, I

19  recognized Sergeant Nichols' voice.  There was a man at the

20  door, Corporal Rossman left where I was to go there and I had a

21  dog to contend with.  Everything was happening at one time.

22         THE COURT:  Where did that dog come from?

23         THE WITNESS:  That, your Honor, I don't know.  I

24  assume it came from the residence because there were two

25  females that came up, they were concerned that I hurt the dog,


42


1  it wasn't my intention to hurt any dog --

2         THE COURT:  What kind of dog was it?

3         THE WITNESS:  It was a big white dog, I believe it

4  was a mastiff, a mastiff or dog of that size, a big dog.

5         THE COURT:  Go ahead, Mr. Schroeder.

6  BY MR. SCHROEDER:

7  Q.   Where was Sergeant Nichols' position when you heard him

8    say "get down, get down?"

9    A.    He would have been on the other side of that black truck,

10   somewhere between the residence and this garage.

11   Q.    Do you know who he ultimately said "get down, get down"

12   to?

13   A.    Eventually, later on, after it calmed down, I saw that it

14   was the gentleman seated at our table that was in the back of

15   the car.

16   Q.    The defendant?

17   A.    Yes, sir.

18   Q.    So in this compressed time period, the engine starts,

19   there's a knock and announcement of some sort, and within just

20   a few seconds you hear "get down, get down" by Sergeant

21   Nichols, who you ultimately came to understand had directed

22   that to the defendant, Maurice Foley?

23   A.    That is correct.

24   Q.    And did you observe whether or not Maurice Foley got down

25   and complied?

43

1    A.    I couldn't see any of this.

2   Q.   Based upon what you were doing, did you have any reason

3   to believe he did not?

4   A.   No, I had no reason to believe he did not.

5   Q.   In fact, based upon your experience, if he had not

6   complied, you certainly would have heard something further with

7   respect to that, correct?

8   A.   That would be correct.

9   Q.   Based upon your experience, when an individual complies,

10  there is no further need to yell further commands to comply?

11  A.   That is correct.

12  Q.   So Maurice Foley, then, based upon what you at least

13  heard, would have exited that garage within that compressed

14  time period, correct?

15  A.   No, exited the building I would say that.

16  Q.   If the building only has doors on the front and the back,

17  and you were positioned in the front, so he would have exited

18  the back?

19  A.   That would be a logical assumption, yes.

20  Q.   And immediately complied because you didn't hear any

21  other directions, correct?

22  A.   I didn't hear any others, no.

23  Q.   And ultimately you saw him there in custody?

24  A.   That is correct.

25  Q.   Now, with respect to your position in the front door of

44

1  the garage, what happened next?

2  A.   Well, like I testified, we took care of the dog

3  situation.  The door was opened, I went in and joined the

4  officers inside.  Again, I'm sure this is Jerry Verga inside,

5  and I joined them.  My job is simply I downed my dog in what we

6  call a down state, just to maintain security.

7  Q.   You previously indicated that the doors were closed?

8  A.   Well, not the man door, the man door was open.

9  Q.   The man door was open?

10  A.   I went in through the man door.

11  Q.   Initially, when you got there, all three doors were

12  closed?

13  A.   That is correct.

14  Q.   So someone opened the man door?

15  A.   Correct.

16  Q.   Do you know who?

17  A.   No, I do not know.

18  Q.   Within this short time period, you said that there were

19  officers inside the building at that time?

20  A.   I know there was Jerry Verga and Corporal Rossman.

21  Corporal Rossman left me because, as I testified, to go when

22  the door opened, when the man had come to the door.

23  Q.   So when this person came to the front door, did you

24  observe him being taken into custody and secured?

25  A.   No, I didn't.


                                45


1  Q.   What did you observe take place there?

2  A.   I was concerned my $10,000 dog is going to get ate up by

3  this white dog.  I had all I could do to keep the dogs part.

4  Q.   So you were distracted?

5  A.   Exactly.

6  Q.   After the dogs were secured, then you went to the garage

7  and agents were inside the garage?

8  A.   That is correct.

9  Q.   At that time were the main doors open or just the man

10  door still?

11  A.   When I went in, it was just the man door.

12  Q.   How many agents were inside the garage at that time?

13  A.   At that time I spoke with Agent Verga.  There could have

14  been other agents that had been in there, I don't know.  But I

15  saw Agent Verga.

16  Q.   Was the garage secured at that point?

17  A.   It was secured with the four people I was watching, yes.

18  There were people upstairs, I know that.

19  Q.   Above the garage?

20  A.   Correct.

21  Q.   When you say four people you were watching, who were the

22  four people you were watching?

23  A.   I don't know, two males and two females.

24  Q.   So you're not including the defendant in that?

25  A.   No, the defendant was in another car.


46


1  Q.   These were civilians who are present?

2  A.   That is correct.

3  Q.   At that time when you went in, the two male civilians,

4  other than the defendant, are secured and the two females are

5  secured?

6  A.   That is correct.

7  Q.   And officers are inside the barn or the garage?

8  A.   There was officers inside.

9  Q.   Now, you testified that at that time, though, you're

10  certain there were other people in the building?

11  A.   There was a ladder leading upstairs and I could hear

12  someone upstairs, I could hear footsteps upstairs.

13  Q.   Now, if the information indicated that one of the agents

14  might have gone upstairs, could you have heard the agent?

15  A.   I wouldn't have known who it was, I couldn't see.  It was

16  just a ladder above the ceiling, I don't know who was up there.

17  Q.   Did you ever come to find out that there were any

18  civilians on this property, other than the four people you just

19  described?

20  A.   I don't know.

21  Q.   But did you ever see any other civilian come down from

22  the second floor or be taken into custody?

23  A.   No, I just saw the four.

24  Q.   And with respect to the timeframe that all this takes

25  place, the best that you're able to estimate from the beginning

1  of the knock and announce, to the point in time when all of the

2  four civilians are secured, how much time elapses?

3  A.    That's very hard to estimate.  It wasn't more than

4  minutes, I mean it was quick, everything was very quick.

5  Q.    As you said on direct, it al happened in seconds?

6  A.    Very fast, yes.

7  Q.    We're not talking about a significant lapse of time,

8  everybody is secured within seconds?

9  A.    Well, probably minutes.  I mean what seems like, there

10  are so many things you're doing, it's probably, I'm sure it was

11  more than a few minutes.  It wasn't long, it wasn't drawn out

12  or anything.

13  Q.    Now, how long do you stay in the vicinity of the garage

14  after everybody is secured, you walked in the garage, there are

15  officers and agents inside the garage, how long do you stay

16  there?

17  A.    I stayed with there Agent Verga until I was released by

18  Corporal Rossman, I must have been 20 minutes in there.

19  Q.    Would it be correct for me to conclude that in that 20

20  minutes you were in there, other agents are in there?

21  A.   There were people coming and going, yes.

22  Q.   And they're walking around, looking at various places

23  inside this garage, correct?

24  A.   No, they just, the people are moving about.  My job, as I

25  pretty much stated, was to watch these four individuals.

48

1  Q.   What were the four agents doing inside this garage for a

2  20 minute period?

3  A.   Well, I didn't say there were four agents, I said there

4  were two men and two women I was watching.  There was Agent

5  Verga with me and there were people I know upstairs, but who

6  was upstairs, I don't know, because I was downstairs watching

7  them, so I don't know who was up there.

8  Q.   How long were they up there?

9  A.   I can't say that, I don't recall.

10  Q.   Are you talking minutes?

11  A.   Not a long time, again, this is something I didn't keep

12  any track of who's upstairs.

13  Q.   Did you ever go to the upstairs?

14  A.   I went to the upstairs I believe the next day, I returned

file:///A|/FOLEYSUP.TXT

15    in the morning.

16    Q.    When you returned the next day and went to the upstairs,

17    what was up there?

18    A.    There was an apartment, what appeared to be an apartment

19    that was partially done.

20    Q.    Did it have separate rooms or was it just one wide room?

21    A.    I recall a kitchen and looked to be like a sleeping area.

22    Again, this is a year and a half, I didn't pay any attention to

23    it, I just seen what was there because one of the officers

24    said, well, this is what we have going on.

25    Q.    But, in any event, however long it was while you're

49

1    downstairs with some agents, you hear footsteps upstairs for

2    some period of time?

3    A.    Well, there are people upstairs at some point, yes, but

4    for how long, I don't know.

5    Q.    Well, for some period of time?

6          MR. TRABOLD:  Objection, your Honor, asked and

7    answered.

8          THE COURT:  Move it along.

9  BY MR. SCHROEDER:

10  Q.    With respect to the agents or officers downstairs, what

11  were they doing in your presence while you were standing there?

12  A.    While I was there, Agent Verga just made a quick, just

13  like if you would just walk around the room to make sure there

14  wasn't anybody else in the room.  It was more for our security

15  than any other reason.

16  Q.    But everybody stayed there for 20 minutes you said?

17  A.    Yes.

18  Q.    And how many people stayed in there for 20 minutes?

19  A.    The two men and the two women that I was watching, with

20  Agent Verga.

21  Q.    So you brought the civilians into the garage?

22  A.    That's where they were, yes.  When I walked into the

23  garage, they were there.

24  Q.    And other officers were present in the garage during that

25  20 minute period?

50

1  A.    There were officers probably coming and going, yes.

2  Q.    So they were leaving the garage, they were coming into

3   the garage, they were walking about the garage?

4   A.   I wouldn't say they were walking about the garage, but

5   they went back and forth talking to each other, calling other

6   officers in.

7   Q.   Now, these officers consisted of an officer from your

8   department, you, from the Pennsylvania State Police and

9   Pennsylvania Parole Board, correct?

10  A.   Yes, there were --

11  Q.   Were there any other departments represented there --

12       THE COURT:  Hang on a second, you have to wait until

13  he finishes, you have to wait until he finishes.

14       MR. SCHROEDER:  Yes, your Honor.

15  BY MR. SCHROEDER:

16  Q.   Any other departments represented, other than the three

17  you indicated?

18  A.   Yes, there was.

19  Q.   Which department?

20  A.   Conneaut Lake Regional Police Department was there.  And

21  Cambridge Springs Police Department was there.

22  Q.   As best as you can recall, how many total officers or

23  agents were on the property that night?

24  A.   I can't say accurately, I don't know.

25  Q.   Over 10?


51


1  A.   I don't believe 10, maybe -- it could have been 10, I

2  suppose, not more than that I don't think.

3        MR. SCHROEDER:  One moment, your Honor.  Nothing

4  further your Honor.

5        THE COURT:  Anything else?

6        MR. TRABOLD:  Just one question.

7              REDIRECT EXAMINATION

8  BY MR. TRABOLD:

9  Q.   You went back the next morning to assist in the execution

10  of a search warrant with your narcotic dog?

11  A.   That is correct.

12        MR. TRABOLD:  Nothing further.

13        THE COURT:  Thank you, sir, you're excused.

14        MR. TRABOLD:  Your Honor, may this witness be

15  excused?

16        THE COURT:  Yes, you can.

17        MR. TRABOLD:  Your Honor, the United States calls

18  Bill Wehrle.

19        THE COURT:  You can after a short break.

20        (Whereupon, the proceedings recessed at 10:05 a.m.

21  in Courtroom C; and reconvened at 10:08 a.m., in Judge's

22  Chambers.)

23        THE COURT:  This is on the subject of immunity.

24  This is from United States v. Bansano, 3rd Circuit, 72 F.2d

25  826.  This here is the rule in the circuit.  Before the court


52


1  can grant immunity to a defense witness, it must be clear that

2  an application has been made to the district court naming the

3  proposed witness and specifying the particulars of the

4  witness's testimony.  In addition, the witness must be

5  available, and the defendant must make a convincing showing

6  sufficient to satisfy the court that the testimony which will

7  be coming forth will be exculpatory and essential to the

8  defendant's case.  Immunity will be denied if the proper

9  testimony is found to be ambiguous, not clearly exculpatory,

10  cumulative, different, or if it is found to relate only to the

11  credibility of the government's witnesses.  Now, you want to

12  call two co-defendants, is that right?

13      MR. SCHROEDER:  That's correct.

14      THE COURT:  Then, as a starting point, what would

15  they say, you have to give me a proffer as to what you believe

16  they would say -- and I realize this is a suppression hearing

17  rather than a trial, the same principle obtains.  How would it

18  be exculpatory insofar as the issues driving your suppression

19  motion are concerned?

20      MR. SCHROEDER:  It is uncontroverted that there was

21  no search warrant initially in this case.  Government has filed

22  a responsive brief indicating that they feel the search that

23  was conducted, whatever search was conducted prior to the

24  warrant being obtained on the next day was done on the basis of

25  a protective sweep, was done pursuant to parole officers'


53


1  authority, or were done pursuant to consent.  These two

2  witnesses were present in the barn or garage area and they

3  would testify as to the timeframe that everything took place

4  and the fact that the individuals were secured.  I will concede

5  the fact that we may have to establish this through other

6  witnesses.

7        THE COURT:  What else, these witnesses would have

8  been only in the garage or the barn, is that right?

9        MR. SCHROEDER:  Right.

10        THE COURT:  Do you have any other firsthand

11  knowledge, other than what they could observe or see from their

12  position inside the garage?

13        MR. SCHROEDER:  The defense is limited, we don't

14  have access to all the reports, I don't know whether they were

15  ultimately taken into the house.

16        THE COURT:  You can't just put them on speculating,

17  under this rule, as to what they may say.  But if the only

18  reason to call them is to establish that at some point there

19  were so many people in the garage and that area was secured,

20  that's cumulative at least.  And I don't see it as being

21  clearly exculpatory or essential within the meaning of the

22  immunity rule.

23        MR. SCHROEDER:  On the testimony that's been

24  proffered on the record so far, I would be inclined to agree

25  with you at that point.  Counsel never knows what testimony is

54

1  going to go on the record until it goes on the record.  I have

2  to do, what I'm trying to do is establish the underlying facts.

3      THE COURT:  What I'm trying to get at earlier,

4  rather than later, is if these people and if the Fifth

5  Amemdment invocation is appropriate.  You're not going to know

6  anymore at the end of the hearing then what you know right now,

7  as you believe what these people would testify to, right?

8      MR. SCHROEDER:  Perhaps slightly more in terms of

9  this last witness was a bit vague with respect to who was

10  where, a bit vague with respect to timeframes.  But we seem to

11  have established that within seconds that there was a knock,

12  that Foley exited the rear of the garage, which is what these

13  witnesses would testify to, and that within seconds or a very

14  short time period, that the other two individuals were secured.

15      THE COURT:  All right.  Based upon your proffer and

16  based upon the case law, I do not see -- first of all, the

17  granting of judicial transactional immunity based upon a

18  request by defense is rare.  But I do not see that the

19  circumstances are justified here.  That said, after this I'm

20  going to put that on the record, these people are free to go.

21  That said, at the conclusion of this hearing if there is some

22  reason, something happens that was unanticipated, I may revisit

23  it.  But I think it's very unlikely they're going to be called.

24          MR. SCHROEDER:  I propose this and this is

25  consistent with what you just suggested.  If this is still an


                                    55


1  issue, the other witness, who I'm now told she may be

2  incarcerated somewhere, that's the first I've heard of this.

3  The defendant's sister came and indicated that she might be

4  incarcerated.

5          THE COURT:  Where?

6          MR. SCHROEDER:  Possibly in the Erie County Prison.

7          THE COURT:  That's easy enough to find out.

8          MR. TRABOLD:  Just for the record, the government

9  has a huge objection to continuing this hearing for any reason

10  whatsoever.  Counsel knew, when counsel filed this motion, so

11  how can a defense attorney seek a continuance for his inability

12  to obtain a witness when he's the one that filed the motion,

13  the motion has been pending for weeks.

14          THE COURT:  I think a continuance is going to be

15  most unlikely.  That said, as a I indicated at the outset, I'm

16  going to hear what comes in.  I am not even certain or at all

17  certain at this point that the testimony of -- whatever her

18  name is, Christina Weber?

19        MR. SCHROEDER:  That's correct.

20        THE COURT:  Is going to be necessary or pivotal.

21        MR. SCHROEDER:  Her testimony would be significant

22  with regard to the search of the house that takes place that

23  night based solely on her consent.

24        THE COURT:  In the government's papers, the search

25  of the house is based on a protective sweep, isn't it?


56


1        MR. TRABOLD:  Correct.

2        THE COURT:  Have you interviewed her, by the way?

3        MR. SCHROEDER:  I have not.

4        THE COURT:  Do you have any idea what she would say?

5        MR. SCHROEDER:  No.

6        THE COURT:  Because then that cuts somewhat the

7  other way.

8        MR. SCHROEDER:  Let me address it this way.  I've

9  been told by various people what she might say.  But I am not

10    confident enough to represent to this court exactly what she

11    would say.

12          THE COURT:  All right, back to timing again.  You

13    got four more people?

14          MR. TRABOLD:  Correct.

15          THE COURT:  Are you going to be wrapped up by noon?

16          MR. TRABOLD:  I think so, I hope.  I'm doing

17    everything I can.

18          THE COURT:  All right, let's go.

19          (Recess in Judge's Chambers at 10:15 a.m.; and

20    reconvened at 10:18 a.m., in Courtroom C.)

21          THE COURT:  Before we get going, Mr. Placidi, Mr.

22    Latouf, I have determined that the invocation of the Fifth

23    Amendment privilege insofar as your clients are concerned is

24    appropriate.  I've also determined that it would be

25    inappropriate for me to grant, at the defendant's request,


                              57


1    transactional immunity with respect to their proposed testimony

2    today.  That said, does either counsel have any objection to

3    these gentlemen and their clients being excused?

4        MR. TRABOLD:  I don't have any objection to there

5   being excused.  Just for purposes of preserving the record, I

6   think it may be of some value at least having counsel put on

7   the record specifically that I have advised my client to take

8   the Fifth Amendment and my client is planning on doing that.

9        THE COURT:  I thought I did that.  Didn't I do that

10  earlier with you?

11       MR. PLACIDI:  Yes, your Honor.

12       MR. TRABOLD:  Okay.

13       THE COURT:  They did it from the gallery.  It is on

14  the record and I think they are authorized to speak for their

15  clients in that regard.  That being said, do you have an

16  objection -- the record will reflect as it does that they would

17  invoke the Fifth Amendment.  Do you have any objection to them

18  leaving or do you want them to remain pursuant to your

19  subpoena?

20       MR. SCHROEDER:  Subject to the right to revisit this

21  issue if a legitimate evidentiary or legal reason is

22  established or exists potentially to the invocation of that

23  Fifth Amendment privilege and seek their testimony with respect

24  to some point that might be proffered on the record on this

25  case, subject to that consideration, I would have no objection

58

1  to them being released.

2         THE COURT:  Counsel, you of course are free to

3  remain, I'm not kicking you out, I'm just indicating that your

4  clients do not have to remain.

5         MR. PLACIDI:  Thank you, your Honor.

6         THE COURT:  All right, let's go.

7         MR. TRABOLD:  Your Honor, the United States calls

8  Bill Wehrle.

9         THE CLERK:  Please raise your right hand, sir.

10         CHARLES WILLIAM WEHRLE, GOVERNMENT WITNESS, SWORN

11                 DIRECT EXAMINATION

12  BY MR. TRABOLD:

13  Q.   Sir, can you state your name and spell your last name?

14  A.   Charles William Wehrle, W-e-h-r-l-e.

15  Q.   Where are you employed, sir?

16  A.   I'm employed by the Commonwealth of Pennsylvania, State

17  Board of Probation and Parole, I'm assigned to the Erie office.

18  Q.   How long have you worked there?

19  A.   Thirty-two years.

20  Q.   And am I correct in saying that your duties include the

21  supervision of individuals who are on state parole and/or

22  probation?

23  A.   That's correct.

24  Q.   And you've done that for 32 years?

25  A.   Yes, sir.


59


1  Q.   And along those lines, back in mid April of 2003, you

2  received some information from a Sergeant Randy Detzel of the

3  Vernon Township Police Department?

4  A.   Yes, sir.

5  Q.   What information did Sergeant Detzel provide to you?

6  A.   He informed me he had received information that a

7  fugitive who we were looking for, Maurice Foley, was in the

8  Saegertown area.

9  Q.   And do you recall when it is that Sergeant Detzel would

10  have provided you this information -- when did he provide that

11  information to you?

12  A.   Why did he?

13  Q.   No, when?

14  A.   When?

15  Q.   Yes.

16  A.   It would have been in the early afternoon.

17  Q.   Of April 17, 2003?

18  A.   That's correct.

19  Q.   Did you take any steps or any action in furtherance of

20  that information?

21  A.   Yeah, I discussed the case with the supervising agent,

22  who was Jerry Verga.

23  Q.   I'm sorry, go ahead?

24  A.   We then contacted Trooper Shane Reinhart, who's in charge

25  of the state police fugitive apprehension unit and asked him to

                                60

1  assist us, and we made arrangements to meet with Sergeant

2  Detzel.

3  Q.   And was the decision made, then, at that point in time

4  that steps were going to be taken to try and apprehend Maurice

5  Foley?

6  A.   Yes, sir, we were going to attempt an apprehension.

7   Q.   I'm assuming that prior to you attempting the

8   apprehension, Mr. Foley's file was looked at to determine

9   exactly what his status was and what his probationary

10  conditions were and things like that?

11  A.   Agent Verga was the supervising agent, so he was familiar

12  with Mr. Foley.

13  Q.   Now, I want to show you what has been marked as

14  Government's Exhibit No. 4 and ask you if can identify it for

15  me?

16  A.   Yes, sir, these are standard conditions governing parole,

17  reparole for the state of Pennsylvania.

18  Q.   And are those the standard conditions that apply for

19  Maurice Foley?

20  A.   Yes, sir.

21  Q.   And am I correct that this is Maurice Foley seated at

22  counsel table?

23  A.   Correct.

24  Q.   And the conditions that are represented in Government's

25  No. 4, would that be a document that would be provided to a

61

1    person when they're put on parole or state probation?

2    A.    Yes, they sign copies and copies are maintained in the

3    file in the office they're supervised under.  I believe they

4    maintain a copy in Harrisburg and the parolee is provided with

5    a copy.

6         THE COURT:  Keep your voice up, speak into the

7    microphone.

8    BY MR. TRABOLD:

9    Q.    So the parolee is provided a copy of Government's 4?

10   A.    Yes, sir.

11   Q.    And Mr. Foley's name is listed on Government's 4?

12   A.    Yes, sir.

13   Q.    And it lists his approved residence as a place on Gorman

14   Drive or Gorman Road, correct?

15   A.    Yes, sir.

16   Q.    And does it indicate or was it signed by Mr. Foley

17   anywhere?

18   A.    Yes, sir, it's signed on the second page.

19   Q.    And is it dated?

20   A.    Yes, sir, it is, 3/27/00.

21   Q.    And am I correct that one of the standard conditions for

22   any parolee in the state of Pennsylvania, as represented by

23   Government's 4, that the person agrees to a search of their

24   residence by a parole officer?

25          MR. SCHROEDER:  I object to the leading nature.


                              62


1          THE COURT:  Overruled.

2          THE WITNESS:  Yes, sir, there is.

3   BY MR. TRABOLD:

4   Q.   And that stand condition is represented on Government's 4

5   at the bottom of the first page, correct?

6   A.   Yes, sir, it's at the bottom of the first page.

7   Q.   Just so the record is clear, does an individual sign that

8   document when they're about to be released or after they've

9   already been released?

10   A.   Prior to their release.

11   Q.   Mr. Foley on the date in March of 2002 when he signed it,

12   would have been prior to his release from state incarceration?

13   A.   The conditions are gone over by an institutional parole

14   representative and usually they do them immediately prior to

15   their release, it could be on the day of release, though.

16   Q.   Okay.  I'm going to show you what I marked as

17   Government's Exhibit No. 5, and ask you if you can identify

18   what that is?

19   A.   Yes, sir, this is a wanted notice for parole absconder,

20   it's a standard form we use when a parolee absconds from

21   supervision.  And this particular one is for Maurice Foley.

22   Q.   Does it indicate a date on there that Mr. Foley absconded

23   from his parole supervision?

24   A.   It doesn't have the date that he absconded, it has a date

25   that this wanted poster was issued, however.


                                    63


1   Q.   And when would that be?

2   A.   5/9/00.

3   Q.   What is encompassed in page number two of Government's

4   Exhibit No. 5?

5   A.   Page two is a warrant for arrest of paroled prisoner.

6   It's a form that when an individual absconds from supervision,

7   that we usually provide to the local police department.

8   Q.   And that was issued when?

9   A.   5/9/00.

10   Q.   So from May 9th of 2000 forward, there was a warrant for

file:///A|/FOLEYSUP.TXT

11  Mr. Foley's arrest as a parole absconder?

12  A.    Yes, sir, that's correct.

13  Q.    And based on that fact and the information you received

14  from Sergeant Detzel, you and other folks at the State Board of

15  Probation and Parole made a decision to attempt to apprehend

16  Mr. Foley?

17  A.    That's correct.

18  Q.    When did you meet with Sergeant Detzel on April 17th of

19  2003?

20  A.    I would say it would have been approximately, I'm not

21  exactly sure, I would say approximately 5 o'clock.

22  Q.    And what was the purpose in that first meeting between

23  yourself and Sergeant Detzel?

24  A.    We wanted to discuss the information that he had

25  concerning Mr. Foley's whereabouts and make arrangements for

64

1  the apprehension.

2  Q.    And who was present during that meeting?

3  A.    It was myself, Trooper Shane Reinhart, from the fugitive

4  apprehension unit here in Erie, Agent Verga, Sergeant Detzel

5   and myself.

6   Q.   And subsequent to that initial meeting at approximately

7   5 o'clock on the 17th, did anyone in that group you just

8   described take steps to go to the property on Hill Road and

9   surveil it?

10   A.   No, we didn't know where it was.  One of the reasons for

11   meeting with Officer Detzel, he was going to show us where the

12   property was.

13   Q.   Did he in fact do that?

14   A.   Yes, sir, he did.

15   Q.   That was subsequent to your 5 o'clock meeting?

16   A.   After, yes, sir.

17   Q.   The property as you saw it, after being led there by

18   Sergeant Detzel, did that correspond to the information that

19   Sergeant Detzel provided you from his informant?

20   A.   Yes, sir.

21   Q.   Did it appear as if anyone was home when you first went

22   and surveilled the property?

23   A.   We couldn't tell.

24   Q.   You didn't go on the property at that point in time?

25   A.   No, sir, we did not.

65

1   Q.   Subsequent to actually going to the property on Hill

2   Road, what happened after you did that the first time?

3   A.   Sergeant Detzel left the scene.  We made arrangements

4   that, we informed him that we were going to surveil the

5   property.  We made arrangements to contact him and another

6   officer by cell phone if we were going to attempt an

7   apprehension.

8   Q.   You stayed there at Hill Road surveilling the property

9   and Sergeant Detzel left?

10   A.   Yes, sir.

11   Q.   And did there come a point in time when you then

12   recontacted Sergeant Detzel?

13   A.   Yes, sir.

14   Q.   Why did you do that?

15   A.   We saw three pickup trucks come up together up the road

16   and pull into the driveway of a garage adjacent to the

17   residence where we were surveilling.

18   Q.   And, approximately, what time was that?

19   A.   I would say that would be approximately 8, 8:30.

20  Q.    Other than yourself, was it just you and Agent Jerry

21  Verga that were doing this surveillance at that time?

22  A.    And Trooper Reinhart was there, also.

23  Q.    So approximately 8, 8:30, you see these three cars pull

24  into the property that you were surveilling; do you then

25  contact Sergeant Detzel?


66


1  A.    Yes, sir.

2  Q.    Then what happens?

3  A.    We contacted him, met with him and another officer.

4  Because of the physical layout, there were two buildings there

5  and because we had seen three pickup trucks come, I felt that

6  we did not have enough officer presence there to safely effect

7  an apprehension.  At that point I contacted the Meadville

8  barracks of the Pennsylvania State Police and asked them for

9  additional officers.

10  Q.    And am I correct that prior to this point in time, there

11  was no discussion between yourself and any other law

12  enforcement officer to go obtain a search warrant, correct?

13  A.    No, sir.

14  Q.   Do you ultimately obtain the assistance of other law

15  enforcement agencies?

16  A.   Yes, sir.

17  Q.   When did that happen?

18  A.   Shortly after we met with Officer Detzel, then we went to

19  Grotto Park, which is between Meadville and the residence, and

20  we met with Corporal Rossman and another Pennsylvania state

21  trooper, that was all the man power he had available at the

22  time.

23  Q.   And the purpose of the state police being there was just

24  additional police presence?

25  A.   Yes, sir.


                                    67


1  Q.   After the meeting in Grotto Park -- first, before we talk

2  about what happens after, do you discuss kind of a plan of

3  operation in that meeting in Grotto Park?

4  A.   I informed them of the physical layout, showed them a

5  picture of Mr. Foley.  Talked to the corporal about our

6  authority as parole officers to effect the arrest.  As I

7  stated, we briefly discussed the physical layout.  We made

8  arrangements to go up to an area near the house where we could

9  begin to look it over and come up with a final plan as to who

10  was going to do what.

11  Q.    And did you then go to that area where you had a vantage

12  point?

13  A.    Yes, we met him where we could all see the house, we fine

14  tuned our plan.

15  Q.    How long were you in that area before your actual entry

16  on to this property?

17  A.    No more than 10 minutes.

18  Q.    Approximately what time did you then actually enter the

19  property at Hill Road there?

20  A.    Between 10 and 10:30.

21  Q.    And explain what happens then when you enter onto the

22  property?

23  A.    We made arrangements for officers to cover the vehicles.

24  We had two K-9 officers there, we had discussed who was going

25  to cover the back.  He put a K-9 towards the back, we put a K-9

68

1  up at the vehicles.  The garage that was adjacent to the place,

2    then we covered the house.  Myself and I believe Agent Verga

3    and Trooper Reinhart went to the front door of the residence.

4    Q.   Would Sergeant Detzel have been one of the officers that

5    was there that covered the vehicles?

6    A.   Yes, sir.

7    Q.   Is it fair to say that there's a pretty fair distance

8    between the outbuilding or garage and the residence?

9    A.   Yes, sir.

10   Q.   Is the distance, in your opinion, sufficient so that if

11   someone in the dark of night was standing by the garage, they

12   would not be able to know what was happening at the residence?

13   A.   I would say that would be correct.

14   Q.   So how many officers in total went onto the property?

15        THE COURT:  And describe by what organization

16   they're affiliated with, also?

17   BY MR. TRABOLD:

18   Q.   Give me the total, then we'll break it down from there?

19   A.   There was myself and Agent Verga with the State Board of

20   Probation and Parole.  There was Trooper Reinhart from the

21   state police fugitive apprehension unit, who had gone down with

22   us.  There was Sergeant Detzel and another K-9 officer from a

23   municipal department in this area, I can't remember his name.

24  And there were two state troopers.

25  Q.   So seven total?

69

1  A.   Yes, sir.

2  Q.   And one of those additional state troopers would have

3  been Corporal Rossman?

4  A.   Yes, sir, that's correct.

5  Q.   So you go onto the property, people take up their

6  locations, and yourself, Agent Verga and Trooper Reinhart

7  approach the residence?

8  A.   That's correct.

9  Q.   Is there a particular reason why the garage wasn't

10  approached first as opposed to the residence?

11  A.    Well, there were lights on in the residence, we couldn't

12  tell if there were any lights on in the garage.  If I remember,

13  there were no windows in the front of the garage, just seemed

14  more natural to approach the residence.

15  Q.   Okay.  What happens when you approach the residence?

16  A.   I knocked at the door, at first nobody responded.  And

17  then I knocked and I announced "state parole".

18  Q.   Did somebody answer the door then?

19  A.   Well, I had knocked and announced several times.  And

20  then the door was subsequently answered by -- by a woman.

21  Q.   Do you recall that individual's identity?

22  A.   I can't remember offhand, it just slipped my mind.

23  Q.   Could it possibly be Christina Weber?

24  A.   It was Christina Weber.

25  Q.   So the record is clear, did you know her prior to going

70

1  onto the property that night?

2  A.   I did not.

3  Q.   She answers the door after you knocked several times,

4  what happens?

5  A.   I informed her who I was, informed her that I had a

6  warrant for the arrest of Maurice Foley and I asked her if Mr.

7  Foley was there.

8  Q.   What did she say?

9  A.   She said he was not.

10  Q.   What happened after that?

11  A.   I asked her if she knew where Mr. Foley was.  She stated

12  that she did not.  I asked who else was in the residence, she

13  said my girlfriend is here.  I asked her who the three vehicles

14  were who had just driven up, that we had, during the course of

15  surveillance, had seen drive up.  She was real evasive about

16  that.

17  Q.    How was she evasive?

18  A.    She said she didn't know.

19  Q.    She didn't have an answer as to why there were three cars

20  on the property?

21  A.    She had no answer.

22  Q.    What happened after that?

23  A.    I asked who else was in the residence, she stated her

24  girlfriend.  I asked her if she would have her girlfriend come

25  to the door.

71

1  Q.    Did the girlfriend in fact come to the door?

2  A.    She did.

3  Q.    Was she identified or did she provide her name?

4  A.    Agent Verga was familiar with her and she also identified

5  herself.

file:///A|/FOLEYSUP.TXT

6   Q.   And how did she identify herself?

7   A.   I believe her name is Angie Carbone.

8   Q.   What happened then when Ms. Carbone came to the door?

9   A.   I asked Ms. Carbone to step out of the residence and I

10  spoke with her.

11  Q.   Why did you ask her to step out of the residence?

12  A.   I wanted to talk to her separately from Ms. Weber.

13  Q.   Before we go further with that, when you knocked and

14  announced at the door, did you have your gun drawn?

15  A.   I did not.

16  Q.   Did either Agent Verga or Trooper Reinhart have his gun

17  drawn?

18  A.   I'm not sure.

19  Q.   And did Angie Carbone comes out of the residence?

20  A.   Correct.

21  Q.   What happens?

22  A.   I asked her, I informed her who I was, I informed her

23  that I had a warrant for Maurice Foley.  I informed her of the

24  possible consequences of hindering apprehension.  I asked her

25  if Mr. Foley was in the residence.

1  Q.   Did you place her under arrest?

2  A.   I did not.

3  Q.   Did you place handcuffs on her?

4  A.   I did not.

5  Q.   Did you tell her she was going to be arrested?

6  A.   I did not.

7  Q.   Did you do any of those things to Christina Weber at that

8  point in time?

9  A.   I informed them that I had a warrant for arrest and I

10  informed them of the possible penalties, and the possibility

11  they could be arrested for hindering apprehension.

12  Q.   What does Ms. Carbone then tell you?

13  A.   She says she didn't know about Mr. Foley, but her

14  boyfriend was in the garage.

15  Q.   Did she identify her boyfriend by name?

16  A.   She did, but I can't remember who he was.

17  Q.   She says my boyfriend such and so, Butler, is in the

18  garage?

19  A.   Yes, sir.

20  Q.   What then happens?

21  A.    We informed all the officers, some of the officers stayed

22  down by the residence and I went up to the garage and knocked

23  on the man door of the garage and announced "state parole, open

24  the door."

25  Q.    Who stayed up by the residence, if you recall?


73


1  A.    I can't remember.

2  Q.    So you went from the residence to the garage by yourself?

3  A.    Yes, sir.

4  Q.    You knocked at the door of the garage and what happens?

5  A.    Nobody answered.  I did that several times, knocking

6  loudly and announcing "state parole, open the door."  There was

7  one of the pickup trucks that we had seen arrive during our

8  surveillance was, I believe it was a black Chevrolet with dual

9  wheels on the back.  That was parked right there by the door,

10  the lights came on and the vehicle started remotely.

11  Q.    And when the vehicle starts remotely, the door where

12  you're at to the garage, the man door is still closed?

13  A.    Yes, sir, nobody responded to --

14  Q.    Then what happens?

15  A.    At that point the door opened and I confront a man there

16  who we immediately put down on the ground and handcuffed.

17  Q.    Why did you do that?

18  A.    Why did we handcuff him?

19  Q.    Yes.

20  A.    For officer safety.

21  Q.    Did you know who he was?

22  A.    I did not.

23  Q.    What happens after you put this individual who opens the

24  door down -- first of all, did the individual open the door and

25  come out of the garage or remain inside the garage?


74


1  A.    He opened the door and we immediately -- we were put on a

2  higher state of alert when that car started.  Obviously, there

3  was something going on.  So as soon as he answered the door, we

4  took him into custody, put him on the ground and handcuffed

5  him.

6  Q.    Is he on the ground outside the garage or inside the

7  garage?

8  A.    I believe we put him on the ground right inside the

9   garage.

10  Q.    And then what happens?

11  A.    At that point we had weapons drawn, we had weapons drawn

12  when the truck started.  I made entry into the garage, and at

13  the back of the garage there's a ladder going up to the second

14  floor and I could see feet coming down the ladder.

15  Q.    And then what did you do?

16  A.    I immediately went to the end of the garage, covered that

17  individual at gun point and ordered him down.

18  Q.    And did you take note of any activity prior to your entry

19  into the garage that may have been happening outside --

20  A.    Yes --

21        THE COURT:  Wait until he finishes, slow down a

22  little bit.

23  BY MR. TRABOLD:

24  Q.    Let me say that again so the record is clear.  Prior to

25  your entry into the garage, did you take note of any activity


                          75


1   that appeared be occurring outside behind the garage?

2   A.    I couldn't see behind the garage because I was in front

3   of it.

4   Q.   Did you see or hear anything?

5   A.   Yes, sir, as I was making my entry into the garage, I

6   could hear shouting coming from the back of the garage outside.

7   Q.   Other than knowing that it was shouting, do you recall

8   the specifics of what was being said?

9   A.   I think I heard words to the effect "get down, get down."

10  Q.   And at that point in time, you didn't have any idea who

11  was being ordered down in the back, in the rear area of the

12  garage?

13  A.   No, sir, I did not.

14        MR. SCHROEDER:  I object to the leading nature of

15  the questions.

16        THE COURT:  Well, overruled.  But try not to lead.

17  BY MR. TRABOLD:

18  Q.   Where were you exactly inside the garage when you heard

19  this commotion in the back?

20  A.   At the time we put the first individual down, when I went

21  back and saw the feet, it was pretty quick.  So it would have

22  been -- I'm talking a short time span here.

23  Q.   Describe the circumstances of this individual coming down

24  from the ladder?

25  A.   There was a ladder going up in the far back of the

76

1  garage, going up through a trap door to the second floor.  I

2  could see the feet.  At that point I immediately went to the

3  rear of the garage.  Like I said, I heard some shouting, "get

4  down, get down," so I knew something was going on behind the

5  garage.  So I ordered that individual down at gun point.  We

6  had thrown him down on the floor and cuffed him.

7  Q.   And while you're doing this with regard to the first

8  individual and the second individual, are you the only one

9  inside the barn?

10  A.   No, sir.

11  Q.   Who else is in there?

12  A.   I believe Trooper Reinhart went in and Corporal Rossman.

13  Q.   So you now have an individual near the front door of the

14  garage who's on the ground in custody, and you place an

15  individual at the back of the garage who was coming down the

16  ladder, you placed that person as well in handcuffs?

17  A.   Yes, sir.

18  Q.   What then happens?

19  A.    Right before or right when I was taking the second

20  individual into custody, Agent Verga came into the garage.  I

21  believe that he assisted me in handcuffing the second

22  individual.  At that point he informed me that they apprehended

23  Mr. Foley attempting to escape out of the rear of the garage.

24  Q.    Prior to Agent Verga informing you that Mr. Foley had

25  been apprehended in the rear outside, did you know where Mr.

77

1  Foley was?

2  A.    No, sir.

3  Q.    Did you have any information to conclude that that was

4  Mr. Foley who was out in the back causing the commotion?

5  A.    No, sir.

6  Q.    After Agent Verga informs you that Mr. Foley is

7  apprehended outside in the rear, what happens?

8  A.    Because of the totality of the circumstances, obviously,

9  there are people in the house, who were being less than honest

10  with us when we knocked and announced, with the truck starting,

11  the amount of people that we had observed, we had surveilled

12  three vehicles come up and still had no idea how many people

13  were in that residence, in that garage at that time, I wanted

14  to, for officer safety, to clear the garage to really make sure

15  there were no other people there.

16  Q.   Did you in fact do that?

17  A.   I did.

18  Q.   Did you go upstairs via the ladder?

19  A.   I did.

20  Q.   With your gun drawn?

21  A.   Yes, sir.

22  Q.   What happens when you get up into the second story of the

23  garage?

24  A.   As I cleared the second story of the garage, I noticed a

25  12-gauge shotgun laying there.  I checked that, it was loaded.


78


1  As I went back, headed towards the front of the garage, the

2  upstairs, I noticed a long container full of marijuana seeds.

3  Q.   Just so we're clear for purposes of the record, as you're

4  clearing that upstairs for officer safety, are you looking in

5  drawers?

6  A.   No, sir.

7   Q.   Can you characterize the facts in which you found this

8   contraband, how was it laying there?

9   A.   There was furniture upstairs, there was all types of

10  obstacles upstairs, as I looked around, they were just laying

11  right out.

12  Q.   Did you have to uncover anything?

13  A.   I did not, this was in plain view.

14  Q.   And the upstairs, was it just one big room or was it a

15  series of smaller rooms?

16  A.   To be honest, I can't remember.

17  Q.   Let me put it to you a different way.  Were there areas

18  upstairs where an individual could have been hiding that you

19  would not have immediately seen?

20  A.   Yes, sir, there were numerous areas.

21  Q.   Can you describe those?

22  A.   Like I say, there was furniture up there, I had to look

23  behind.  I believe there was a couch up there.  Right at the

24  top of the ladder there was a place for a wall had been built,

25  and the roof came down, we had to look under.

79

1   Q.   Did you go upstairs by yourself to conduct the search for

2   officer safety?

3   A.   I did not.

4   Q.   Who else was with you?

5   A.   I believe it was Trooper Reinhart, I don't know if Agent

6   Verga came up or not, I had to have somebody cover me.

7   Q.   When you went up the stairs, you already said you knew

8   there were three individuals that were apprehended; did you

9   know -- did you have any way of knowing whether anyone else was

10  upstairs, other than to go up there and see?

11  A.   I did not.  I knew that I had seen three vehicles pull

12  in, I did not observe how many people were in each vehicle.

13  Q.   So how long a period of time did it take you to clear the

14  upstairs?

15  A.   Matter of minutes.

16  Q.   Did you then come down the ladder?

17  A.   I did.

18  Q.   What happens when you he get down back to the first story

19  of the garage?

20  A.   We continued to just clear the garage, to make sure

21  nobody else is hiding in the garage.  Right as I faced the rear

22  of the garage by the ladder there was a workbench, right over

23  on the right, I noticed a large triple beam scale on that

24  workbench.

25  Q.    Did you notice any other items of contraband that were

80

1  out in the open?

2  A.    I did.  When I went back over in that area, I noticed a

3  large amount of green leafy vegetable material on the

4  workbench, I believed that to be marijuana.  I also noted there

5  was a large amount of large ziploc plastics bags.  When I had

6  come down the ladder, I also noticed that there was a disc with

7  white powder and a straw right by the ladder.  I noticed that

8  that there was a money wrapper, I believe it was, it indicated

9  a thousand dollars money wrapper that was torn over.  And when

10  we were taking the individuals out to the garage, I noticed

11  that there was a plastic bag with marijuana in it laying by the

12  man door.

13        THE COURT:  Keep your voice up, sir.

14  BY MR. TRABOLD:

15  Q.    You said you noticed a plastic bag laying by the man

16  door, in close proximity to the man door?

17  A.    Within a foot.

18  Q.    Would you characterize the amount of suspected marijuana

19  as a large amount or a small amount?

20  A.    Probably, I'd say a quarter ounce, a small amount.

21  Q.    Now, all of these items of contraband that you noticed,

22  did you have to pick anything up that was on the top of them or

23  uncover them in any fashion?

24  A.    We did not.

25  Q.    Did you undertake a search for contraband in that garage


81


1  at that point in time?

2  A.    The only search we did was for officer safety.

3  Q.    By officer safety, you mean to see if there was anybody

4  else there?

5  A.    We were looking for people.

6  Q.    What goes through your mind when you see firearms as

7  you're conducting your protective sweep?

8  A.    Again, I mean, it was already dark, we had a large area,

9  we had a limited number of officers, the truck had started, I

10   saw a loaded firearm, what I believe to be drug paraphernalia,

11   we were even more concerned for officer safety at that point.

12   It was dark, we couldn't see around the building or anything.

13   Q.    Was there lights on inside the garage?

14   A.    Yes, sir.

15   Q.    Downstairs as well as upstairs?

16   A.    Yes, sir.

17   Q.    So ultimately you got these three individuals in custody,

18   you made sure no one else is in the garage, what do you then

19   do?

20   A.    We cleared the garage.  I then informed the officers

21   there of what I had observed, the state police officers there.

22   And then I informed Corporal Rossman, I believe, that I wanted

23   to go back down to the residence, speak with Ms. Weber, I

24   wanted to get consent from her to walk through the residence to

25   make sure there were no other people in the residence.


82


1   Q.    Did that in fact occur?

2   A.    Yes, sir.

3   Q.    Explain the circumstances to the court of what happens

4    when you go back up to the residence?

5    A.    I went back down to the residence, knocked at the door,

6    Ms. Weber answered the door.  I informed her that we had found

7    Mr. Foley in the garage.  I told her that I wanted to walk

8    through the house to make sure there were no other people

9    there.  I informed her that we were not going to go in any

10    drawers or perform any search other than a search for persons.

11    Q.    And did you place her in custody or arrest her or did you

12    have your gun drawn or anything like that?

13    A.    I had my gun drawn, but I did not have it drawn on her.

14    Q.    You had your gun out?

15    A.    I had my gun out.

16    Q.    You were not pointing it at her?

17    A.    I did not.

18    Q.    Was she in handcuffs?

19    A.    No, sir.

20    Q.    Did you tell her you were going to place her under arrest

21    if she did not allow you in the house?

22    A.    I just asked her for consent.  I was quite specific,

23    again, we weren't going to search drawers or anything, we were

24    just searching for people.  As a matter of fact, she walked

25    through with me.

83

1  Q.   She consented and allowed you to enter the residence?

2  A.   Yes, sir, she did.

3  Q.   Did she sign a written form in that regard?

4  A.   She did not.

5  Q.   Is it your practice to carry those forms around?

6  A.   We do not.

7  Q.   So you enter into the residence and she walks through the

8  residence with you?

9  A.   Yeah, she was behind me, she showed me where Mr. Foley's

10  room was, I had her stay behind me as I went into the room.

11  Q.   Explain what happens as you go into the residence, you

12  step foot into the residence, what happens, where do you go?

13  A.   Well, I cleared the area to make sure there was nobody

14  there when I first entered.  As it was cleared, she took me to

15  Mr. Foley's room.

16       THE COURT:  Who is with you, police officer wise, as

17  you enter the residence?

18       THE WITNESS:  There was one of the other municipal

19  officers with me and I believe Agent Verga also went into the

20   residence.

21        THE COURT:  And when you returned to the residence

22   from the garage after you secured that area, were there any

23   police officers that had been left at the residence or outside

24   the residence while the events were occurring at the garage?

25        THE WITNESS:  Yes, sir, I believe that there were


                                84


1   still officers who stayed behind at the residence to cover the

2   rear of the residence.

3        THE COURT:  And finally Mr. Trabold asked you a

4   question whether you told Ms. Weber that she would be arrested

5   if she did not consent, I wasn't sure what your response was?

6        THE WITNESS:  No.  In fact, I told her that she

7   didn't have to let us into the residence.  We did not tell her

8   that she would be arrested if she did not consent.

9   BY MR. TRABOLD:

10  Q.   Just so the record is clear, not only did you not tell

11  her that she would be arrested, you told her she didn't have to

12  consent to the search?

13  A.   That's correct.

14  Q.    And did she, prior to letting you in the house, did she

15  hesitate at all or did she say anything like, geez, I don't

16  know, maybe I should talk to somebody or anything like that?

17  A.    No, at that point she knew that we had Mr. Foley in

18  custody, she was totally cooperative at that point.

19  Q.    So she let's you into the residence, you then begin to

20  walk through?

21  A.    Correct.

22  Q.    Ms. Weber then identifies the room in the house as Mr.

23  Foley's bedroom?

24  A.    That's correct.

25  Q.    What did you find, if anything, in there?

85

1  A.    I saw laying on the bed a shotgun that had a pistol

2  grip -- short, compact type shotgun, I picked that up, it was

3  loaded.  I saw an army type tool kit bag that had a large

4  amount of ammunition in it.  I saw laying on top of that

5  ammunition bag what I believe to be a magazine for an AK-47

6  assault rifle, which was fully loaded.  I believe there was an

7  open type closet or a china closet there, and I saw two bongs,

8  which I believe are commonly used for smoking marijuana.

9  Q.   Did you ultimately discover anyone else inside the house,

10  other than Ms. Weber or Ms. Carbone?

11  A.   No, sir.

12  Q.   How long a period of time were you in the house?

13  A.   Less than 10 minutes.

14  Q.   Did Ms. Weber make any statements to you with regard to

15  the possible presence of narcotics or other contraband in the

16  house?

17  A.   I asked her whose shotgun that was, she informed me it

18  was Mr. Foley's.

19  Q.   Did she say anything to you about the presence of

20  additional marijuana in the house?

21  A.   I didn't discuss drugs with Ms. Weber.

22  Q.   You're in there about 10 minutes, you then leave the

23  residence, what happens after you leave the residence?

24  A.   We had, I had -- informed Ms. Weber that we had taken Mr.

25  Foley into custody.  And I informed her that that shotgun, I

86

1  believe was a violation of parole, it was a violation of the

2  law.  I asked her if the officer could stay in the residence

3  with her because we were going to secure the area and contact

4  other authorities.

5  Q.   And did she allow that to occur?

6  A.   She did.

7  Q.   While you were going through the house, was Ms. Carbone

8  in the residence at the time or was she somewhere else?

9  A.   I believe that we had her go outside the residence.

10  Q.   Now, you then --

11  A.   I can't remember, she didn't talk with me.

12  Q.   She may have been in the house or out of the house,

13  you're just not sure?

14  A.   That's correct.

15  Q.   Now, what happens after Ms. Weber agrees that an officer

16  could stay inside the house to secure the residence?

17  A.   We contacted, I believe, it was Trooper Basinger of the

18  Pennsylvania State Police, it was narcotics investigations, and

19  we secured the garage area and the house area until his

20  arrival.

21  Q.   How were they secured?

22  A.   I believe we had an officer in the residence with Ms.

23  Weber.  I believe we had an officer remain in the barn, and

24  officers were stationed in various positions around the

25  residence.

87

1   Q.    And where were the three people that were apprehended and

2   handcuffed, where were they?

3   A.    I believe they were placed in a patrol car.  Two of them

4   were subsequently released, I can't remember when they were

5   released.

6   Q.    Did you undertake any questioning of those people?

7   A.    I did not.

8   Q.    Did you question Mr. Foley?

9   A.    I did not.

10  Q.    Trooper Basinger gets there from the state police, do you

11  then provide him information that you learned while you were on

12  the property?

13  A.    Yes, sir.

14  Q.    And is that the extent of your involvement in the case?

15  A.    I also contacted the Bureau of Alcohol, Tobacco and

16  Firearms, because I had seen the weapons there and Ms. Weber

17  had said one was Mr. Foley's.

18  Q.    You had contacted the appropriate authorities, you

19  provided them the information you have, is that the extent of

20  your involvement?

21  A.    They asked, we still had limited manpower, they asked

22  that we remain on the scene and keep the scene secure until

23  they could return with a search warrant.

24  Q.    Did they in fact do that?

25  A.    Yes, sir.


88


1  Q.    You weren't involved in the actual taking of the search

2  warrant application to the district justice?

3  A.    No, sir.

4  Q.    Did you take part in the execution of the search warrant?

5  A.    Yes, a limited amount.

6  Q.    And then that's the extent of your involvement?

7  A.    Yes, sir.

8        MR. TRABOLD:  One moment, your Honor.

9        THE COURT:  Okay.

10       MR. TRABOLD:  Nothing further.

11     THE COURT:  All right, you may cross.

12          CROSS-EXAMINATION

13  BY MR. SCHROEDER:

14  Q.    Agent Wehrle, I believe your testimony on direct

15  examination would have established, in terms of the number of

16  people who were present on April 17th at the time of this

17  search, if I'm understanding your testimony correctly, there

18  was seven officers or agents, correct?

19  A.    Yes, sir, to the best of my recollection.

20  Q.    And there were four civilians, correct, the defendant,

21  Maurice Foley -- I'm sorry, five civilians; the defendant,

22  Maurice Foley, Christina Weber, Angela Carbone, Eric Dunn and

23  Paul Butler were the five civilians?

24  A.    Yes, sir.

25  Q.    You were there the entire time period, no one else was

89

1  ever located on the premises?

2  A.    Yes, sir, that's correct.

3  Q.    You have testified on direct examination that there were

4  seven officers?

5    A.    Correct.

6    Q.    Now, we have entered an exhibit in this case or

7    introduced an exhibit that I'll refer to as Defendant's

8    Exhibit A.  I'm going to show you this, sir, and ask you

9    whether this fairly and accurately depicts, as you recall, the

10    configuration of the house, the road, the driveway, and the

11    garage or barn?

12    A.    Yes, sir.

13    Q.    Now, with respect to this document, sir, I believe your

14    testimony was that earlier in the day you had received some

15    contact from Sergeant Detzel, correct?

16    A.    Yes, sir.

17    Q.    Was that the first that you had spoken with Sergeant

18    Detzel about this situation?

19    A.    Yes, sir.

20    Q.    Now, if Sergeant Detzel would have testified that he had

21    information about a week or so before this date regarding the

22    parole absconder, the alleged parole absconder, Maurice Foley,

23    being at this location, plus some other reliable information

24    about drug activity, you wouldn't have any reason to disagree

25    with that, would you; that he had obtained this information

90

1    about a week before the 17th of April, you wouldn't have any

2    reason to disagree with that, would you?

3    A.    No, I don't know when he obtained the information.

4    Q.    But as far as your involvement in this matter is

5    concerned, the first you get any information is the 17th of

6    April?

7    A.    Yes, sir, that's correct.

8    Q.    Earlier in the day I believe you testified to?

9    A.    That's correct.

10    Q.    What time?

11    A.    It would have been in the afternoon.

12    Q.    And Sergeant Detzel testified that there's always a

13    magistrate, a district justice on duty in any county,

14    specifically Crawford County, with respect to going any time of

15    the day or night for purposes of a search warrant, would you

16    agree with that?

17    A.    I would agree with that.

18    Q.    And you testified on direct examination that after you

19    received this information, that there was some sort of a

20    meeting which takes place?

file:///A|/FOLEYSUP.TXT

21  A.   Yes, sir, we met with Sergeant Detzel.

22  Q.   Was this what the prosecutor kept referring to as the

23  Grotto Park meeting?

24  A.   No, sir.

25  Q.   So there were two meetings?

91

1  A.   The first meeting we met with Sergeant Detzel, so he

2  could show us where the residence was.  The second meeting, it

3  was another meeting, is when we saw the vehicles come.  The

4  meeting at Grotto Park is the meeting that we had where I

5  determined that we did not have enough officers to safely

6  attempt to effectuate an arrest.

7  Q.   What time did the first meeting with Sergeant Detzel take

8  place?

9  A.   I would say roughly 5 o'clock.

10  Q.   Where?

11  A.   It took place at the Saegertown exit of I-79.

12  Q.   You drove your vehicles and met him there?

13  A.   Yes, sir.

14  Q.   And how many state parole agents were present for that

15   meeting?

16   A.   Two.

17   Q.   Yourself and Officer Verga?

18   A.   Yes, sir.

19   Q.   And Sergeant Detzel?

20   A.   Yes, sir.

21   Q.   He at that time communicates to you information regarding

22   Maurice Foley, as well as information about possible drug

23   activity?

24   A.   He stated -- the main gist of the information was that

25   Mr. Foley was there.  And Mr. Foley was a fugitive.  He warned

92

1   us that his informant had also said that there was possibly

2   some methamphetamine activity there.

3   Q.   There was drug information communicated at that time?

4   A.   This was more of a safety thing because of the

5   methamphetamine issue.

6   Q.   Then this takes place at 5 o'clock, what happens next

7   time wise?

8   A.   Okay, then we -- this is approximately five, I might be a

9   little bit off on time.  We drove out to Hill Road.  He shows

10   us where the house was.  Trooper Reinhart was with us at the

11   meeting also, he had driven down --

12   Q.   We have a local police officer, a Pennsylvania state

13   trooper and two parole officers?

14   A.   That's correct.

15   Q.   The four of you then go in one vehicle?

16   A.   No, sir, we go in two vehicles.

17   Q.   Do you ride by or stop at the time?

18   A.   There was a church down the road, we stopped there.

19   Q.   And what time did this first stop occur there?

20   A.   It would have been a half hour after our initial meeting.

21   Q.   Sometime between 5 and 6 o'clock?

22   A.   Yes, sir.

23   Q.   Perhaps then?

24   A.   At that time we informed Officer Detzel that we wanted to

25   surveil the location, we just didn't want to go up and knock on


93


1   the door, we could not tell if anybody was home or not.  We

2   made arrangements, we got his cell phone number, we made

3  arrangements to call him in case we needed back up, and he said

4  that he could get an additional K-9 officer to also back us up.

5  Q.   Did you then continue to remain at the location or did

6  you leave and then come back to surveil?

7  A.   We went to a location and surveiled.

8  Q.   We being yourself and Officer Verga?

9  A.   And Trooper Reinhart who was in our vehicle.

10 Q.   The three of you then and Officer Detzel?

11 A.   Yes.  During that period we also interviewed some of the

12 neighbors.

13 Q.   Did you receive any information from any of the neighbors

14 regarding any unusual activities at the premises?

15 A.   Nothing, you know, they just said there was a lot of

16 traffic in and out.

17 Q.   And a lot of traffic in and out is, in your experience,

18 consistent with drug activity, correct?

19 A.   It could be, may not be.

20 Q.   It's not inconsistent with drug activity?

21 A.   Pardon me.

22 Q.   It's not inconsistent with drug activity?

23 A.   It's not inconsistent.

24  Q.    What other information did you --

25          THE COURT:  Keep your voice up, please.


                              94


1          THE WITNESS:  Yes, your Honor.

2  BY MR. SCHROEDER:

3  Q.    Do you recall any other specific information you

4  received?

5  A.    Nothing specific.

6  Q.    And at this time was at least one agent from the

7  Pennsylvania State Police present with you, when you're

8  interviewing neighbors?

9  A.    He was there as a backup, he's from the fugitive

10  apprehension unit.  He really didn't participate in the

11  interviews, I conducted the interviews.

12  Q.    I would be correct in concluding that in view of the fact

13  that all of you are working together on this, you're sharing

14  information back and forth with respect to what neighbors are

15  saying, things of that nature, correct?

16  A.    We were discussing the situation, correct.

17  Q.    And what happens next time wise with respect to the

18  ultimate arrival at this property?

19  A.    The next thing we saw, I would say would be approximately

20  between 8 and 8:30, we saw three vehicles drive together up the

21  road and pull in and park by the garage.

22  Q.    Were you in marked vehicles at the time?

23  A.    We were not.  We only had one vehicle, it was just my

24  vehicle.

25  Q.    That's an unmarked vehicle?

95

1  A.    Yes, sir.

2  Q.    Did you see individuals exit those vehicles?

3  A.    We did not.

4  Q.    What happened then after you see these three vehicles

5  pull into the driveway?

6  A.    We contacted Officer Detzel, we informed him that three

7  vehicles had arrived.  We informed him that we were going to

8  attempt to see if Mr. Foley was there.  And I informed him that

9  we did not have enough officers to safely do that.

10  Q.    Now, if my computation of the time is correct, if you

11  arrive there at or around 5:30, you said that the three

12    vehicles arrive at 8 or 8:30, and you remain in that location

13    that entire time period, we're talking about an approximate

14    three-hour period that yourself, Mr. Verga and at least one

15    state police officer remained at the scene?

16    A.    Yes, sir.

17    Q.    Continuing to develop evidence with respect to the

18    defendant and the activity taking place there?

19    A.    We were surveilling the residence to see if we could see

20    Mr. Foley.  And, like I say, we could not tell if anybody was

21    home.

22    Q.    Well, you also indicated you were interviewing neighbors?

23    A.    We talked to neighbors, right.

24    Q.    Now, at or about 8:30, you contact Sergeant Detzel again

25    and you indicate you need more personnel?


96


1    A.    We told him of the arrival of three vehicles.  He said,

2    he had previously informed me that there was another K-9

3    officer available, another municipal officer.  I informed him

4    that I did not think that was enough to safely do what we had

5    to do.

6   Q.   So did you leave that area then?

7   A.   We did.

8   Q.   Is that when the Grotto park meeting takes place?

9   A.   Yes, we contacted Corporal Rossman at the Meadville

10  barracks of the Pennsylvania State Police, informed him of the

11  situation and requested additional backup.

12  Q.   Where is this Grotto Park located?

13  A.   Between Meadville and the residence.

14  Q.   So all of the ultimate officers and agents that are

15  involved in this arrest of Mr. Foley, meet at Grotto Park and

16  then go on the location itself?

17  A.   Yes, sir.

18  Q.   And all of the information that exists is exchanged and

19  discussed at Grotto Park?

20  A.   Information was exchanged and discuss, we showed them a

21  picture of Mr. Foley.  We informed them we had seen three

22  vehicles drive up.  That's why we wanted the additional backup.

23  At that point we had a discussion, I still did not feel that we

24  had enough officers to safety to do what we had to do there,

25  but there was nobody else available, Corporal Rossman was the

97

1   supervisor.  I drew some pictures of the layout, and we had a

2   discussion of who was going to go the front door, who was going

3   to go to the back door, who was going to cover the cars.  We

4   agreed to meet at a location where we could observe the

5   residence and finalize our plans.

6   Q.    Did you exchange any information about drug activities?

7   A.    We did not.  I believe Officer Detzel again mentioned

8   that his informant said something about methamphetamines.

9   Q.    So, as far as you recall, the Grotto Park meeting and

10  everything that had taken place, the only focus is the

11  apprehension of Maurice Foley, you're not even talking about

12  other things?

13  A.    I believe, again, Officer Detzel stated about the

14  methamphetamine because of the danger associated with that.

15  The fact that there is the possibility of drug activity, this

16  was, of course, discussed because again that's an officer

17  safety issue.

18  Q.    But, as far as you're concerned, you would agree with me

19  that you and Officer Verga are the lead guys because this is a

20  parole situation?

21  A.    That's correct.

22  Q.   As far as you're concerned, the sole thrust of this is to

23   arrest Maurice Foley?

24  A.   That's correct.

25  Q.   Now, after the meeting in Grotto Park, you then go to the

98

1  location, you go directly from Grotto Park to the Hill Road

2  property location?

3  A.   We went to an area where we can observe the property,

4  where the other officers who were not familiar with the

5  property could see seen the layout and we finalized our plan.

6  Q.   The layout you drew, you did this just based on your

7  prior observations?

8  A.   Yes, sir.

9  Q.   Did you go onto the property at all?

10  A.   I did not.

11  Q.   So this is just what you were able to observe?

12  A.   Just what I was able to observe.

13  Q.   This is April 17th, correct?

14  A.   Correct.

15  Q.   When you first arrived, it's sometime after 6 o'clock,

16   would it have been dark or light at that time?

17   A.   There was still some light.

18   Q.   Dusk?

19   A.   To be honest, I can't remember.

20   Q.   But it's getting progressively darker?

21   A.   The vapor light up over the garage, I remember that came

22   on at some point.

23   Q.   The whole group comes back, seven officers come back at

24   or about 10 o'clock, 10:30?

25   A.   Correct.


99


1   Q.   For the sole purpose, as you've just described, of

2   apprehending Maurice Foley?

3   A.   Right.

4   Q.   As far as you're concerned, you're the lead guy?

5   A.   Correct.

6   Q.   And the officers position themselves at various locations

7   for what you described as being officer safety, correct?

8   A.   Correct.

9   Q.   Now, with respect to the diagram in front of you, sir,

file:///A|/FOLEYSUP.TXT

10  Defendant's Exhibit A, are you able to indicate on that diagram

11  with a circle, the location of the various officers -- well,

12  let me back up first.  You indicated that you first go to the

13  door of the house, correct?

14  A.    Yes, sir.

15  Q.    Who's with you when you go to the door of the house?

16  A.    Agent Verga and Trooper Reinhart were with me.

17  Q.    Had everyone else been strategically positioned when you

18  went to the door of the house?

19  A.    Yes, sir.

20  Q.    So everybody, based upon your prior observations, your

21  diagrams and your plan, everybody was where they were supposed

22  to be?

23  A.    As far as I knew.

24  Q.    Can you put a circle in all of the locations where the

25  people were supposed to be; I would note for purposes of the


100


1  record, the prior witness, if I could see that one minute, had

2  identified the location here where Sergeant Detzel with a dog

3  and another officer; is that consistent with what you recall of

4   their locations?

5   A.   Sergeant Detzel was to cover the vehicles, which were

6   right up here.  And I believe there was a big light on right

7   here, they stepped out into the shadows.

8   Q.   Could you, with a circle large enough to write the name

9   of every individual inside the circle; put the locations as you

10  recall where you strategically placed then at the moment you

11  went to the door of the house?

12  A.   I believe the agents -- when we went to the door of the

13  house?

14  Q.   When you went to the door of the house, you testified

15  previously you had strategically placed everyone, correct?

16  A.   Correct.

17  Q.   Where were they?

18  A.   Sergeant Detzel was up here by the vehicles.  Agent Verga

19  and I believe Trooper Reinhart and myself went to the front

20  door.  I believe the other K-9 officer and one the other state

21  trooper was to cover the back.

22  Q.   Could you then put three circles --

23         THE COURT:  You know what would be helpful to me is

24  if you used the overhead projector so I could see what's going

25   on, can you do that.  Mr. Schroeder, if you can put it on the

101

1   screen over there, then it will come up on everybody's screen.

2   BY MR. SCHROEDER:

3   Q.    Are you able to see this at your location, sir?

4   A.    Yes, sir.

5        THE COURT:  You can mark this up in any way, you can

6   do it with your finger just by pushing on the screen.  Go

7   ahead.

8   BY MR. SCHROEDER:

9   Q.   If you would do that, sir, we've already identified the

10   approximate position of Sergeant Detzel and at least one other

11   officer watching the vehicles as you've described, correct?

12   A.    Correct.

13   Q.   Do you agree with their position?

14   A.    Yes, sir.

15   Q.   Could you then mark a circle and put the initials of the

16   other strategically placed individuals?

17   A.   Do you want me to mark --

18        THE COURT:  Just mark the circle.

19  BY MR. SCHROEDER:

20  Q.   Mark the circle.

21  A.   (Witness complies).  That would be myself, I believe

22  Agent Verga and Trooper Reinhart.  I believe the other K-9

23  officer initially would have been in the back of the residence,

24  and possibly Corporal Rossman, I can't remember.

25  Q.   There were at least two people behind the residence, is

102

1  that correct?

2  A.   Yes, sir.

3  Q.   And then the two by the garage, initially?

4  A.   Yes, sir.

5  Q.   And you then indicate you knock on the door of the house?

6  A.   Yes, sir.

7  Q.   Did you speak first with Christina Weber?

8  A.   Yes, sir.

9  Q.   And your testimony is that you have some conversation

10  with her, was she cooperative initially or uncooperative?

11  A.    She was cooperative in that she spoke to us, she was

12  uncooperative in that she would not give us information about

13   Mr. Foley, and she would not let us look in the residence.

14   Q.   And that's cause for concern for you in your position,

15   correct?

16   A.   Yes.

17   Q.   And I would be correct in concluding that based on that,

18   just general safety principles, you keep her and Angela

19   Carbone, someone keeps them under surveillance the entire time

20   that this operation is taking place?

21   A.   I don't know that.

22   Q.   Pardon me?

23   A.   You mean when we moved up to the garage?

24   Q.   After your initial encounter with them, you receive

25   limited truthful information, according to what you just


                                    103


1   indicated, from her?

2   A.   Correct.

3   Q.   That you would have in the interest of officer safety and

4   procedures, someone would have kept these two females under

5   observation and control the entire time?

6   A.   They went back into the residence.

7   Q.   You let them go back into the residence without an

8   officer present?

9   A.   Ms. Weber would not let us in the residence.

10  Q.   So she closed the door and just went into the residence?

11  A.   Yes, sir.

12       THE COURT:  Let me ask you a question here.  When

13  you went to the house, this is the first time, before any of

14  the arrests were effectuated, right?

15       THE WITNESS:  Yes, sir.

16       THE COURT:  That's what we're talking about now?

17       THE WITNESS:  Yes, sir.

18       THE COURT:  Do I presume when you said she wouldn't

19  let us in, that initially the first time you went up there you

20  asked her for her consent to let you in and she said no?

21       THE WITNESS:  I asked her if Mr. Foley was there, I

22  said can we come in and look for him, she said no.

23       THE COURT:  All right, go ahead.

24  BY MR. SCHROEDER:

25  Q.   She said no, he wasn't there, no, you cannot come in?

104

1  A.   She said no, we could not look for him.

2  Q.   Did she then close the door?

3  A.   No.  Then I asked who else was at the residence.  She

4  said her girlfriend.  Who we determined to be Ms. Carbone.

5  Then I asked Ms. Carbone to come out and speak with me.

6  Q.   Where was Christina Weber at that time?

7  A.   Standing in the doorway.

8  Q.   And did Ms. Carbone come out when Ms. Weber was standing

9  there?

10  A.   Yes, sir.

11  Q.   And you spoke basically with the two of them in concert

12  together?

13  A.   No, sir, I wanted to speak with Ms. Carbone separately.

14  Q.   What information did you obtain from Ms. Carbone?

15  A.   That her boyfriend was up in the garage.

16  Q.   That would be Mr. Butler?

17  A.   I believe so.

18  Q.   Had you ever met any of these people before?

19  A.   I had not.

20  Q.   And what other information did you obtain from her?

21  A.   That was all.

22  Q.   So you obtained information that at least one person was

23  in the garage, correct?

24  A.   Yes, sir.

25  Q.   And that was the only information you would obtain at


105


1  that time?

2  A.   I had seen three vehicles arrive.

3  Q.   That's correct.  But in terms of the information that was

4  developed at the scene from individuals, you know that one

5  person was in the garage?

6  A.   Yes, sir.

7  Q.   Does anyone then stay, do any officers stay at the house

8  with the two females?

9  A.   No, to the best of my recollection no officer went in the

10  house because we had not been granted access to the house.  I

11  believe that an officer stayed down by the house while the rest

12  of us went up to the garage.

13  Q.   Did you keep the females on the porch for officer safety?

14  A.   (Witness shakes head.)

15  Q.   You're shaking your head no?

16  A.   We were spread out, okay, we had limited communications,

17  no, we we're just doing the best we could.  It wasn't perfect,

18  it's the best we could.

19  Q.   Well, officer safety is your primary concern, correct?

20  A.   Yes, sir.

21  Q.   And you would agree with me that you had gotten what you

22  deemed to be erroneous information from the individual, and

23  Christina Weber was actually -- she actually lived there,

24  correct?

25  A.   I don't know that.


106


1  Q.   Did you ever develop that information?

2  A.   Did I?

3  Q.   Yes, sir.

4  A.   I did not.

5  Q.   You get what is at least somewhat untruthful or even

6  incomplete information from her and you are concerned for

7  officer safety, correct?

8  A.   Correct.

9  Q.   You don't recall whether they were kept under

10  surveillance --

11  A.   I don't recall.

12  Q.   Now, who else also goes to the garage, that you recall?

13  A.   The focus shifted to the garage.  I know that Agent Verga

14  went to the back.  I know that Corporal Rossman was with me.

15  I'm not sure whether either Trooper Reinhart came up to the

16  garage with us or he stayed back at the house, I can't

17  remember.

18  Q.   Could you place circles on the exhibit as to where the

19  individuals were when you went to the garage to knock and

20  announce?

21  A.   I couldn't see the people behind the garage.  It's kind

22  of hard for me to say where they were.

23  Q.   But you do know there was somebody there?

24  A.   Yeah.

25  Q.   Because, in fact, somebody was arrested going out the

107

1  back of the garage?

2  A.   Where they were in the back of the garage, I don't know.

3  Q.   Well, just generally, they were behind the garage?

4  A.   They were behind the garage.

file:///A|/FOLEYSUP.TXT

5    Q.    So there are two people behind the garage?

6    A.    At least two people.

7    Q.    And we have the two officers previously positioned with

8    the dogs?

9    A.    I believe one of the K-9s was in the back of the garage,

10   and Officer Detzel was still up by the vehicles.

11   Q.    So we have probably four positioned already, how many do

12   you recall going to the front door -- you said you went to the

13   front door, knocked and announced, how many officers or agents

14   went to that door to do that?

15   A.    I remember myself and Corporal Rossman.

16   Q.    Where was Agent Verga?

17   A.    He went to the back.

18   Q.    He went to the back as well.  So, as best as I can tell

19   from the finite number of officers in position, then everybody

20   would have gone --

21   A.    I'm not too sure Trooper Reinhart stayed down there at

22   the residence or not.

23   Q.    In any event, you testified you then knock and announce?

24   A.    Correct.

25   Q.    And what did you announce?

108

1  A.    "State parole, open the door."

2  Q.    And the witness previously testified in this case that

3  everything happened within a matter of seconds; do you agree

4  with that?

5  A.    Matter of what?

6  Q.    Seconds?

7  A.    Seconds.  No, sir, I had to knock and announce on several

8  occasions.

9  Q.    How long did you wait to knock and announce?

10  A.    At least 30 seconds.

11  Q.    So you knocked and announced, you wait 30 seconds, you

12  knock and announce again, you're standing there and everybody

13  is positioned; what do you next recall happening?

14  A.    I knocked and announced several times.  The next thing

15  that happened was this truck started up in the driveway.

16  Q.    Now, did you ever examine that truck to see what caused

17  it to start?

18  A.    I did not.

19  Q.    Did you look and see whether there were any individuals

20  in the truck?

21  A.   We cleared it, there was nobody in the truck.

22  Q.   So if you cleared it, there's obviously some sort of a

23  remote starting device, if this vehicle started, it had to be

24  done remotely?

25  A.   That would be my guess.


109


1  Q.   Did you ever examine the truck to see if a remote

2  starting device was present?

3  A.   I did not.

4  Q.   Did you ever see anybody activate any kind of remote

5  starting device?

6  A.   I did not.

7  Q.   Did you ever see any remote starting device obtained from

8  any person or through any search of these premises?

9  A.   I don't know.

10  Q.   So the vehicle starts, do the lights go on?

11  A.   The lights go on.

12  Q.   This is in the middle of your knock and announce?

13  A.   Yes, sir.

14   Q.   What happens then?

15   A.   Then Mr. Butler, I believe, opened the door.

16   Q.   And the testimony was that he's immediately taken down

17   and secured?

18   A.   He's immediately what?

19   Q.   Taken down and secured?

20   A.   Yes, sir.

21   Q.   And you then enter the garage/barn structure, correct?

22   A.   Correct.

23   Q.   Do you see feet going up the ladder?

24   A.   Yes.

25   Q.   And this tells you that there's at least one other person

110

1   present inside?

2   A.   Yes.

3   Q.   Now, would you agree with me that even before this,

4   there's a flurry of activity in the back and you can hear

5   indications that somebody is being taken down and secured in

6   the back?

7   A.   The way I remember it is -- Mr. Butler, I'm ordering Mr.

8  Butler to the ground, get down.  We have guns drawn, I'm

9  ordering him to get down, I can't hear anything while I'm

10  talking.  Then I enter, okay.  As I enter, I see the feet now

11  moving back towards the garage, I hear, you know, voices and

12  yelling coming from the back of the garage.

13  Q.    And ultimately you came down that Maurice Foley was

14  apprehended in the back of the garage?

15  A.    That's correct.

16  Q.    So what you heard then is consistent with Maurice Foley

17  being apprehended at the back of the garage when you're inside,

18  after you've already taken down and secured Mr. Butler?

19  A.    Correct.

20  Q.    As far as you know, then, there is at least one other

21  person, you see feet going up the ladder, correct?

22  A.    Yes, sir.

23  Q.    This is a ladder, it's not steps?

24  A.    Yes, sir.

25  Q.    And you then follow-up -- do you then have that person

111

1  come down?

2  A.   I ordered that person down.

3       THE COURT:  Hang on one second.  It might have been

4  a slip of the tongue, you then see a person's feet going up the

5  ladder, is that what you meant to say?

6       THE WITNESS:  The feet were coming down the ladder.

7       THE COURT:  All right.

8  BY MR. SCHROEDER:

9  Q.   You see feet coming down the ladder?

10  A.   Yes, sir.

11  Q.   You order that person down?

12  A.   Yes, sir.

13  Q.   And that person complies?

14  A.   Yes, sir.

15  Q.   He's immediately taken into custody and secured?

16  A.   Yes, sir.

17  Q.   And at that point in time, what your testimony is you

18  don't know who else if anybody might be present there?

19  A.   That's correct.

20  Q.   Did you at this point in time make a determination that

21  Mr. Foley was out back and not secured?

22  A.   Agent Verga had told me he was secured.

23  Q.   So you know that the thrust and focus of why you went

24  there is secured?

25  A.   That's correct.


                                    112


1  Q.   You previously testified that none of this other drug

2  activity was important, the reason you went there, the person

3  you went there to get, was in custody and secured, correct?

4  A.   Correct.

5  Q.   And then you testified that you then go up the ladder to

6  examine the upstairs?

7  A.   That's correct.

8  Q.   And the upstairs is just one open room, it's not an

9  apartment with a separate bathroom, correct?

10  A.   I can't remember if there was any small divides, there

11  was a lot of furniture and stuff piled up there.

12  Q.   But as you walk through the garage, I mean a human being

13  is a fairly large conspicuous entity, correct?

14        THE COURT:  Depends on the human being.

15        THE WITNESS:  I found people hiding in closets,

16  cupboards, everything.

17  BY MR. SCHROEDER:

18   Q.    But as you walk through the garage, you're confident that

19   there's nobody hiding in the downstairs portion?

20   A.    No, sir, I was not.  We came upon those individuals in

21   plain sight.  That was going to be our focus.  Okay.  There

22   were other officers downstairs to help once we took them into

23   custody and clear, to see if anybody was hiding under anything.

24   I wanted to go upstairs at that point.  I obtained backup to go

25   upstairs to see if anybody else was upstairs.


113


1   Q.    But you would agree with me that you never would have

2   climbed that ladder without being reasonably confident that the

3   downstairs was secure, that you would exposed yourself

4   completely by having a portion of your body above the floor?

5          MR. TRABOLD:  Objection, as to the relevance of that

6   question, and it calls for speculation.

7          THE COURT:  Overruled.  Do you understand the

8   question?

9          THE WITNESS:  Yes, sir.  I would be relatively sure,

10   but not positive.

11   BY MR. SCHROEDER:

12  Q.   Well, what remained to be done downstairs that led you to

13  being positive before you would have subjected yourself to that

14  potential danger?

15  A.   Well, looking back on it, there are probably a lot of

16  things I would have done differently on every arrest I make.

17  The situation is fluid, okay.  I did not have a whole lot of

18  time to stop and analyze every move that I make.  Maybe I

19  should have done a better search downstairs.  At the time,

20  okay, it seemed prudent for me to go upstairs.  Whether or not

21  that was exactly the right thing to do, I guess we could

22  discuss that on and on.  I don't know.  I did what I thought I

23  should do.

24  Q.   Well, it seemed prudent because you had adequately, in

25  your mind, protectively swept the downstairs, you were


114


1  confident that you could go upstairs and look around?

2  A.   There were other officers there downstairs.  I had moved

3  through, taken an individual into custody, I wanted to go up

4  and check the upstairs.

5  Q.   You would agree with me that when you went up the up

6  stairs, there's more or less a trap door in the floor as you go

7  up the ladder, as you come up there you're able to look around

8  the room?

9  A.   That's correct.

10  Q.   There wasn't any portion of that room that wasn't openly

11  conspicuous --

12  A.   There were many areas of that room that were not only

13  conspicuous.

14  Q.   Before you go upstairs, do you observe any of the items

15  downstairs that you detailed in your direct examination?

16  A.   I observed, before I went upstairs, I observed a triple

17  beam scale, I observed the disc with the white powder on it.

18  Q.   Now, the triple beam scale was all the way at the back of

19  the garage?

20  A.   Over to my right.

21  Q.   And the disc with the white powder, where was that?

22  A.   Right by the ladder.

23  Q.   And those would be items that you observed downstairs?

24  A.   Yes, sir.

25  Q.   And when you go up the ladder, what do you observe up

1  there, do you actually physically go all the way up?

2  A.   All the way up.

3  Q.   With your feet on the floor walking around?

4  A.   Yes, sir.

5  Q.   And what do you observe, would you tell us what you

6  observe up there?

7  A.   A loaded 12-gauge shotgun.  As I moved back towards the

8  front, laying out on the floor was a large container with a

9  large amount of marijuana seeds in it.

10  Q.   Would you agree with me, sir, that had you just gone up

11  for protective sweep purposes, that you would have to merely

12  stick your head above or a portion of the body above --

13  A.   I totally disagree with that.

14  Q.   Do you believe there were areas where someone could have

15  been secreted?

16  A.   I know there were areas where somebody could have been

17  secreted.

18  Q.   What were they?

19  A.   As I previously testified, there was furniture, there

20  were all types of obstacles up there.  I mean -- it's

21 impossible to stick your head up and determine whether it was

22 clear.

23 Q.    But at some point you're satisfied that there's no human

24 beings up there?

25 A.    After I looked through the room, I was satisfied there

116

1 were no human beings up there.

2 Q.    Then you go downstairs and the other officers are still

3 inside the downstairs portion?

4 A.    Yes, sir.

5 Q.    Did they have Mr. Butler and Mr. Dunn inside the

6 downstairs portion?

7 A.    I believe everybody was still where we put them down.

8 Q.    So you put them down on the floor inside the garage.  And

9 how long did you remain inside now at this point in time, you

10 were satisfied, for protective purposes, this building had been

11 adequately swept, correct?

12 A.    Yes, sir.

13 Q.    And yet everybody remains inside?

14 A.    Yes, we were trying to figure out what we were going to

15  do at that point.  We had to sort out who was who, I know the

16  state police were going to run ID checks, they were running

17  checks on the vehicles, there was still a lot of work to be

18  done.

19  Q.   In fact, at this point in time, you know what you told us

20  to be the primary, the sole focus of you going in as the lead

21  agent, he's in custody already.

22  A.   He's in custody.

23  Q.   You have what you went there for, correct?

24  A.   We had taken Mr. Foley into custody.

25  Q.   And in the interest of what you were there for, you had


117


1  him in custody, ultimately, he's taken to a penal institution

2  that night, you have accomplished everything you went there to

3  accomplish?

4  A.   We went there to arrest Mr. Foley.  We took him into

5  custody.  I had observed a loaded shotgun.  I observed a large

6  amount of what I believe to be marijuana seeds.  I had observed

7  the triple beam scale.  There was a bag of marijuana laying on

8  the floor, there was also a money wrapper that I had seen.  I

9   still thought, that led me to believe, okay, that there was

10  possible criminal activity taking place.

11  Q.   Without regard to that, though, you had the person you

12  went for?

13       MR. TRABOLD:  Objection, asked and answered.

14       THE COURT:  Overruled.

15  BY MR. SCHROEDER:

16  Q.   Now, despite the fact that you have that person in

17  custody, with the other known people are secured, you then go

18  back to the house?

19  A.   I do.

20  Q.   And you then have further conversation with Christina

21  Weber?

22  A.   I did.

23  Q.   And was anyone present with you at this time, and how

24  long after you had entered the barn, did you go back to the

25  house, how much time elapsed?


118


1   A.   As soon as we were assured everybody was secured, I don't

2   know, 15, 20 minutes.

3  Q.    Everybody remains in the barn for 15, 20 minutes?

4  A.    Again, I'm speculating on time, I would guess that, being

5  the state police are running IDs, they're running, just

6  everything is trying to get organized.

7  Q.    You would agree with me that in terms of the 15, 20

8  minutes in the garage, common sense would tell me that

9  everybody is secured within a very short time period after the

10  entry?

11  A.    Common sense would tell you what?

12  Q.    That the individuals inside there are secured very soon

13  after you go in there, that is your first and foremost focus

14  going in there, is to secure the individuals in the barn?

15  A.    When I left the barn, I was satisfied the barn was

16  secured.

17  Q.    But those individuals, the individuals are secured right

18  away, because that's what you're doing --

19        THE COURT:  Mr. Schroeder, we covered this, let's go

20  on to something else.

21  BY MR. SCHROEDER:

22  Q.    So after being in the barn for 20 minutes, you then go up

23  to the house and have a conversation with Ms. Weber?

24  A.    Correct.

25  Q.  You then testified that you asked her if you could then

119

1  go through the house?

2  A.  I did.

3  Q.  Now, when you went there to talk with her, where was she?

4  A.  When I went through the house where was she?

5  Q.  When you went back to speak with her at the house, where

6  was she?

7  A.  She answered the door.

8  Q.  And was there an officer present?

9  A.  No.

10      THE COURT:  Who was with you, you were asked that

11  initially; who was with you, this is the second conversation

12  now, after you had your first one, you're done with the garage,

13  who walks up with you to the front stoop?

14      THE WITNESS:  I believe it was Agent Verga, I

15  believe, and one of the municipal officers.

16      THE COURT:  So the three of you, to the best of your

17  recollection?

18      THE WITNESS:  To the best of my recollection.

file:///A|/FOLEYSUP.TXT

19          THE COURT:  Go ahead.

20   BY MR. SCHROEDER:

21   Q.    You've indicated she answers the door, there's no officer

22   there with her guarding her or watching her?

23   A.    No, she wouldn't let us in the house.

24   Q.    So that would tell me, at least for that 20 minute period

25   that you were in the barn, approximately 20 minute period, that

                            120

1   one felt sufficiently threatened or concerned about the house

2   that they went back to keep the two individuals in the house

3   under surveillance or secured?

4   A.    If I didn't feel sufficiently secure, I wouldn't have to

5   go back to the house.  Like I said, I wasn't satisfied with the

6   number of officers who we had when we went there initially.  I

7   would have five more or ten more if I could of, but they

8   weren't available.  I wouldn't have gone back there if I felt

9   secure.

10   Q.    But you would agree with me, sir, that after you secured

11   the individuals at the barn, nothing would have precluded you

12   from sending an officer back up to the house to keep them under

13  observation or surveillance if in fact you were concerned for

14  officer safety, what might be taking place in the house?

15  A.    That's why I went back to the house.

16  Q.    Twenty minutes later?

17  A.    We kind of had our hands full there for 20 minutes.

18  Q.    Your hands were full, but the individuals in the barn

19  were secured very shortly after you go into the barn?

20  A.    We don't know that until we cleared the barn.

21  Q.    But you cleared it right away, we established that, that

22  was the first thing that happened, was you cleared the barn?

23  A.    In 20 minutes we cleared the barn.  When I was satisfied,

24  that's all I can tell you, when I was satisfied that the barn

25  was cleared, I had a concern, I informed the officers I'm going

121

1  back down to the house.  Because I informed the officers that I

2  had observed what I thought was criminal activity taking place,

3  that I wanted that barn locked down.  Then, because we were

4  going to lock down the barn, okay, and made sure that nobody

5  came or went, because of what is possible criminal activity

6  that I observed, I then wanted to go down and make sure that

7    there was nobody else in the house that was a threat to us.

8    Q.    But not until however long you were in the barn had

9    elapsed, be it 15, 20 minutes, that 15, 20 minute period

10   elapses, there is no one in the house with those two females?

11   A.    Correct.

12   Q.    At that point you are telling us, then, after the

13   expiration of the time period, then you feel the need to go in

14   and do a protective sweep in the house?

15   A.    As I told you, if we were going to leave, it would have

16   been different, we would have never gone back to the house.

17   But I had observed what I felt would be evidence of criminal

18   activity.  I had asked the other officers to lock down that

19   barn.  Because we were now going to stay at the scene, okay, I

20   wanted to go and check the house.

21   Q.    Sir, you've already told me that the focus, you're a

22   parole agent, you are not a criminal investigator, correct?

23   A.    Sir, I'm aware of my duties.  I observed what I believe

24   to be criminal activity, it's my responsibility then to contact

25   the appropriate authorities and let them take action.  If they

122

1  want to get a search warrant, if they want to continue the

2  investigation, that was up to them.  That is exactly why I

3  contacted them.

4  Q.    After the fact, but first you went back to the house and

5  you went through the house, correct?

6  A.    Correct.

7  Q.    And you already established that the individual which was

8  your focus was in custody, everybody else was secure,

9  approximately 20 minutes elapses, the females are in the house

10  alone, then you, on the basis of what you consider to be

11  criminal activity that you observe, you then made an

12  independent determination to continue the investigation?

13  A.    That's not what I said.

14  Q.    Well, you said you saw evidence of criminal activity?

15  A.    I saw what I believe to be evidence of criminal activity,

16  I asked the other officers there to secure the barn, because we

17  were going to stay on the scene, I informed them I wanted to go

18  down.  We had already been lied to.  People had already tried

19  to escape.  I saw evidence of criminal activity, to include

20  loaded firearms.  It was dark.  We had a limited number of

21  people.  I wanted to go back in to the residence to make sure

22  that there was nobody else in that residence who was a possible

23  threat to us staying on the scene.

24  Q.   But you had the Pennsylvania State Police and local

25  police authorities on the scene with you?

123

1  A.   That's correct.

2  Q.   You have, according to what you told us, already observed

3  some evidence of criminal activity?

4  A.   That's correct.

5  Q.   Nothing would have precluded you from securing the two

6  females or whatever, from going and getting a search warrant or

7  have the appropriate authorities get a search warrant?

8  A.   We did have the proper authorities get a search warrant.

9  Q.   The next day, correct -- on April 18th, Trooper Basinger

10  obtained a search warrant?

11  A.   I don't know why it took Trooper Basinger so long to get

12  a search warrant.  We started, it was at 10 o'clock at night by

13  that time, I can't even remember what time Trooper Basinger got

14  there, we had to wait for him to get there.  Then we had to

15  inform Trooper Basinger what we saw.  Then Trooper Basinger had

16   to find a magistrate.  Then he had to type an affidavit of

17   probable cause to get the search warrant and then come back.

18   Q.    So this is all one continuous series of events, you don't

19   leave the premises?

20   A.    No.  We secured the premises and did not leave, no.

21   Q.    Now, you previously have identified Exhibit 4 as being

22   the conditions governing parole and reparole, correct?

23   A.    Yes, sir.

24   Q.    And you indicate in the last paragraph down there, is a

25   consent paragraph that the individual who signs this consents


                                    124


1   to, correct?

2   A.    Yes, sir.

3   Q.    On page one.  Now, the address at the top, the approved

4   address for Mr. Foley, that's not the address that you're at

5   that night, is it?

6   A.    That's correct.

7   Q.    So the consent that the defendant signed to search was of

8   his approved residence, correct?

9   A.    Correct.

10  Q.   And not this address?

11  A.   Correct.

12  Q.   Now --

13  A.   That's why we didn't search it.

14  Q.   You didn't search what?

15  A.   The residence, that's why they got a search warrant.

16  Q.   You then go through the home, is it your testimony Ms.

17  Weber goes through the home with you?

18  A.   Yes, because she identified the room or that 28

19  shotgun -- the 28 sawed off shotgun which was Mr. Foley's, she

20  was with me.

21  Q.   With respect to any consent, did you obtain consent from

22  her?

23  A.   Yes, sir.

24  Q.   You were taking the lead with respect to that aspect of

25  this?


125


1  A.   As I testified, I told her that I wanted to go through

2  the house to see if there were any other individuals in there.

3  I informed her that we were not going to go through her drawers

4    or anything like that.  She said okay.  In fact, I even told

5    the other municipal policeman that was with me, don't look in

6    any drawers, all we're doing is looking for people period.

7    Q.    At the time that she consents, you've testified that you

8    say she consents you have a gun drawn?

9    A.    I had my weapon out I believe then.

10   Q.    At that time everybody else had already been -- the three

11   individuals in the barn had been secured for some period of

12   time?

13   A.    Correct.

14   Q.    She's obviously aware that there's a lot of activity,

15   there's seven officers and people being arrested?

16        MR. TRABOLD:  Objection, your Honor, he can't

17   possibly know what she's aware of.

18        THE COURT:  Well, what can you see.

19   BY MR. SCHROEDER:

20   Q.    What can you see that she would have been aware of?

21   A.    Ask that again.

22   Q.    From her vantage point at the home?

23   A.    I don't know where she was in the home, I have no idea

24   what she's aware of.  I told her that we took Mr. Foley into

25   custody.  I don't know where she was in the house.

126

1  Q.   So you told her, she already knows at least one person

2  has been taken into custody and you're standing there with your

3  gun drawn?

4  A.   Yes, sir, I had my gun out.

5       THE COURT:  Excuse me, how much more do you have, if

6  you have a lot we're going to break for lunch?

7       MR. SCHROEDER:  I have a good bit.

8       THE COURT:  We're going to take our lunch break.

9       (Luncheon recess from 11:45 a.m.; until 1:20 p.m.)

10       THE COURT:  Would the witness resume the stand,

11  please.  All right, Mr. Schroeder.

12  BY MR. SCHROEDER:

13  Q.   Officer Wehrle, in connection with your duties as a

14  parole officer, do you prepare reports in the normal course of

15  doing business?

16  A.   Yes.

17  Q.   Did you prepare a report with respect to this incident?

18  A.   No, we only prepare reports on the cases that we

19  supervise.

20  Q.   When you say "we", whom are you referring to?

21  A.   Agents.

22  Q.   Is it your testimony that there is no report whatsoever

23  with regard to this incident?

24      MR. TRABOLD:  Your Honor, I'm going to object,

25  counsel is not entitled to the report at this stage of the

127

1  proceedings anyways, whether he has a report or doesn't have a

2  report is of no consequence.

3      MR. SCHROEDER:  I wouldn't necessarily agree with

4  counsel's position.

5      THE COURT:  But I'm listening between the lines,

6  tell me if this is wrong.  You didn't generate a report, is

7  that right?

8      THE WITNESS:  Yes, sir, that's correct.

9      THE COURT:  All right, then there's no report to

10  give.  I don't have to decide Mr. Trabold's point as to whether

11  you're entitled to that which does not exist.

12  BY MR. SCHROEDER:

13  Q.   My next question was, to your knowledge was there a

14  report prepared at all?

15  A.   Yes, sir, there was.

16  Q.   And the report was prepared by Agent Verga?

17  A.   That's correct.

18  Q.   Now, having reviewed that report, there's no question

19  that the conclusion you reached, based upon your investigation,

20  was that Mr. Foley was staying at this location?

21  A.   Say that again.

22  Q.   Is it accurate to conclude that you folks felt that he

23  was staying at that location at least, even though it wasn't

24  his approved residence, you concluded he was staying there?

25       THE COURT:  Do you understand the question?


                              128


1        THE WITNESS:  Prior to arresting him or after?

2  BY MR. SCHROEDER:

3  Q.   After.

4  A.   After, yes, sir.

5  Q.   Thank you.

6        THE COURT:  I want to make sure I'm following this.

7  After they arrested him, they knew he was there because they

8    arrested him?

9         MR. SCHROEDER:  Your Honor, with all due respect,

10   there would be a difference between being there and staying

11   there.

12        THE COURT:  All right, go ahead.

13   BY MR. SCHROEDER:

14   Q.   With respect to Mr. Foley, in your direct examination I

15   did not hear you ever testify to any specific knowledge,

16   information or evidence that you knew him to be a dangerous

17   person, is that correct?

18   A.   Did I testify to that?

19   Q.   Yes.

20   A.   No one asked me the question.

21   Q.   And do you have any evidence or information or knowledge,

22   based on his parole record, that in fact he was a dangerous

23   individual?

24   A.   I consider any fugitive a dangerous individual.

25   Q.   But looking at his prior record, he never had any

129

1    offenses of violence in his prior record, correct?

2  A.    I don't remember.

3  Q.    And do you recall any specific evidence or information

4  that other than your general conclusion that labeled him a

5  dangerous or violent individual?

6  A.    I don't remember.

7  Q.    Now, with respect to evidence, would I be correct, sir,

8  that at various points in time you actually seized physical

9  evidence before the state police obtained a warrant the next

10  day?

11  A.    The only evidence that we seized would be weapons, loaded

12  weapons.  I secured them.

13  Q.    So you actually took those items, picked them up, secured

14  them or seized them, anything else that you did?

15  A.    I picked up the marijuana that was laying on the floor.

16  Q.    And you did this despite the fact that the premises,

17  after everything has taken place, the premises were in fact

18  secured, there were agents waiting for Trooper Basinger to

19  obtain a warrant?

20  A.    I picked up the marijuana off the floor before we even

21  called Trooper Basinger.

22  Q.    Now, with respect to Christina Weber, I would be correct

23  in concluding that you never obtained any written consent from

24  her to search the premises at any point in time?

25  A.    That's correct.


130


1   Q.    And with respect to when you obtained consent from her to

2   search the premises, when did you, as precisely as you recall,

3   when did you actually obtain consent from her to search the

4   premises?

5   A.    After I felt that the garage was secure, I went back down

6   to the house, knocked on the door and told her that we had

7   taken Mr. Foley into custody, told her that I wanted to go

8   through the house to see if anybody else was in the house.

9   Q.    She was in fact arrested and charged in this matter in

10  state court, correct?

11  A.    I believe the state police arrested her, yes, sir.

12  Q.    But you were taking the lead with respect to obtaining

13  consent from her at that point in time or you took the lead

14  with respect to this entire investigation?

15  A.    I'd say so.

16  Q.    And you indicated that you had your weapon drawn?

17  A.  I didn't have it pointed at her, I still had it drawn.

18  Q.  Did you advise her that she had the right not to consent?

19  A.  I did.

20  Q.  Was anyone present when you advised her of that right?

21  A.  There was.

22  Q.  Who?

23  A.  I believe Agent Verga was there, I believe one of the

24  municipal police officers was with me.

25  Q.  In fact, sir, based on the fact she was charged and taken

131

1  to jail, she was essentially in custody at that point in time?

2  A.  No, she wasn't.

3  Q.  It's your conclusion she was not in custody?

4  A.  No, she could have left.  I didn't take her into custody,

5  I didn't arrest her.

6  Q.  Sir, did you ever examine the vehicle that you indicated

7  started on its own?

8  A.  I did not.

9  Q.  To determine whether it had a remote starter?

10  A.   I did not.

11  Q.   Did you actually hear that start yourself?

12  A.   I saw the lights and everything come on.

13  Q.   You were standing very close to it, correct?

14  A.   Fairly close.

15  Q.   But you do not recall hearing the engine come on?

16  A.   I don't recall hearing the engine come on.  I know that I

17  was alerted, I knew what was going on, I saw the lights come on

18  because I announced to the other officers, look out, the

19  truck's starting.

20       MR. SCHROEDER:  Thank you, I have nothing further.

21       THE COURT:  All right.

22            REDIRECT EXAMINATION

23  BY MR. TRABOLD:

24  Q.   Mr. Wehrle, counsel keeps saying you got the search

25  warrant the next day.  Is it accurate to say that the next day


                            132


1  would have been two hours after you actually went on to Mr.

2  Foley's property?

3  A.   Yes, sir, that would be correct.

4  Q.   So the next day is not a period of 24 hours, it's a

5    little more than two hours?

6    A.    No, they were working on that from the time we contacted

7    Trooper Basinger, it was just a matter of administration until

8    he got back with the warrant.

9    Q.    But my point is you didn't even go onto the property

10    until 10 o'clock at night?

11    A.    That's correct, yes, sir.

12    Q.    Now, I think you said when you went into the house, Ms.

13    Weber took you through the house, correct?

14    A.    Correct.

15    Q.    And you went into a room where there was a firearm laying

16    on a bed or in that room?

17    A.    That's correct.

18    Q.    Did Ms. Weber identify whose room that was?

19    A.    She stated it was Mr. Foley's room.

20    Q.    From that you concluded that Mr. Foley was staying there?

21    A.    I did.

22    Q.    When the vehicle that counsel had just asked you about,

23    the dually pickup truck, when that went on or turned on or

24    whatever happened to it, where were you?

25    A.    I was knocking at the door.

1  Q.   Again, how far would the vehicle have been from you,

2  approximately?

3  A.   I'd say 20 feet.

4  Q.   In relation to you, was it behind you, in front of you,

5  to the side of you?

6  A.   Behind me.

7  Q.   And did the vehicle starting, whatever happened to the

8  vehicle, cause you a safety concern?

9  A.   Certainly did.

10  Q.   In what regard?

11  A.   Ms. Weber had been less than harmonious with us, okay.

12  I didn't feel we had enough officers there to do what we were

13  going to do anyway.  But when I'm knocking and announcing,

14  nobody is answering the door, and all of a sudden the lights

15  come on in the pickup truck, my first thought is somebody is

16  going to try to escape.  Obviously, you activate your vehicle

17  from inside.

18  Q.   Counsel asked you questions concerning Ms. Weber being

19  arrested and charged with a crime, you said she was charged

20  with hindering apprehension.  You didn't charge her with that?

21  A.   I did not.

22  Q.   At the point in time when you dealt with her and she said

23  yes, you can come in the house, was she in custody?

24  A.   She was not.

25  Q.   Did you ever handcuff her?

134

1  A.   I did not.

2  Q.   Were you even around when she was placed under arrest by

3  the state police?

4  A.   I was on the premises but I don't believe I was in her

5  immediate vicinity when she was placed into custody.

6  Q.   How long would that have been when she was placed into

7  custody from when you got consent from her to enter the

8  residence, approximately?

9  A.   I'd hate to even say because I don't know, I had nothing

10  to do with taking her into custody.

11  Q.   Would it be fair to say that a significant amount of time

12  elapsed from the time she gave you consent until the time she

13  was in custody?

14  A.   I would say so.

15  Q.    And the person that put her into custody, was that person

16  even there when you were getting her consent?

17  A.    No, sir.

18  Q.    That would be Trooper Basinger?

19  A.    I believe so, yes, sir.

20  Q.    Now, you knock and announce and no one answers for a

21  while, you do that for a little while, once the door opens and

22  you take that person into custody, were events transpiring very

23  quickly or were things moving slowly, did you have time to

24  react; explain how quickly things were moving?

25  A.    From the time that the vehicle was activated until Mr.


135


1  Butler answered the door, okay, that was a very short period of

2  time.  As soon as I had Mr. Butler on the ground, I saw the

3  legs on the ladder, then I immediately started to move back

4  towards the rear of the garage.  Everything was happening in

5  rapid succession.

6        MR. TRABOLD:  Nothing further, your Honor.

7        THE COURT:  All right.  Thank you, sir.

8        MR. TRABOLD:   Your Honor, the United States calls

file:///A|/FOLEYSUP.TXT

9  Jerry Verga.

10       THE CLERK:  Raise your right hand, please.

11         GERALD VERGA, GOVERNMENT WITNESS, SWORN

12              DIRECT EXAMINATION

13  BY MR. TRABOLD:

14  Q.   Sir, can you state your name?

15  A.   Gerald Verga.

16  Q.   How do you spell your last name?

17  A.   V, as in Victor, e-r-g-a.

18  Q.   Where are you employed?

19  A.   With the Board of Probation and Parole.

20  Q.   How long have you worked there?

21  A.   Nine years, nine months.

22  Q.   In your capacity with the Board of Probation and Parole,

23  were you involved in the entry onto the property on Hill Road

24  in Saegertown on April 17th of 2003?

25  A.   Yes, I was.


                          136


1  Q.   And we've already heard from prior witnesses at length

2  about how that transpired, and I want to focus your testimony

3  on a few issues involved with that. You went onto the property

4  at approximately what time?

5  A.    Oh, I would say around 10 p.m.

6  Q.    Prior to going onto the property, were you the parole

7  officer that was in charge of Mr. Foley's case at the point in

8  time that you went onto the property to apprehend him?

9  A.    I was the agent of record, that's correct.

10  Q.    Is it fair to say that since Mr. Foley had been an

11  absconder for a period of almost three years, you hadn't had

12  really any contact with him?

13  A.    That's correct.

14  Q.    You didn't actually supervise him on parole?

15  A.    That's correct.

16  Q.    You go onto the property at approximately 10 o'clock at

17  night, and where do you go?

18  A.    We went to the house originally.

19  Q.    You and who else?

20  A.    Agent Wehrle, Trooper Reinhart.

21  Q.    And does there come a point in time during your time at

22  the residence where you speak to a person by the name of Angela

23  Carbone?

file:///A|/FOLEYSUP.TXT

24  A.   Yes, that's correct.

25  Q.   And how does that transpire?


137


1  A.   Agent Wehrle, as I stated earlier, and Trooper Reinhart

2  and myself approached the house, announced "state parole

3  agents, police."  At which time Ms. Christina Weber came to the

4  door, and Ms. Carbone.  And it was at that time that we had

5  spoke with Ms. Carbone.

6  Q.   Now, does Ms. Weber indicate that she knows Mr. Foley to

7  be on the property during the course of this conversation?

8  A.   No.

9  Q.   She says she doesn't know where he is?

10  A.   Correct.

11  Q.   Do you then undertake a conversation with Ms. Carbone?

12  A.   I don't directly, Agent Wehrle does.

13  Q.   Did you have some prior knowledge or prior dealings with

14  Ms. Carbone?

15  A.   That's correct.

16  Q.   And during the course of Agent Wehrle's conversation with

17  Ms. Carbone, does she reveal that there are other people on the

18  property?

19  A.   Yes.

20  Q.   What does she say in that regard?

21  A.   She says that there's people up in the outbuilding, the

22  garage.

23  Q.   And does she specifically identify one of the people as

24  being her boyfriend?

25  A.   That's correct.


138


1   Q.   And based upon that information, what do you and Agent

2   Wehrle then do?

3   A.   We proceed to the outbuilding, the garage.

4   Q.   And where do you position yourself?

5   A.   I'm positioned on the corner of the garage.

6   Q.   So you can see the front, as well as the side?

7   A.   That's correct.

8   Q.   Did you approach the front man door to the garage?

9   A.   No, I did not.

10  Q.   Who did that?

11  A.   Agent Wehrle and Trooper Reinhart and I believe there

12   were several other officers.

13   Q.   How far would you say you were away from the man door

14   when Agent Wehrle approached the man door?

15   A.   Fifteen feet maybe.

16   Q.   And from your vantage point, you had an opportunity to

17   see the man door, as well as down the side of the garage or the

18   outbuilding?

19   A.   That's correct.

20   Q.   Does there come a point in time when Agent Wehrle enters

21   the garage?

22   A.   That's correct.

23   Q.   Prior to Agent Wehrle entering the garage, do you hear

24   him say anything prior to actually entering the garage?

25   A.   Yes, Agent Wehrle announced "state parole agents, police,


139


1   open up."

2   Q.   And after a period of time does the door open?

3   A.   The door does open.

4   Q.   Is that an immediate thing after he knocks and announces

5   or does it take sometime?

6   A.   I takes sometime.

7   Q.   What happens then once you see Agent Wehrle begin to

8   enter that garage, what happens?

9   A.   As Agent Wehrle enters with Trooper Reinhart and the rest

10  of the officers, I hear what's tantamount to loud yelling on

11  the side of the garage.  At that point in time, I seen an

12  individual leaving the building and I see Trooper Whitman, as

13  I'm approaching, giving this individual commands, instructions,

14  orders, put your hands up, get down on the ground.

15  Q.   And is this in the area behind this garage or to the

16  side?

17  A.   It's to the side, as I recollect.

18  Q.   What are the lighting conditions like in that area?

19  A.   Low light.

20  Q.   Difficult to see?

21  A.   Yes.

22  Q.   You then approach that area?

23  A.   That's correct.

24  Q.   And what do you see Trooper Whitman doing?

25  A.   Trooper Whitman has his weapon drawn, giving the

140

1   individual, as I just said, instructions, orders, commands,

2   get your hands up in the air, state police.

3   Q.   Does the individual comply?

4   A.   The individual does comply.

5   Q.   And then what happens?

6   A.   At that time I approach.  The individual was down on the

7   ground, I cuffed the individual, and at that point in time I

8   recognized the individual as being Mr. Maurice Foley.

9   Q.   Prior to you recognizing the person that's on the ground

10   as Maurice Foley, do you hear that person saying anything, like

11   I'm Maurice Foley, or identifying themselves in any way?

12   A.   No.

13   Q.   And you knew it was Maurice Foley how?

14   A.   I knew it was Maurice Foley because at one point in time

15   Agent Wright, who's no longer with our agency, supervised this

16   individual, and Agent Wright and I had the same duty day.  So I

17   was in contact with Agent Wright's parolees because we shared

18   the same interview room.  So when these individuals would come

19   into report as instructed, it was not uncommon that I would

20   know some of Agent Wright's parolees and vice-versa.  So I knew

21   who Maurice Foley was, I could ID him.

22  Q.    You see this person down on the ground, you identify them

23   as Maurice Foley; does Mr. Foley say anything to you at that

24   point in time?

25  A.    Not that I recollect.


                                    141


1  Q.    What do you do then after you positively identified that

2  person as Maurice Foley, what steps do you then take?

3  A.    Well, at that point in time I asked Trooper Whitman if he

4  was you know safe with this situation.  I believe at that point

5  in time an officer proceeded, and he said yes, he had control

6  of the situation, the suspect.  At that time I went back to the

7  front of the outbuilding and entered the premises.

8  Q.    And what did you see occurring inside the premises of the

9  outbuilding when you went in?

10  A.    As I entered the outbuilding, as I went through the man

11  door, there was an individual that was cuffed, there was an

12  officer detaining him.  As I approached the back, I saw officer

13  or Agent Wehrle along with Trooper Reinhart and another

14  individual in the process of cuffing him.  It was at that point

15  in time that I approached and finished securing that individual

16    and remained as a cover agent with respect to that particular

17    area.

18    Q.    At what point in time did you notify or tell Agent Wehrle

19    that Maurice Foley was apprehended out back?

20    A.    It was at that time I said we have Maurice Foley.

21    Q.    Simultaneous with this second individual being detained

22    inside the garage?

23    A.    That's correct.

24    Q.    And does Agent Wehrle then go up the stairs into the

25    second floor of the garage?


                                142


1    A.    He does, that's correct.

2    Q.    Did you notice while you were inside that garage any

3    items of obvious contraband out in the open?

4    A.    There appeared to be some loose leafy green substances.

5    I believe there was some plastic bags, things of that nature.

6    Q.    So there were items that you considered to be contraband

7    inside the garage?

8    A.    That's correct.

9    Q.    Now, subsequent to everyone being secured in the area of

10    the garage being secured, do you go somewhere with Agent

11    Wehrle?

12    A.    Yes, I did.

13    Q.    Where do you go?

14    A.    We then proceed back to the main house.

15    Q.    Before we go back to the main house -- did you at any

16    point in time go up into the second floor of the garage?

17    A.    No, I did not.

18    Q.    You then go to the main residence with Agent Wehrle?

19    A.    That's correct.

20    Q.    Just the two of you or is there anyone else with you?

21    A.    I believe there was Trooper Reinhart and other officers

22    that I recollect.

23        THE COURT:  Who was with you, besides you and Agent

24    Wehrle?

25        THE WITNESS:  Trooper Reinhart, judge, and several


143


1    other officers.

2    BY MR. TRABOLD:

3    Q.    What happens when you go back up to the residence?

4   A.    Ms. Christina Weber was there.  And it was at that time

5   that Agent Wehrle explained to her that we had Maurice Foley

6   and that we wished to have her give us a consent to search the

7   residence.  Merely for officer safety, to see if there was any

8   other individuals with respect to our security.

9   Q.    And prior to asking her that, did Agent Wehrle place

10  handcuffs on her or tell her she was under arrest?

11  A.    No.

12  Q.    Did any other officers do those things?

13  A.    No.

14  Q.    Did you have your gun drawn?

15  A.    I don't believe it was drawn.  I don't recall.

16  Q.    Is it possible that you had your gun out?

17  A.    I possibly could have had it out.

18  Q.    Was Ms. Weber threatened or physically touched in any

19  way?

20  A.    Absolutely not.

21  Q.    Did she willingly allow Agent Wehrle to go into the

22  residence?

23  A.    Yes.

24  Q.    Did you also go into the residence?

25  A.  Yes, I did.


144


1  Q.  What happened when you went into the residence?

2  A.  When we went into the residence, as I recall Agent Wehrle

3  asked where Maurice Foley's bedroom was, where he was staying.

4  She pointed to an area in the back of the residence, I believe

5  it would have been just off the kitchen.

6  Q.  And you noticed items -- did you notice items in this

7  bedroom area that she identified that were obvious contraband?

8  A.  Yes.

9  Q.  What type of items?

10  A.  Well, there was -- the most prominent thing that struck

11  me, there was a pistol gripped shotgun, I believe, 20-gauge

12  shotgun.  I believe there was another firearm there.  There

13  were belts of spent, might have been AK-47 or M-16 ammunition.

14  Q.  Prior to Ms. Weber giving consent, did Agent Wehrle tell

15  her that she didn't have to consent?

16  A.  Yes.

17  Q.  Was there ever any hesitation by her to as to whether she

18  didn't want to consent or she wasn't sure?

19  A.   Not that I recollect.

20  Q.   The first time you went up to the house, did she let you

21  into the house?

22  A.   No, she did not.

23  Q.   Did anyone force their way into the house the first time?

24  A.   No.

25       MR. TRABOLD:  One moment, your Honor.  Nothing


                              145


1  further.

2                 CROSS-EXAMINATION

3  BY MR. SCHROEDER:

4  Q.   Agent Verga, you prepared a report in connection with

5  this matter, correct?

6  A.   Correct.

7  Q.   It's a three-page written report?

8  A.   Yes.

9  Q.   And it was prepared on April 21, 2003, approximately a

10  year and a half ago?

11  A.   Correct.

12        THE COURT:  Keep your voice up, Mr. Schroeder.

13  BY MR. SCHROEDER:

14  Q.  It was prepared April 21, 2003, approximately a year and

15  a half ago?

16  A.  Correct.

17  Q.  You would agree with me, when you prepare a written

18  report several days after an incident, chances are that report

19  is going to be more accurate than your recollection a year and

20  a half later?

21  A.  Yes.

22  Q.  Have you reviewed that report today, sir?

23  A.  Yes.

24  Q.  Do you have that report with you, sir?

25  A.  No, I don't.


146


1  Q.  I'm going to hand you this document, sir -- which it has

2  been marked as Defendant's Exhibit B, I'm going to ask you,

3  sir, whether you recognize that three-page document,

4  Defendant's Exhibit B?

5  A.  Yes, I do.

6  Q.  And that would be the report that you prepared and signed

7   on April 21, 2003?

8   A.   Correct.

9   Q.   Now, calling your attention to the first page of that

10   report.  Would you agree that this is a technical violation

11   arrest report prepared in connection with your duties as a

12   state parole officer, correct?

13   A.   Correct.

14   Q.   You are not an investigating police officer, you are a

15   state parole officer, correct?

16   A.   Correct.

17   Q.   In the middle of that it talks about evidence

18   confiscated, am I correct when I read "when this agent and

19   Agent Wehrle were conducting our search, we did find several

20   weapons, what appeared to be amounts of a green leafy

21   substance, and drug paraphernalia.  It was determined that we

22   should stop and proceed with a warrant," w/a, which I'm

23   presuming is with a warrant?

24   A.   Yes.

25   Q.   "Which the PSP did secure."  So in this middle paragraph

147

1  of page one, you make a statement that you're conducting a

2  search without a warrant, correct?

3  A.    Well, we had a warrant for a parole prisoner.

4  Q.    You had an arrest warrant for a parole prisoner, but you

5  did not have a search warrant to search the premises?

6  A.    We did not have a search warrant, that's why we stopped.

7  Q.    Now, sir, I want to call your attention to page two of

8  that report.  Did you review this report before you testified

9  today?

10  A.    No, I did not.

11  Q.    Would you take a few minutes and review this, sir?

12  A.    Okay.

13  Q.    Have you reviewed the entire report?

14  A.    Yes, sir.

15  Q.    With respect to page two of the report, page one of the

16  supervision history, that states at the bottom, it gives

17  basically a chronology of what happened here, correct?

18  A.    Yes.

19  Q.    "2130 hours, this agent," and again, sir, these are your

20  words that you typed up or put in the computer, and you

21  prepared this document four days after this incident, correct?

22  A.    Yes, that's correct.

23   Q.   And it states, "this agent," that would be you, "Agent

24   Wehrle and Trooper Reinhart met with Sergeant Detzel, Sergeant

25   Nichols and Chief Eric Johnston of the Cambridge Township,

148

1   P.D., Corporal Joseph Rossman of the PA State Police, and

2   Trooper Jason Whitman;" those are all individuals that you

3   reported being present, correct?

4   A.   That's correct.

5   Q.   Then skip down a little bit, the report indicates "Agent

6   Wehrle knocked on the door and announced, 'state Parole agents

7   and state police, open the door'." Now, in the context of this

8   report, that is at the house initially, correct?

9   A.   That's correct.

10   Q.   Then you ago a little further down and it talks about

11   meeting Christina Weber, continue to question her, meeting

12   Angie Carbone. And then you state in your report, " Ms. Weber

13   culminated in her allowing us to and giving us consent to

14   search the premises. Ms. Weber then admitted that parolee had

15   been staying at the residence and a search of the parolee's

16   bedroom revealed, in plain sight, a pistol gripped 20-gauge

17   shotgun and in the corner of the bedroom, a single shot

18   12-guage," correct?

19   A.    That's correct.

20   Q.    Now, when you read that in connection with the next page

21   of the supervision history, then the next page goes into the

22   chronology that occurs at the barn, correct?

23   A.    Correct.

24   Q.    When you testified on direct examination a few moments

25   ago, I believe your exact words were the first time in that


                                   149


1   house she did not let us in the house?

2   A.    That's correct.

3   Q.    In view of your report now, that would not be accurate,

4   would it?

5   A.    That's correct.

6   Q.    It's correct that it's not accurate?

7   A.    In the chronology of the report, we did not enter the

8   residence, we did not secure that weapon until after the

9   incidents at the barn.

10   Q.    Well, if you read on in your report, it says "these

11  weapons were confiscated and secured.  The two white females

12  were escorted outside the residence, at which time Chief Eric

13  Johnson took possession of the weapons and the two white

14  females were placed in his charge."  Then the report says on

15  page two, "it was at this time that this agent, Agent Wehrle,

16  and Trooper Reinhart went to an outbuilding that could be

17  describe as a large barn/garage setting," correct?

18  A.    Yes.

19  Q.    Now, in the chronology of your report as it lays it out,

20  the search as you characterize it, has the search of the house

21  occurring first, weapons and items being seized, and then,

22  according to the report, a fair reading of the language of the

23  report, then you go to the garage, and everything that takes

24  place at the barn/garage occurs then, correct?

25  A.    According to this, yes.


150


1  Q.    Is it your testimony that this report is incorrect?

2  A.    Yes.  Based on the chronology of the fact that we went to

3  the house first, then to the barn, secured the individual, and

4  then went back and searched.  So this report is in error.

5   Q.   But you would agree with me this was prepared four days

6   after the incident?

7   A.   That's correct.

8   Q.   At a time when your memory and recollection is much

9   better, just given human frailties, than it would be today?

10  A.   That's correct.

11  Q.   And you would agree with me that any reading of this

12  clearly establishes that a search of the house was done before

13  you went to the garage?

14  A.   That's correct.

15  Q.   But your testimony is that this is not accurate --

16  A.   That's correct.

17  Q.   As I'm reading it.  Then the report goes on further to

18  state that "Agent Wehrle began to knock at that door and

19  announce, 'state parole agents and state police, open the

20  door'," and that's in quotation marks, correct?

21  A.   Correct.

22  Q.   And then it says "it was at this time, as this agent was

23  serving as a cover agent at the corner of the building, that a

24  white male exited a door located towards the rear of the

25  building," correct?

151

1  A.   Correct.

2  Q.   It doesn't talk about any knock and announce and waiting

3  20 or 30 seconds, and further knock and announce; your report

4  prepared then says "it was at this time?"

5  A.   Correct.

6  Q.   So the individual exited the building immediately,

7  according to your report?

8  A.   Well, within several seconds, I said 20, it could have

9  been 5, 10 seconds.

10  Q.   But as you recorded it "it was at this time" in the

11  report.  Then the report goes further to say that "Trooper

12  Whitman of the PSP began to give this white male verbal

13  commands.  This agent assisted Trooper Whitman in taking this

14  white male into custody, and upon parolee being taken into

15  custody and being secured, he was left in the charge of Trooper

16  Whitman," correct?

17  A.   Correct.

18  Q.   The parolee, that would be the defendant, Mr. Foley?

19  A.   Correct.

20   Q.    Now, your purpose in going there was to apprehend and

21   secure Mr. Foley, correct?

22   A.    That's correct.

23   Q.    And you would agree with me, then, based upon this

24   report, that it was just your testimony a moment ago, within

25   just a couple of seconds of arriving at the scene, you

152

1    accomplished your stated purpose and intention in going there?

2    A.    That would be correct.

3    Q.    Which was to apprehend Mr. Foley?

4    A.    That would be correct.

5    Q.    And at the time there were other police officers present

6    with you, correct?

7    A.    Correct.

8    Q.    Then the report goes further to say, "this agent," that

9    would be you, "returned to his cover position and noted that

10   Agenty Wehrle, Trooper Reinhart, Corporal Rossman of PSP were

11   inside the dwelling and had an older white male secured and

12   were proceeding to clear the rest of the dwelling."  So this

13   would be happening shortly thereafter as well, correct?

14   A.   Correct.

15   Q.   When you're at the scene of something like this, your

16   immediate attention, the highest priority was to secure the

17   individuals in the building first, that occurs very soon after

18   going into the building, correct?

19   A.   Correct.

20   Q.   "Two other white males who had retreated to the top floor

21   of the residence were also secured --

22        THE COURT:  Too fast, you have to slow down.

23        MR. SCHROEDER:  I'm sorry, your Honor.

24   BY MR. SCHROEDER:

25   Q.   "Two other white males who had retreated to the top floor


                                  153


1   of the residence were also secured and placed into custody."

2   So the report indicates that two males had gone upstairs?

3   A.   I thought there were two males.

4   Q.   Do you recall differently today?

5   A.   I thought there were two -- what happened was, as I had

6   testified earlier, was as I entered the building and went

7   through the threshold, there was an individual cuffed and being

8   detained by an officer.  As I proceeded to the back of the

9   building, Agent Wehrle and Trooper Reinhart had another

10  individual secured.  I finished cuffing the individual and

11  secured that individual.  It was at that time that Agent Wehrle

12  and Trooper Reinhart proceeded upstairs to clear the rest of

13  the building.

14  Q.   The report indicates "it should be noted that Trooper

15  Reinhart and Agent Wehrle did retrieve a loaded 12-guage pump

16  shotgun."  So they seized an item at that point?

17  A.   Yes.

18  Q.   "Upon clearing the residence of any other occupants, all

19  three white males that were in the building were placed in an

20  area where they could be observed by appropriate law

21  enforcement personal."  Is that what the report says?

22  A.   Correct.

23  Q.   The way you worded the report on that date, the building

24  is completely secure and the occupants are secured and taken

25  into custody and represent no further threat to officer safety,

154

1   correct?

2  A.    In that particular building, yes.

3  Q.    Then it states "upon clearing the building, several bags

4  of what appeared to be a green leafy substance were in plain

5  view on the floor towards the rear of the building."  Now, this

6  paragraph comes in, at least in a temporal sense, after you

7  write that the individuals had been secured and cleared?

8  A.    Correct.

9  Q.    So there is at least some observation and some search

10  taking place after the individuals had been secured and the

11  building was cleared?

12  A.    Some observation, there was no search, that was in plain

13  sight.

14  Q.    Then it makes reference to "a green safe for firearms

15  with a combination lock was also observed by law enforcement

16  personnel?"

17  A.    Correct.

18  Q.    "Upon clearing the barn/garage, agents and police

19  retreated to the main residence at which time this agent

20  confiscated a 30-06 scoped rifle that was fully loaded and a

21  number of shells?"

22  A.    Correct.

23  Q.    So the agents then confiscated the weapon?

24  A.   That's correct.

25  Q.   "Also retrieved were two magazine clips, fully loaded,

155

1  for an AK-47, approximately 1,000 rounds of ammunition, two

2  holsters used for small automatic pistols."  Then you state

3  "it was at this time that this agent and Agent Wehrle ceased

4  our search and requested a search warrant from the PA State

5  Police?"

6  A.   That's correct.

7  Q.   So you acknowledge in the report that you were conducting

8  a search, after the individuals had been secured, after the

9  officer safety was no longer an issue because they're all

10  secured and in custody?

11  A.   Not a search per se.

12  Q.   Those are your words --

13        THE COURT:  Hang on a second, let him answer the

14  question.

15        MR. SCHROEDER:  I'm sorry.

16        THE COURT:  Go ahead.

17        THE WITNESS:  Thank you, judge.  It was not a search

18   per se, these items that were retrieved were in plain sight.

19   BY MR. SCHROEDER:

20   Q.   But they were in fact retrieved?

21   A.   Yes, they were.

22   Q.   They were confiscated?

23   A.   That's correct.

24   Q.   And in your report in multiple instances you use the word

25   "a search," correct?

156

1   A.   Correct.

2   Q.   Now, with respect to the knock and announce situation,

3   how many knocks and announces do you recall after you had the

4   opportunity to review your report?

5   A.   Several.

6   Q.   You recall several before the individual went out of the

7   building?

8   A.   That's correct.

9   Q.   You go back up to the home after this then?

10   A.   That's correct.

11   Q.   And is it your testimony then that the only search or

12  entry of the interior of the premises of the home occurs at

13  this point and not what is reflected inside your written report

14  here?

15  A.   That's correct.

16  Q.   And it is at this time that certain items were seized in

17  the home as well?

18  A.   That's correct.

19  Q.   And this search was based upon consent given by Ms.

20  Weber?

21  A.   That's correct.

22  Q.   You would agree with me there is no written consent form

23  signed?

24  A.   The consent was for us to search the residence, Mr.

25  Schroeder, for officer safety to clear the house.  It wasn't a

157

1  search per se in that we were going through drawers, looking

2  under mattresses, things of that nature.  Just to clarify that

3  issue.

4  Q.   But, in any event, whatever was done, was done by

5  consent?

6   A.   By Ms. Weber's consent, that's correct.

7   Q.   And was this done in your presence?

8   A.   That's correct, yes.

9   Q.   And you would agree with me at that time at least one

10   officer had a weapon drawn?

11   A.   Yes, that's correct.

12   Q.   You would agree with me at that time at least several

13   people are already in custody?

14   A.   Correct.

15   Q.   You would agree with me that Ms. Weber was ultimately

16   charged with hindering apprehension?

17   A.   That I'm not sure of, that very well could be.

18   Q.   If in fact she was charged with Hindering apprehension,

19   that's not entirely consistent with somebody giving consent to

20   search the premises?

21   A.   That sounds like somewhat of a moot issue, sir, I'm not

22   familiar with that.

23   Q.   You would agree with me, did you hear her given an

24   explanation that she did not have to consent?

25   A.   Yes, Agent Wehrle did state that.

1  Q.   And you were standing right there when that happened?

2  A.   That's correct.

3       MR. SCHROEDER:  One moment, please, your Honor.

4  Nothing further, your Honor.

5       THE COURT:  Anything else?

6       MR. TRABOLD:  Just briefly, your Honor.

7                   REDIRECT EXAMINATION

8  BY MR. TRABOLD:

9  Q.   Do you have a copy of the report in front of you?

10  A.   Yes, sir.

11  Q.   Can you turn to where it says page 2 of 2, which would

12  be, I guess it says analysis of prior criminal history there --

13  up here where it says -- see where the sentence begins "upon

14  clearing the barn/garage?"

15  A.   Yes, I see it.

16  Q.   Can you read for the court what you wrote there in that

17  sentence?

18  A.   "Upon clearing the building, several bags of what

19  appeared to be a green leafy substance were in plain view on

20  the floor" --

21          THE COURT:  You have to slow down, would you be so

22   kind as to start that all over again.

23          THE WITNESS:  Yes, sir.  "Upon clearing the

24   building, several bags of what appeared to be a green leafy

25   substance" --


                              159


1   BY MR. TRABOLD:

2   Q.    Go down a little, I'm sorry, where it says, the sentence

3   down or two down from there, where it says "upon clearing the

4   barn/garage?"

5   A.    I beg your pardon.  Okay.  "Upon clearing the

6   barn/garage, agents and police retreated to the main residence

7   at which time this agent confiscated a 30-06 scoped rifle that

8   was fully loaded and a number of shells.  Also retrieved were

9   two magazine clips, fully loaded, for an AK-47, approximately

10   1,000 rounds of ammunition, two holsters used for small

11   automatic pistols."

12   Q.    Okay.  Your report does indicate that after the

13   barn/garage areas were secured, you then went back up to the

14   house and went in the house and secured some firearms?

15  A.    That's correct, sir.

16  Q.    And ammunition?

17  A.    That's correct.

18  Q.    How long have you been a parole agent?

19  A.    Nine years, nine months.

20  Q.    And is it common ordinary practice for when you go out to

21  apprehend a fugitive, to turn a blind eye to any criminal

22  activity that may be going on there?

23  A.    No, sir.

24  Q.    I mean, would it have been ordinary practice for you and

25  Agent Wehrle to apprehend Mr. Foley and not even consider

160

1  whether there was any contraband in the area where you

2  apprehended him?

3  A.    No, sir.

4  Q.    And as a law enforcement officer, you're charged with the

5  duty to uphold the law?

6  A.    That's correct, sir.

7  Q.    So it would have been completely outside your procedure

8  and protocol to ignore what amounts to a mountain full of

9   contraband lying on this property?

10  A.    That's correct.

11          MR. TRABOLD:  Nothing further.

12          MR. SCHROEDER:  Nothing further, your Honor.

13          THE COURT:  You're excused.

14          MR. TRABOLD:  Your Honor, that is all the government

15  has.

16          THE COURT:  Do you have anybody, Mr. Schroeder?

17          MR. SCHROEDER:  Your Honor, may I ask for a brief

18  recess to consult with Mr. Foley.

19          THE COURT:  Can't you consult with him right there.

20          (Discussion held off the record between the

21  Defendant and Defense Counsel.)

22          THE COURT:  Mr. Schroeder, I'll give you a little

23  more time, we'll will take a short recess.

24          (Recess from 2:08 p.m.; until 2:15 p.m.)

25          THE COURT:  Mr. Schroeder, do you have anything?


161


1           MR. SCHROEDER:  Your Honor, at this time the defense

2   would move for the admission of Defendant's Exhibits A and B.

3          THE COURT:  Those are admitted.

4          MR. SCHROEDER:  And the defense would note for the

5    record that I've had approximately 10, 15 minutes to discuss

6    the issue with the defendant, and that the defense at this time

7    is resting, not presenting evidence or testimony with respect

8    to the suppression issue.

9          THE COURT:  All right.

10         MR. TRABOLD:  Your Honor, I would move for the

11   admission of Government Exhibits 1 through 5.  If the court

12   wishes, we can also mark as Exhibit 6 the state police search

13   warrant, the initial search warrant?

14         THE COURT:  Is that the one that was obtained, I was

15   going to ask about that because that should be a part of the

16   record because I'm going to refer to it in my ruling.  Let's

17   make it part of the record.  Is that the one obtained from the

18   DJ?

19         MR. TRABOLD:  Correct.  I believe I have it here,

20   give me a second to locate it.

21         MR. SCHROEDER:   We would ask that the entire

22   warrant be admitted with all the documents attached to it as

23   well.

24         THE COURT:  I don't know what you're referring to?

25          MR. SCHROEDER:  The warrant and the affidavit.


162


1          THE COURT:  Yes.

2          MR. TRABOLD:  I have the whole thing.  I'm trying to

3  locate it, your Honor.

4          THE COURT:  You don't have to do it right now.  You

5  can identify it, I have a copy of it.

6          MR. TRABOLD:  That would be Government's 6, your

7  Honor.

8          THE COURT:  All right, then they're admitted.

9          MR. SCHROEDER:  One other housekeeping matter.  The

10  defendant provided me a two page note of the research he has

11  done with respect to this motion.  He asks that I provide that

12  to you for consideration.  He's aware that I have filed a brief

13  and the government has filed a brief.  I'll provide a copy to

14  the government.

15          THE COURT:  I'm always happy to look at more

16  research, you can bring it up to me.  Give it to my clerk,

17  because I'm going to rule right now.  This is going to be an

18  order -- do you have a copy of what the defendant prepared?

19    MR. TRABOLD:  I do not, your Honor.  I'm perfectly

20  willing to accept a copy from the court and counsel subsequent

21  to the hearing.

22    THE COURT:  We'll do that.  In fairness, before I

23  rule on this, is there anything that anybody wants to say to me

24  now that the evidence has been taken; do you have anything you

25  want to say?


163


1    MR. TRABOLD:  Your Honor, I don't have anything

2  beyond the papers that the government has filed.  I think it

3  crystallizes our position.

4    THE COURT:  How about you?

5    MR. SCHROEDER:  Your Honor, the defendant would

6  stand on the motion, the brief that we filed, and the record of

7  this case that we have heard for the last several hours.

8    THE COURT:  All right.  This is going to be an

9  order.

10                    ORDER

11      The defendant moves to suppress items seized from

12  the residence and garage located at 19845 Hill Road,

13  Saegertown, PA.  Having heard the testimony and reviewed the

14  evidence at the suppression hearing, the following are my

15  findings of fact.

16          On or about April the 9th of 2003, Officer Randy

17  Detzel received information that the defendant, Mo Foley, was

18  living in Saegertown, PA and possibly involved in drug

19  distribution.  Specifically, he was informed that the

20  defendant, who was a fugitive or absconder at that time, having

21  previously been placed on parole and then left approximately

22  three years earlier, was living with his girlfriend, Christina

23  Weber, at the previously-described address.  The testimony also

24  indicates that the informant described with some particularity

25  the layout of the premises, describing it as a two-story house

164

1  with a large detached garage.

2          On or about April the 17th, 2003, Agent Bill Wehrle,

3  a parole officer, had a discussion with Officer Randy Detzel

4  relative to the information that Detzel had secured from his

5  confidential informant.  Pennsylvania State Police were

6  subsequently contacted to provide additional support.

7  Information was obtained prior to the police proceeding to the

8  residence that numerous people could be present at the

9  structure.

10         After a preliminary stake out of the residence,

11  which revealed, among other things, the arrival of three

12  different types of vehicles, the officers arrived at the scene

13  sometime between 10, 10:15 p.m.  Initially, Agent Wehrle and a

14  number of other officers proceeded to the residence.  They

15  knocked on the door, announced their purpose, and the door was

16  answered by an individual later identified as Christina Weber.

17  She informed the officers that Foley was not there.  However,

18  she indicated that a girlfriend of hers was.  That individual,

19  Angela Carbone, upon questioning said that her boyfriend, Paul

20  Butler, was in the garage.  Both individuals were advised

21  during the course of this initial encounter that they would or

22  could be arrested if they were hindering the apprehension or

23  arrest of the defendant.

24         At that point Agent Wehrle and Agent Verga proceeded

25  to the garage.  Agent Wehrle knocked on the garage door several

165

1  times.  While he was knocking, the lights and engine of a black

2  pickup truck, which was parked immediately in front of the bay

3  of the garage suddenly activated.  And an individual opened the

4  door and Agent Wehrle immediately brought him to the ground and

5  secured him.  This individual, if memory serves, would later be

6  identified as Butler.  Agent Wehrle then proceeded to enter the

7  interior of the garage.  As he did so, he observed a pair of

8  legs descending on a ladder from the second floor of the garage

9  to the first.  At that point he secured that individual and

10  handcuffed him.

11       Shortly after entering the garage, Agent Wehrle and

12  others observed in plain view the following material or

13  contraband.  A triple beam scale.  Several plastic baggies.

14  Marijuana residue.  A compact disc case with white powder on

15  it.  And in the vicinity of the door to the garage, a bag of

16  suspected marijuana.

17       Having secured the individual on the ladder, Agent

18  Wehrle then proceeded to the second floor, crawling up a ladder

19  and then entering the second-floor loft area through a trap

20  door.  He testified that he performed a protective sweep of

21  that area and while so doing, observed in plain view a 12-gauge

22  shotgun, and an open box containing marijuana seeds.  Shortly

23  after Agent Wehrle and the other officers entered the garage, a

24  commotion or yelling was heard outside.  Shortly thereafter,

25  one of the other officers entered the garage and advised that


166


1  the defendant Foley had been apprehended while attempting to

2  escape through the back.

3        Subsequent to the sweep of the premises in the

4  garage and the securing of the individuals there, Agent Wehrle,

5  along with three or four other officers, returned to the

6  residence.  Let me digress and say briefly that -- in addition

7  to having been informed that Mr. Butler was present in the

8  garage and having been informed that Mr. Foley was not there

9  by Christina Weber, I also find, based upon the uncontradicted

10  testimony, that the officers at that time requested of Ms.

11  Weber the right to search the premises, that is the residence,

12  which she denied.

13        In any event, Agent Wehrle and the three or four

14  other officers then returned.  When they returned, they advised

15  her of the arrests.  When they returned, Agent Wehrle had his

16 gun drawn, as did at least one of the other officers. Agent

17 Wehrle inquired as to whether a "search of the premises for the

18 officers' protection could be conducted." And Ms. Weber

19 permitted the officers to enter. She was asked by Agent Wehrle

20 where Foley's bedroom was and was conducted to it. In the

21 bedroom he found a fully loaded Mossburg 20-gauge shotgun,

22 AK-47 ammunition, magazine clips, various drug paraphernalia,

23 and an Army tool kit containing some type of ammunition.

24     Shortly thereafter, a search warrant was obtained on

25 April the 18th from the local district justice. The affidavit

167

1 of probable cause for the search recited in large measure the

2 events I previously described, and in the interest of brevity,

3 I incorporate it herein by reference as is fully set forth.

4     While the Fourth Amendment normally requires both

5 probable cause and a warrant prior to governmental officials

6 performing a search, that is not the case with respect with to

7 parolees. As stated in United_States_v._Baker, 221 F.3d 438
         ‾‾‾‾‾ ‾‾‾‾‾ ‾‾ ‾‾‾‾‾

8 (3rd Cir. 2000):

9     "In the case of parolees, however, the requisite

file:///A|/FOLEYSUP.TXT

10    level of suspicion is reduced and a warrant is not required.

11    In Griffin_v._Wisconsin, 483 U.S. 868, 871-72 (1987), a
      _____ __ _____

12    Wisconsin statute authorized probation officers to conduct

13    warrantless searches of probationers' homes when there were

14    'reasonable grounds' to believe that contraband would be found

15    there.  The court found that the operation of a state's

16    probation system presented 'special needs', beyond the need for

17    law enforcement, justifying an exception to the warrant and

18    probable cause requirements of the Fourth Amendment."

19           The Baker court then continued:
                   _____

20           "It is reasonable to allow a parole officer to

21    search whenever he reasonably believes that it is necessary to

22    perform his duties.  The decision to search must be based on

23    "specific facts', that the officer need not possess probable

24    cause."  Citing Terry_v._Ohio, 392 U.S. 1 (1968).
                      _____ __ _____

25           Now, in determining whether the officers had a


                              168


1    reasonable suspicion, it is necessary to view the matter

2  through the prism of the totality of the circumstances.

3  Insofar as the confidential informant is important on the

4  question of reasonable suspicion and, of course, in this case

5  he or she is, various factors have been identified which are

6  germane to the inquiry.  They would include, but not

7  necessarily be limited to, the credibility or veracity of the

8  informant, the basis of the informant's knowledge, and the

9  extent to which the police are able to independently verify the

10  reliability of the tip.  See United_States_v._Leos-Quijada,
                                    _____ _____ __ _____

11  107 F.3d 786, 792 (10th Cir. 1997).

12          In this case, first, it was uncontroverted that

13  Foley was in violation of his parole by walking away from a

14  work release detail a number of years earlier.  With respect to

15  the informant's information regarding Foley's location, as well

16  as his possible involvement in drug distribution, I find that

17  under the totality of the circumstances that it bears a

18  sufficient indicia of reliability.

19          Here, there was testimony from the police officer

20  that he knew this informant.  There was also testimony from the

21  police officer that he had worked with this informant several

22  times in the past, and that the informant had always on

23  previous occasions provided accurate information concerning the

24  criminal activities of others.

25          In addition, I note that the information that was


                                169


1  supplied was somewhat specific and ultimately at least in part

2  verifiable.  The description of the premises, as described by

3  the informant, was subsequently checked out and the

4  configuration of the structures on the premises were consistent

5  therewith.

6          Now, as previously indicated, when the officers

7  entered the garage, the following items were almost immediately

8  in plain view.  The triple beam scale, large ziploc bags,

9  marijuana residue on the floor, and a compact disc covered with

10  what appeared to be white powder.  And, as I previously

11  indicated, having observed a man climbing down a ladder from

12  the second floor, Agent Wehrle climbed to the second floor to

13  perform what he characterized as a protective sweep of that

14  area.  And recovered a shotgun and an open box containing

15  marijuana seeds.

16          At this point, then, it's appropriate to say a few

17  words on the law relative to protective sweeps.  In Maryland_v.

_____ __

18  Buie, 494 U.S. 325 (1990), the court stated the following with

____

19  respect to a protective sweep relative to an in-home arrest:

20      "We hold that as an incident to the arrest the

21  officers could as a precautionary matter and without probable

22  cause or reasonable suspicion look in closets and other spaces

23  immediately adjoining the place of arrest for which an attack

24  would be immediately launched.  Beyond that, however, we hold

25  that there must be articulable facts which taken together with

170

1  the rational inferences from these facts would warrant a

2  reasonable prudent officer in believing that the area to be

3  swept harbors an individual posing a danger to those on the

4  arrest scene."  The court concluded by stating:

5      "The Fourth Amendment permits a properly limited

6  protective sweep in conjunction with an in-home arrest when the

7  searching officer processes a reasonable belief based on

8  specific and articulable facts that the area to be swept

9  harbors an individual posing a danger to those on the arrest

10   scene.  That's Id. at 334 and 336.

11       In Sharrar_v._Felsing, 128 F.3d 810, (3rd. Cir.

12   1997), the court had the occasion to address the principles

13   announced in Buie in the context of an arrest that occurred

14   outside the residence.  The Sharrar court observed:

15       "Although this court has never ruled on the

16   circumstances in which a protective sweep of a home, as defined

17   in Buie, would be permissible as incident to an arrest

18   occurring just outside the home, those circuits that have

19   addressed the issue have uniformly held that the reasoning of

20   Buie is also applicable and that under those circumstances,

21   protective sweeps of the home in such situations are not per se

22   unreasonable."  Citing cases.

23       "Those courts also agree that a sweep incident to an

24   arrest occurring just outside the home must be analyzed under

25   the second prong of the Buie analysis requiring 'articulable

171

1  facts which, taken together with the rational inferences from

2  those facts, would warrant a reasonably prudent officer in

3  believing that the area to be swept harbors an individual

4  posing a danger to those on the arrest scene."

5        Finally, the court in Sharrar observed:

————————

6        "The reasonable possibility that an associate of the

7  arrestees remains at large to do mischief or cause danger to

8  the officers is the salient, although not necessarily only,

9  concern for which a warrantless protective sweep is justified.

10       Now, in Sharrar, the court noted that the police

————————

11  were aware that the defendant's confederates who had been with

12  the defendant were out of the house and in custody.  The court

13  concluded that the officers who swept the house had no

14  articulable facts to conclude that dangerous individuals

15  potentially remained in the building who could pose a threat to

16  the officers.  The Sharrar court stressed that a protective

————————

17  sweep cannot be based on speculation and it cannot be based on

18  no information.

19        Here, if I haven't said it already, let me, the

20  officers had an arrest warrant.  There was, in my view,

21  reasonable suspicion, based upon the information previously

22  provided by the informant, that the parolee absconder was

23  present on the premises.

24       Here, the evidence reveals that the actual arrest

25  was effected immediately behind the garage.  Upon entering the


172


1  premises, the police officers were immediately confronted with

2  not only one, but a second individual crawling down from the

3  loft.  They had already observed in plain view drug

4  paraphernalia.  They had just been startled by the dark vehicle

5  suddenly apparently being activated by a remote control device.

6  It was, in my view, under the previously-described case law

7  relative to protective sweeps imminently reasonable for Agent

8  Wehrle to conduct a protective sweep of the second-floor loft

9  area which was in every meaningful sense immediately adjacent,

10  albeit immediately above, the area where the other officers

11  were operating.  To determine under the circumstances whether

12  any threat from Mr. Foley or any of the other individual

13  confederates might exist in those areas.

14       In short, then, I find that the search that --

15  let me put it in logical steps.  In short, then, I find that

16  the contraband identified during the search of the garage was

17  entirely proper.  The officers were armed with a warrant for

18  arrest, they knocked and the door was answered.  Immediately

19  upon entering, the contraband was seen in plain view and for

20  the reasons previously indicated, I find that the protective

21  sweep, which revealed the presence of other contraband material

22  on the second floor, was justified.

23       I now turn to the propriety of the search of the

24  main residence.  The government here relies in part on the

25  doctrine of consent to justify its warrantless search of the

173

1  actual residence.  Before I forget, as a factual matter let me

2  say having looked at the photographs of both the detached

3  garage/barn and the residence, as well as listened to the

4  testimony, a considerable distance exists between the two,

5  and as a matter of fact the barn appears to sit at a different

6  elevation than the residence.

7       In any event that said, in U.S._v._Kim, 27 F.3d 947

_____ ___ ___

8    (3rd Cir. 1994), the Third Circuit stated the following:

9        "As the Supreme Court instructed, 'when a prosecutor

10   seeks to rely upon consent to justify the lawfulness of a

11   search, he has the burden of proving that the consent was, in

12   fact, freely and voluntarily given."  Schneckloth, 412 U.S. at

13   222.  "Whether a consent to a search was in fact 'voluntary' or

14   was the product of duress or coercion, expressed or implied, is

15   a question of fact to be determined from the totality of the

16   circumstances.  Thus whether consent was given is to be

17   resolved by examining all relevant factors, without giving

18   dispositive effect to any single criteria.  Certain factors

19   that courts consider in determining whether confessions were

20   voluntary, such as the age of the accused, his education, his

21   intelligence, whether he was advised of his constitutional

22   rights, and whether the request was repeated or prolonged, are

23   relevant to our examination."  Citing United_States_v.

24   Velasquez, 885 F.2d 1076 (3rd Cir. 1989).  And that's Id. at

25   955.

174

1        Here, having carefully considered the testimony and

2   applying the previously-described factors relative to the

3   totality of the circumstances, I find that Christina Weber's

4   consent to search was not voluntary.  And I do so on the basis

5   of the following.  Evidence here reflects that upon the

6   policemen's encounter with her, she refused access to the

7   house.  At that time she was advised, as well as was Ms.

8   Carbone, that they would be arrested if they were found to be

9   harboring a defendant or interfering with his arrest.

10  Subsequently, and after approximately seven officers had

11  arrived on the scene, at least three or four officers returned

12  and informed Ms. Weber that Mr. Foley and others had been

13  arrested.  At least one, if not more officers, had guns drawn,

14  but not pointed in the direction of Ms. Weber.  The evidence on

15  record is completely devoid as to any evidence concerning her

16  age, her sophistication, her previous contact with the criminal

17  justice system.  There has been testimony that she was informed

18  that she could refuse consent.  For purposes of this hearing, I

19  will accept that testimony as true.  That said, under the

20  totality of the circumstances, the previous denial, the guns

21  drawn, and the large number of police present at the scene that

22   night, and in the absence of any other information concerning

23   those other relevant points, I cannot say and do not find that

24   the consent was voluntary.

25          Alternatively, the government contends that a search

175

1   of the premises, that is the search of the residence was

2   justified as a protective sweep.  Under the

3   previously-described case law, I do not find that it was.

4   By the time that search took place, the parolee was already

5   under arrest.  The garage area had been secured and the

6   policemen who had participated in securing the garage were a

7   considerable distance away from the residence.  In short, the

8   law does not permit police officers to place themselves back in

9   harms way in order to effectuate a protective sweep.

10          That said, however, it is also well-settled that

11   even assuming that some portions of an affidavit are tainted,

12   it does not necessarily vitiate a warrant which is otherwise

13   validly issued upon probable cause reflected in the affidavit.

14   See, for example, United_States_v._Burton, 288 F.3d 91, 103
     _____ _____ __ _____

15   (3rd Cir. 2002).  In other words, the test that the court is

16  required to perform, in my view, is to excise from the

17  affidavit all references -- let me say that again so it's more

18  specific to this case.  In other words, the exercise that I'm

19  required to perform here, in my view, is to excise from the

20  affidavit all references to contraband or incriminating

21  evidence that was located in the residence, and then determine

22  whether the other evidence, remaining evidence in the

23  affidavit, would have been sufficient to support a warrant, of

24  a search warrant in any event.

25          In my view, the contraband which was located within


176


1  the garage, coupled with Foley's parolee's status, and

2  particularly in light of my previous conclusion that the

3  officers were legitimately in the garage and legitimately swept

4  it, independently supports the affiant of probable cause.  In

5  the interest of completeness, I incorporate by reference as is

6  fully set forth the contents of the affidavit of probable

7  cause, up to and including page two, which concludes with the

8  following sentence.  "This officer field tested the white

9  crystalline substance and the results were positive for

10    methamphetamine.  This officer also field tested the green

11    vegetable matter and the results were positive for marijuana."

12          To be clear, then, while I find that a search

13    predicated upon either consent or under the doctrine of

14    protective sweep with respect to the residence was

15    constitutionally infirm, I also find that the information in

16    the affidavit obtained in connection with the garage search was

17    independently adequate to support the issuance of the warrant.

18          And so, for all those reasons, the motion to

19    suppress is denied.

20

21          (Whereupon, at 2:58 p.m., the Suppression Hearing

22    was concluded.)

23

24                    - - -

25

                                177


1          C E R T I F I C A T E
            _ _ _ _ _ _ _ _ _ _ _

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12   _____

13   Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25